OFFICE COPY

JUDGE BATTS

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

04 CV 1773

| | |
|---|---|
| NARESH CHAND, on Behalf of Himself and All Others Similarly Situated, | ) Civil Action No. |
| | ) |
| Plaintiff, | ) CLASS ACTION COMPLAINT |
| | ) |
| | ) JURY TRIAL DEMANDED |
| vs. | ) |
| | ) |
| AMERICAN EXPRESS COMPANY, | ) |
| AMERICAN EXPRESS FINANCIAL | ) |
| CORPORATION, AND AMERICAN EXPRESS | ) |
| FINANCIAL ADVISORS, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

RECEIVED
MAR 04 2004
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of press releases and media reports about the American Express Company ("AEC"), American Express Financial Corporation ("AEFC") and American Express Financial Advisers, Inc. ("AEFA") and the facts forming the basis for the allegations herein. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal class action on behalf of a class consisting of all persons other than defendants who were AEFA clients between March 10, 1999 and February 9, 2004 (the "Class Period"), inclusive, and who purchased AEC Funds and/or Preferred Funds (as defined herein) during that period. Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Company Act of 1940 (the "Investment Company Act"), the Investment Advisors Act of 1940 (the "Investment Advisers Act") and common law.

2.       This action charges defendants with engaging in an unlawful and deceitful course of conduct designed to improperly financially advantage defendants to the detriment of plaintiff

and the other members of the Class. Defendants at all relevant times held out and marketed

AEFA brokers as financial advisors who, in exchange for a flat or hourly fee paid by the client,

would dispense reliable and unbiased investment advice for the sole purpose of helping clients

develop and maintain long-range investment plans.

3.      A typical AEC representation with respect to AEFA advisors is the one currently

appearing on the AEFA website.  It states that AEFA advisors *"concentrate first on*

*understanding your needs and goals, rather than promoting specific products or investments"*

(emphasis added) and that the advisors provide *"trusted advice to help you shape your personal*

*economy."*  https://www64.americanexpress.com/om/comp/template/TemplateA.jsp.

4.      In truth and in fact, defendants' undisclosed incentive arrangements operated as a

fraudulent scheme that exploited the misplaced trust of AEFA clients.  AEFA advisors were

under constant pressure to steer their clients to AEC Funds managed by defendant AEFC ---

and/or 11 Preferred Funds marketed under different brand names that AEC was paid to promote

(the "Preferred Funds") ---- and AEFA advisors in fact steered clients to AEC Funds and/or the

Preferred Funds regardless of the existence of comparable, better-performing investment

alternatives (*e.g.* a mutual fund with the same portfolio profile that was managed by an entity

other than AEFC and marketed under another, non-AEC brand name). This is evidenced by,

among other things, the fact that AEC Funds account for roughly 65% of AEFA advisor sales

even though over the last three and the last five years AEC funds have ranked in the bottom third

of all fund families.

5.      The advice for which AEFA clients paid a flat fee (plus brokerage commissions

for their transactions) was, therefore, not only biased by AEFA's undisclosed interest in pushing

AEC Funds and Preferred Funds, it was also financially damaging to AEFA clients because the

AEC Funds and Preferred Funds that AEFA foisted upon its clients were amongst the poorest

performing mutual funds then on the market.   Thus plaintiff and other members of the Class

were harmed by defendants' fraudulent conduct because they paid AEFA a flat fee for unbiased

expert advice and believed they were receiving such advice when, in fact, AEFA advisors were

strongly motivated to and did advise their clients to purchase AEC Funds and Preferred Funds

and because, based on the advice AEFA clients received from AEFA advisors, they invested in

such funds that underperformed relative to comparable investment alternatives.   Because of such

deception and manipulation, AEFA clients were prevented from making fully informed

investment decisions and their trust reposed in their AEFA advisors was violated.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of

the Exchange Act [15 U.S.C. § 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the

SEC [17 C.F.R. 240.10b-5]; Sections 206 and 215 of the Investment Advisers Act [15 U.S.C.

§§80b-6 and 80b-15], and common law.

7.      This Court has jurisdiction over the subject matter of this action pursuant to § 27

of the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 214 of the Investment Advisers Act, 15

U.S.C. §80b-14; and 28 U.S.C. § 1391(b).

8.      Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.

Defendants conducted other substantial business within this District and many Class members

reside within this District. At all relevant times AEC was, and is, headquartered in this District.

9.      In connection with the acts alleged in this complaint, defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## PARTIES

10.     Plaintiff Naresh Chand, as set forth in his certification, which is attached hereto and incorporated by reference herein, was an AEFA client between March 10, 1999 and February 9, 2004 and purchased shares or units of the AXP Cash Management Fund.

11.     AEC is incorporated in Delaware and its principal executive offices are located at World Financial Center, 200 Vesey Street, New York, New York.  AEC is in the business of providing travel-related services, financial advisory services and international banking services worldwide.  Financial advisory services and products include financial planning and advice, investment advisory services and various products, including insurance and annuities; investment certificates and mutual funds.

12.     AEFC is incorporated in Delaware and its principal executive offices are located at 50606 AXP Financial Center, Minneapolis, Minnesota.  AEFC, a wholly-owned subsidiary of AEC, is registered as an investment adviser under the Investment Advisers Act of 1940 and, at all relevant times, provided research, analysis and investment management services for the AEC Funds in exchange for a fee that was calculated as a percentage of assets under management. The AEC Funds are 64 mutual funds, marketed under the proprietary American Express trade mark that American Express categorizes as follows:  Growth Funds, Blend Funds, Value Funds, Global/International Funds, Income/Tax Exempt Funds, Sector Funds, and Index Funds.

13.     AEFA is incorporated in Delaware and its principal executive offices also are located at 50606 AXP Financial Center, Minneapolis, Minnesota.  AEFA, a wholly-owned subsidiary of AEFC and an indirect wholly-owned subsidiary of AEC, is a registered broker-dealer and registered investment advisor that, at all relevant times, maintained a nationwide sales force of approximately 11,600 so-called financial advisors.  In 2003, AEFA and AEFC accounted for approximately 24% of AEC's $26 billion in revenue and 22% of its net income.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b) (3) on behalf of a Class, consisting of all persons or entities who were

clients of AEFA and purchased or otherwise acquired shares or like interests in any of the

American Express Funds, and/or 11 outside fund families between March 10, 1999, and

February 9, 2004, inclusive, and who were damaged thereby.

15.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to plaintiff at this time and

can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds

or thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by AEC and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class

actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

18.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

            (a)     whether the federal securities laws were violated by defendants' acts as

alleged herein;

      (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts;

      (c)     Whether defendants breached their common law fiduciary duties; and

      (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

19.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Defendants Profited From The Misplaced Trust Of Their Clients

20.     AEFA is a registered broker dealer and investment advisor that maintains a nationwide sales force of approximately 11,600 financial advisors with varying relationships with AEFA; advisors may be AEFA employees who sell branded AEC products; "franchisees" who sell "branded" AEC products; and/or affiliates with Securities America, Inc. which is an "unbranded" broker-dealer.  AEFA markets a wide variety of AEC financial products including mutual funds, annuities, a variety of insurance products, and a variety of investment products.

21.     AEFC provides research, analysis and investment management services for the AEC Funds.  AEFC's fees were calculated as a percentage of funds under management and, therefore, tended to increase as the number of AEC investors grew and the size of their holdings increased.

22.     Together, AEFC, AEFA and their subsidiaries and affiliates make up AEC's American Express Financial Advisors business unit (the "Unit").  The Unit's "core business" is "financial planning and advice," according to AEC public filings.  AEC public filings state that AEFA's financial advisors "work with retail clients to develop strong relationships and long-term financial strategies" and AEC cites its client relationships as a competitive advantage over firms whose brokers focus solely on completing brokerage transactions, without providing advice.

23.     However, only a small portion of the Unit's income is derived from advisory fees paid by clients; in 2003, fees from financial plans and other advice services accounted for just $121 million of the Unit's $6.2 billion in revenue.  The lion's share of the $6.2 billion in revenue was derived from brokerage commissions that clients to pay AEFA, and, even more importantly, from the fees charged to AEC Funds investors for the management of the AEC Funds.

24.     Consequently, AEFA's fiduciary relationships with its clients were extremely important to defendants, not primarily because of the advisory fees that they generated, but because such relationships enabled defendants to influence their clients' investment decisions and, specifically, steer them to AEFA and Preferred Funds.  Since the management fees paid to AEFC were calculated as a percentage of total assets under management, defendants, acting in concert, had a strong financial incentive to tailor their advice to ensure that a critical component of any clients' long-term financial plan was an investment in AEC Funds, and the greater the investment, the better.  Additionally, defendants received "revenue sharing" payments from funds in eleven other fund families (the "Preferred Funds") calculated on the basis of the number of AEFA referrals to such funds, and therefore had a strong incentive to push those funds as well, unbeknownst to its clients.

- 7 -

25.    As a result of this incentive scheme, AEFA's primary loyalty was not to its clients and achievement of the clients' financial goals.  Rather, defendants viewed paying, AEFA clients primarily as a vehicle for generating investment management fees and "revenue sharing" payments so that AEC could achieve AEC's financial goals and increase the profitability of the ultimate corporate parent.

### Defendants Concealed Their Scheme And Marketed AEFA Advisors As Unbiased

26.    Disclosure of the true motivations of AEFA advisors would greatly reduce their influence over AEFA clients, and ruin AEFA advisors as a fee-generating mechanism for the Unit.  Consequently, AEFA's ulterior motives were not disclosed in any of the defendants' public filings or promotional material.   Rather, AEFA offered purportedly objective advice about investment decisions that it claimed are inextricably linked to the most intimate aspects of investors' lives, thus suggesting that AEFA advisors warrant the same trust that one might place in a marriage counselor, and expressly stated that their advice would be based on their understanding of the relationship between the clients' intimate personal and investment goals.  In this regard, the AEC website states as follows: ***Our advisors combine customized planning, sound advice, and the right products to help you meet your unique goals***.

http://finance.americanexpress.com/sif/cda/page/0,1641,14939,00.asp

27.    Potential AEFA clients were invited to "Get more information related to your ***specific needs***" *id* (emphasis added)  and offered the following linked life events: Retirement Planning, Having a Baby, College Planning, Job Change, Inheritance, Divorce, Savings Goal, Other.  The web page relating to marriage states, in relevant part, as follows:

> ***For today's newlywed economies, financial advice can be just as important as marital advice. American Express Financial Advisors understands how one event can impact your broader economic picture.*** With the right combination of advice and insight, we can help you take control of your personal economy. To learn more, request our FREE Financial Guide, and review some important financial tips for economies like yours: [. . .]

- 8 -

Review your income and cash flow needs. An added income may seem like a windfall, but you may have additional costs, like a larger mortgage.

Build a cash reserve. Keeping a cash reserve of three to six months of living expenses can help safeguard against unforeseen circumstances.

Update wills and beneficiary designations. Once you've said "I do," make sure your retirement plan beneficiary designations and your will reflect your new status.

Protect yourself and your spouse. As you join together financially, your need for life, health, disability and other protection may change. Eliminate policy duplication where possible, update beneficiaries and ensure that coverage limits are adequate.

Invest for your goals. Reaching your long-term goals requires the same type of commitment that makes a marriage successful. Once you agree on mutual financial objectives and set a price tag and time frame for them, you can create an investment plan to reach them together.

*Our unique Personal Economic Forecast can help you marry your finances with the right combination of advice, insight and solutions.* Simply:

Request a complimentary initial consultation with a financial advisor in your area, or

Request a FREE guide, Achieving Financial Success.  [Emphasis added.]

28.    At the bottom of the page, in smaller letters, there is the following statement with respect to the free financial consultation.

A Personal Economic Forecast is any written financial analysis provided with an American Express Financial Advisory Service. The nature and cost of the service varies and will be determined by an American Express financial advisor in consultation with the client, based on individual needs and objectives. There is no fee for an initial complimentary consultation. All Personal Economic Forecast illustrations are hypothetical and not a forecast or guarantee of specific investment results. American Express Financial Advisors, Inc., Member NASD. Copyright American Express Financial Corporation.

29.    The other categories contained the following claims, each accompanied by a prominent exhortation to request a complimentary initial consultation:

**Planning for College**

American Express Financial Advisors has been offering advice to college-bound economies semester after semester. *By looking at your broader economic*

- 9 -

*picture, we can show you how to achieve your education plans even as you save for other financial goals.* To learn more, request our FREE College Planning Guide, and review some important financial tips for college-bound economies: . . . [Emphasis added.]

## Having a Baby

For today's growing-family economies, financial advice can be just as important as child rearing advice. *American Express Financial Advisors understands how one event can impact your broader economic picture. With the right combination of advice and insight, we can help you take control of your personal economy.* To learn more, request our FREE College Planning Guide, and review some important financial tips for new-baby economies: . . . [Emphasis added.]

## Retirement

At American Express Financial Advisors, we believe that financial planning is important for every economy, especially a retiring one. Whether your retirement is two or twenty years away, our professional financial advisors can help. To learn more, request our FREE Retirement Guide, and review some important financial tips for retirement-focused economies:

## Job Change

Changing jobs often involves making an important decision about your employer-sponsored retirement plan. To help you take control of your new personal economy, try our Rollover Evaluator tool. Our knowledgeable financial advisors can also help you understand these options so you make *the right choice for your situation.* [. . .] [Emphasis added.]

## Divorce

At American Express Financial Advisors, we believe that financial planning is important for every family's economy, especially one facing a divorce. During this challenging time, financial details often can be overlooked, so it's important you find sound financial guidance. To learn more about how we can help, request our FREE Financial Planning Guide, and review these important financial tips: [. . .] [Emphasis added.]

## Inheritance

Expecting a lump sum of cash? *Take a new look at your personal economy.* Financial planning is important for every economy, especially one expecting a windfall. Whether it's an inheritance, retirement plan payout or insurance settlement, our professional advisors can help you take control of your personal economy. To learn more, request our Free Money Management Workbook and review these important tips: [. . .] [Emphasis added.]

## Savings Goal

Good things - like a second home or a comfortable retirement - come to those
who plan. At American Express Financial Advisors, we believe even better things
can come to those who plan their economy. ***By looking at your broader economic
picture, we can help you achieve all of your financial goals***. To learn more,
request our FREE Financial Planning Guide, and review these important financial
tips: . . . [Emphasis added.]

**Other**

If you're like most people, your financial situation is changing constantly. That's
why flexible planning is key. To help you take control of your evolving personal
economy, request our FREE Financial Planning Guide. ***Our knowledgeable
financial advisors can also help you learn more about the right strategies for
your situation***, such as: . . . [Emphasis added.]

30.    Nowhere do defendants reveal that their recommendations are based not on their

understanding of their client's financial personal needs and stage in life, but rather, solely or

primarily on their incentives to increase assets under AEFC's management.  AEC's revenue-

sharing arrangements with its 11 preferred funds also presented a clear undisclosed conflict of

interest, pitting the financial interest of the AEFA advisors against that of its clients. Disclosure

of this conflict is clearly material if clients are expected to make informed investment decisions.

However, knowing that a recommendation to purchase one of the Preferred Funds would be

given lesser weight if clients knew that AEFA was paid to give them, AEFA was strongly

motivated to, and did, conceal the truth regarding AEC's revenue-sharing arrangements.

Defendants failed to disclose their revenue-sharing arrangements on their website, in sales

brochures distributed to their clients or in any other form or manner.

**The Scheme Is Illuminated**

31.    On February 9, 2004, The *Wall Street Journal* published an article about AEC

under the headline, "Financial Plans: Selling for In-House Gains," which laid out the undisclosed

plan and scheme set forth herein.  The article stated in pertinent part as follows:

Investors who sign up for financial plans believe they are getting independent
advice tailored to their own needs.  But in one of several "open secrets" that have
been hazards for investors in this era, these plans often are little more than sales

tools that stand a better chance of making money for advisers and their firm than their clients.

*Critics say advisers rarely disclose that they get big bucks for directing investors to insurance products and mutual funds that provide the highest payouts, rather than offering investments that may pay the adviser less but are better-suited to the client's needs. Any information about potential conflicts is often vague at best and tucked into documents provided to investors when they are already well into the planning process.*

A good financial plan can be useful to chart an investor's future, of course. But "for a number of advisers it is a marketing hook," says Matthew McGinness, an associate director with Cerulli Associates, a market-research firm.

Many financial firms that provide such plans also offer proprietary, or in- house, financial products. *The potential for conflicts at American Express is intense because of its large stable of in-house mutual funds and insurance products. Proprietary products account for roughly 65% of adviser sales at AmEx, a regulatory filing says.*

*Many AmEx funds have been poor performers. Over the past three and five years, AmEx funds have, on average, ranked in the bottom third of all fund families, according to fund-tracker Morningstar, Inc. And AmEx receives special revenue- sharing payments from 11 outside fund families -- including AIM, Putnam, Strong and Van Kampen.*

An American Express spokesman says the company has been overhauling its fund operation in the past two years in an effort to boost returns. "We are absolutely committed to improving our performance," he says. Though fund performance has improved, AmEx funds still ranked in the bottom half of all fund families in the past 12 months, according to Morningstar.

*American Express Financial Advisors carries a lower profile than the firm's credit-card business, yet it accounted for roughly 24% of American Express's $26 billion in revenue and 22% of its net income last year. Fees from financial plans and other advice services accounted for just $121 million of the unit's $6.2 billion in revenue last year, according to regulatory filings. But the importance of planning to AmEx and the firm's more than 12,000 advisers is far greater: Three-quarters of total sales were generated by financial plans and advice services.*

Financial advisers use the planning process to draw clients in, but they depend on product sales for their livelihood, current and former advisers say. "The financial plan is their big claim to fame. But if that's all you did, you'd starve to death," says Judy Reed, an adviser who left American Express in early 2002 after more than a decade with the company. *Other former AmEx advisers say that when they presented a financial plan, they dubbed it "The Close," because of its usefulness in selling high-fee products, including proprietary funds and insurance that paid more to the salesmen -- and to the firm.*

An AmEx spokesman says "financial planning is at the core of what we do" and is "the best way to serve the needs of our clients," adding that the firm's approach to financial planning is "comprehensive." While many clients buy financial plans from AmEx and then use the firm to follow its recommendations, others pay for plans and implement the suggestions elsewhere or simply buy products from the firm, the spokesman says. "It's not one size fits all."

*In some cases, the pressure to sell in-house products is overt. Peggy Bigelow, a financial adviser who left American Express in 2001 after a year with the firm, says she was repeatedly criticized for recommending that her clients invest in outside mutual funds. Other former advisers say the training they received focused largely on sales techniques and the company's proprietary insurance products.* [Emphasis added.]

Mr. Haritos, a medical-equipment salesman in Mesa, Ariz., says he learned this lesson the hard way. When he discovered in 2001 that the investments recommended by his adviser were faring poorly, he closed the brokerage account, at a loss of roughly $14,000, or about 35% of his total investment, and moved his IRA to Charles Schwab Corp. He's still holding [his American Express] annuity, however, because he doesn't want to pay a costly surrender charge.

His suit, filed in October seeking class-action status, requests the refund of all financial-planning fees plus interest, according to Jon E. Drucker, Mr. Haritos's lawyer. Mr. Haritos says his AmEx adviser, Michael Vukonich, never told him he had financial incentives for recommending AmEx proprietary products, rather than outside investments offered by other companies. Mr. Vukonich declined to comment.

Other investors say they were directed to the firm's in-house mutual funds and other proprietary investments. Pierre Gangloff, a software engineer in Boston, says he was looking for tax and investment advice when he paid $600 for a financial consultation in 2002. Mr. Gangloff says his adviser persuaded him to invest a total of more than $17,000 in a dozen different AmEx mutual funds. Mr. Gangloff also invested $500 a month in an IDS variable universal life policy and moved $8,000 from a money-market account to a less-liquid AmEx Market Strategy Certificate -- a certificate of deposit tied to the Standard & Poor's 500. "I had the impression I would be . . . hiring some professional . . . who would work for me to figure out the best alternatives," he says. "But they were really pushing the American Express brand."

Some AmEx customers say they didn't learn about the potential conflicts until they were well into the planning process. Douglas Parker, a computer programmer in Baltimore, paid AmEx $450 for a financial plan in 2001. Mr. Parker says his AmEx adviser then sold him disability insurance, term insurance and two variable universal life-insurance policies run by IDS. Mr. Parker also rolled over $34,000 from three retirement accounts at Charles Schwab, T. Rowe Price Group Inc. and TIAA-CREF into AmEx annuities and an AmEx brokerage account that included investments in proprietary mutual funds. Mr. Parker says he

didn't receive any papers indicating that the adviser might have a conflict until after he had signed the planning agreement and rollover papers.

Says Mr. Parker: "They manage to get control of your funds before you know it."

### Additional Scienter Allegations

32.     As alleged herein, defendants acted with scienter in that defendants knew that the public statements issued or disseminated in the name of the defendants were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their knowledge of the true facts regarding defendants' revenue-sharing arrangements, their knowledge of the true facts regarding the use of financial advisors to generate brokerage commissions and management fees, their control over, and/or receipt and/or modification of AEC's materially misleading omissions and misstatements and/or their associations with AEC which made them privy to confidential proprietary information concerning AEC revenue-sharing arrangements, culpably participated in the fraudulent scheme alleged herein.

33.     Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for allowing the unlawful practices alleged herein, AEC received many millions of dollars each year in management fees and revenue sharing payments. Moreover, defendants were highly motivated to conceal the existence of the revenue-sharing arrangements from Class members, who would discount AEFA advisors' recommendations if they knew that AEFA was receiving financial benefits for making the recommendations.

## VIOLATIONS OF THE EXCHANGE ACT

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

34.    At all relevant times, the market for AEC Funds and the Preferred Funds was efficient for the following reasons, among others:

(a)    The AEC Funds and Preferred Funds met the requirements for listing, and were listed and actively bought and sold through a highly efficient and automated market;

(b)    As regulated entities, periodic public reports concerning the AEC Funds and Preferred Funds were regularly filed with the SEC;

(c)    Persons associated with the AEC Funds and Preferred Funds regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The AEC Funds and Preferred Funds were followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

35.    As a result of the foregoing, the market for the AEC Funds and the Preferred Funds promptly digested current information regarding the AEC Funds and the Preferred Funds from all publicly available sources and reflected such information in the respective AEC Funds and Preferred Funds' share prices.  Investors who purchased or otherwise acquired shares or interests in the AEC Funds Preferred Funds relied on the integrity of the market for such

securities as well as the integrity and honesty of AEC. Under these circumstances, all purchasers of the AEC Funds and the Preferred Funds during the Class Period suffered similar injury through their purchase or acquisition of AEC Funds and Preferred Funds.

### FIRST CLAIM

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

36.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37.    During the Class Period, each of the defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including plaintiff and other Class members, as alleged herein and cause plaintiff and other members of the Class to pay advisory fees, to purchase shares or interests in the AEC Funds and Preferred Funds and to otherwise suffer damages. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

38.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the AEFA advisor clients who purchased AEC Funds and the Preferred Funds' securities, including plaintiff and other members of the Class, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully decreased the value of their clients' accounts in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

39.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about defendants' revenue-sharing arrangements and other incentives to peddle the AEC Funds and Preferred Funds.

40.     These defendants employed devices, schemes and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from fees paid to them as a result of defendants' undisclosed arrangements to peddle the AEC Funds and the Preferred Funds and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon plaintiff and members of the Class.

41.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

42.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above the sales process was manipulated. In ignorance of the facts that the advice they were receiving was tainted by undisclosed conflicts of interest, and relying directly or indirectly on the false and misleading statements made by defendants and the purported honesty of AEC's business practices, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class paid advisory

fees and acquired the shares or interests in the Preferred Funds during the Class Period and were damaged thereby.

43.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and other members of the Class and the marketplace known of the truth concerning the revenue-sharing arrangements, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their shares or, if they had acquired such shares or other interests during the Class Period.

44.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

45.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Preferred Funds shares during the Class Period.

## SECOND CLAIM

### Against the AEC and AEFC
### For Violations of Section 20(a) of the Exchange Act

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Claim is brought pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants, as control persons of AEFA.

48.     It is appropriate to treat these defendants as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in AEFA's public representations are the collective actions of the AEC and AEFC.

49.     Each of AEC and AEFA acted as a controlling person of AEFA within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein. By virtue of their

operational and management control of AEFA' business and systematic involvement in the fraudulent scheme alleged herein, AEC and AEFC each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of AEFA, including the content and dissemination of the various statements which plaintiff contends are false and misleading. AEC and AEFC had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

50.     In particular, AEC and AEFC had direct and supervisory involvement in the operations of AEFA and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

51.     As set forth above, defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, AEC and AEFC are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of AEC Funds and Preferred Funds' securities during the Class Period.

## THIRD CLAIM

### Against AEFA Under Section 215 Of The Investment Advisers Act For Violations Of Section 206 Of The Investment Advisers Act

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

54.     AEFA served as an "investment adviser" to plaintiff and the other members of the Class pursuant to the Investment Advisers Act.

55.     As fiduciaries pursuant to the Investment Advisers Act, AEFA was required to serve plaintiff and the other members of the Class in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

56.     During the Class Period, AEFA, through its agents, breached its fiduciary duties to plaintiff and other members of the Class by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon plaintiff and other members of the Class. As detailed above, AEFA advisors failed to disclose that they were motivated to steer clients to AEC proprietary products and that, therefore, their advise was not unbiased and objective as claimed.  The purpose and effect of said scheme, practice and course of conduct was to enrich defendants at the expense of plaintiff and other members of the Class. AEFA, through its agents, breached its fiduciary duties owed to plaintiff and the other members of the Class by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon plaintiff and other members of the Class.

57.     AEFA is liable as a direct participant in the wrongs complained of herein.  AEFA, because of its position of authority and control over AEFA advisors, was able to and did control the conduct of AEFA advisors.

58.     AEFA had a duty to (1) disseminate accurate and truthful information with respect to the services provided by the AEFA advisors; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to plaintiff and the other

members of the Class.  AEFA participated in the wrongdoing complained of herein in order to

prevent plaintiff and other members of the Class from knowing of AEFA's breaches of fiduciary

duties including the charging of fees for supposedly unbiased financial advice that was not in

fact unbiased but rather, designed to steer clients to AEC proprietary products.

59.     As a result of AEFA's multiple breaches of their fiduciary duties owed to plaintiff

and other members of the Class, plaintiff and other members of the Class were damaged.

60.     Plaintiff and other members of the Class are entitled to rescind their investment

advisory contracts with the Investment Adviser Defendants and recover all fees paid in

connection with such contracts.

## FOURTH CLAIM

### Breach Of Fiduciary Duty Against  AEFA

61.     Plaintiff repeats and realleges each of the preceding allegations as though fully set

forth herein.

62.     As advisers to plaintiff and the other members of the Class, AEFA was a fiduciary

to the plaintiff and other members of the Class and was required to act with the highest

obligations of good faith, loyalty, fair dealing, due care and candor.

63.     As set forth above, AEFA, through its agents, breached its fiduciary duties to

plaintiff and the Class.

64.     Plaintiff and the Class have been specially injured as a direct, proximate and

foreseeable result of such breach on the part of the Investment Adviser Defendants and have

suffered substantial damages.

65.     Because AEFA acted with reckless and willful disregard for the rights of plaintiff

and other members of the class, AEFA is liable for punitive damages in an amount to be

determined by the jury.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and appointing plaintiff as lead plaintiff and his counsel as lead counsel for the Class and certifying him as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding punitive damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding plaintiff and the other members of the Class rescission of their contracts with AEFA, including recovery of all fees which would otherwise apply, and recovery of all fees paid to AEFA;

E.      Ordering restitution of all unlawfully or discriminatorily obtained fees and charges;

F.      Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure that plaintiff and the Class have an effective remedy;

G.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demand a trial by jury.

Dated: March 4, 2004

                              MILBERG WEISS BERSHAD
                              HYNES & LERACH LLP

                              By: _____
                              Steven G. Schulman (SS-2561)
                              Peter E. Seidman (PS-8769)
                              Andrei V. Rado (AR-3724)
                              One Pennsylvania Plaza
                              New York, NY 10119-0165
                              (212) 594-5300
                              Fax: (212) 868-1229

                              **Attorneys for Plaintiff**

# CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Naresh Chand, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.   I have reviewed the complaint of American Express Company & certain of its' affiliates prepared by Milberg Weiss Bershad Hynes & Lerach LLP, whom I designate as my counsel in this action for all purposes.

2.   I did not acquire the referenced fund units at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.   I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.   I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.   I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except:_____

6.   I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

7.   Since February 28, 1999, I have made the following transactions in referenced funds, and will provide records of those transactions upon request:

| Fund/Ticker | Trade Date | No. of Shares/Units | Price Per Share/Unit | Buy or Sell |
|-------------|------------|---------------------|----------------------|-------------|
| INAGX | 03/15/00 | 652.90 | 36.34 | Buy |
| POTBX | 03/17/00 | 1066.325 | 46.89 | Buy |
| PNVBX | 03/20/00 | 748.832 | 31.68 | Buy |
|  |  |  |  |  |
|  |  |  |  |  |

Please use and attach additional pages if necessary.

**I declare under penalty of perjury that the foregoing is true and correct**

Executed this _____ day of _____, 2004

_N Chand_
_____
Naresh Chand

_____
Signature

DOCS\181063v1

PAGE 3/3 * RCVD AT 2/20/2004 4:27:46 PM [Eastern Standard Time] * SVR:NYRFAX01/1 * DNIS:4436 * CSID: * DURATION (mm-ss):01-12       TOTAL P.03