OFFICE COPY

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN EXPRESS FINANCIAL ADVISORS SECURITIES LITIGATION | ) Civil Action No. 1:04-CV-1773 <br> ) <br> ) CONSOLIDATED AMENDED CLASS <br> ) ACTION COMPLAINT <br> ) <br> ) JURY TRIAL DEMANDED |

Plaintiffs, by and through their counsel, allege the following based upon the investigation

of counsel, which included interviews with persons with knowledge of the conduct complained

of herein, a review of United States Securities and Exchange Commission ("SEC") filings, as

well as other regulatory filings, reports, advisories, press releases, and media reports about the

American Express Company, American Express Financial Corporation ("American Express

Financial") and American Express Financial Advisors, Inc. ("American Express Advisors")

(collectively, "American Express" or "Defendants") and the facts forming the basis for the

allegations herein.  Plaintiffs believe that substantial additional evidentiary support will exist for

the allegations set forth herein after a reasonable opportunity for discovery.

### INTRODUCTION

1.     This is a federal class action arising out of the failure of American Express to

disclose an unlawful and deceitful course of conduct they engaged in that was designed to

improperly financially advantage defendants to the detriment of plaintiffs and other members of

the class.  American Express calls its broker-dealers "financial advisors", claiming they will

provide "trusted advice" that focuses on an investor's "needs and goals" rather than "promoting

specific products of investments."  Recently learned facts, however, show that the truth is far

different and have revealed an insidious scheme at American Express to sell investors pre-

determined Financial Plans and canned "financial advice" and then, pursuant to this advice, to

push investors into a select number of pre-determined mutual funds (identified in Exhibit A attached hereto and collectively referred to herein as "Shelf Space Funds") with which American Express had an undisclosed kickback arrangements – referred to as buying "shelf space" at American Express – whereby American Express received illegal payments and other improper incentives from these mutual funds Shelf Space Funds in exchange for American Express pushing American Express clients into the Shelf Space Funds.

2.    In other words, instead of offering fair, honest and unbiased recommendations to plaintiffs and other investors, American Express "financial advisors" gave pre-determined recommendations, pushing clients into a pre-selected limited number of mutual funds in order to reap millions of dollars in kickbacks from the Shelf Space Funds, with whom it had struck secret deals. As a result of their material omissions and conduct regarding this scheme – and the inherent conflicts of interest it created - Defendants are now liable under the Securities Act of 1933 (the "Securities Act"); the Securities Exchange Act of 1934 (the "Exchange Act"); the Minnesota Deceptive Trade Practices Act; the Minnesota Consumer Fraud Act; the Minnesota False Advertisement Act; the Minnesota Unlawful Trade Practices Act; and for breaches of their common law fiduciary duties to a class (the "Class") of all persons or entities, other than defendants, who were American Express clients between March 10, 1999 and February 9, 2004 (the "Class Period"), inclusive, and who purchased Space Funds during that period. The Minnesota state law claims are asserted on behalf of a subclass of all persons, other than defendants, who also purchased an American Express Financial Plan, Financial Management Proposal or Financial Advisory Proposal (collectively "Financial Plan") during the Class Period.

3.    During the Class Period, American Express used its nationwide network of American Express financial advisors and the sale of bogus Financial Plans to improperly steer

plaintiffs and other members of the Class into the Shelf Space Funds affiliated with American Express. By purchasing the Financial Plans and investing in the Shelf Space Funds, plaintiffs and other members of the Class paid hundreds of dollars for bogus and misleading Financial Plans and/or financial advice only to be steered into pre-determined Shelf Space Funds. Then, to exacerbate plaintiffs' injury, plaintiffs received diminished returns on their Shelf Space Fund investments as those Shelf Space Funds improperly used investor assets to pay kickbacks to American Express as part of a *quid pro quo* arrangement to have American Express push even more investors into the Shelf Space Funds. This practice has since come under scrutiny of the National Association of Securities Dealers ("NASD"), with the NASD condemning the practice and recommending that proceedings be brought against American Express for potential violations of the federal securities laws and the rules and regulations of the SEC and NASD.

4.      Defendants' motivation, though concealed from investors throughout the Class Period, is now apparent. American Express was motivated to engage in this undisclosed plan and scheme because it (a) reaped millions of dollars in fees for its bogus Financial Plans and investment advice; (b) received undisclosed kickbacks from the Shelf Space Funds in exchange for American Express placing its clients into those Funds; and (c) collected fees for managing and advising certain of the Shelf Space Funds under its control which were calculated as a percentage of funds under management, and, therefore, tended to increase as the number of investors grew.

5.      As detailed below, American Express and its defendant subsidiaries, while claiming to provide unbiased, objective financial planning advice and objective recommendations in the best interest of their clients, made a standard business practice of giving their customers self-serving and biased investment advice for the sole purpose of pushing

customers into Shelf Space Funds as part of a secret plan and scheme to improperly generate fees and other revenue.

6.      The Financial Plans sold by American Express financial advisors were neither objective nor tailored to the particular needs of the clients, but rather, were part of the undisclosed and illegal plan and scheme to use American Express's nationwide financial advisor network to steer unwitting clients, who thought they were getting unbiased advice, into inferior Shelf Space Funds and other American Express financial products, pre-determined by American Express's financial advisors.

7.      In truth and in fact, defendants' undisclosed incentive arrangements operated as a fraudulent scheme that exploited the misplaced trust of American Express clients. American Express advisors were under constant pressure, and had enormous financial incentive to steer their clients to Shelf Space Funds. This pressure existed both in the form of improper revenue-sharing (*i.e.* direct payments from the mutual funds to the brokerage house) and directed brokerage payments (*i.e.* allotting trades – and the lucrative commissions that are a result of the trades - in the securities that made up a mutual fund investment portfolio) from the Shelf Space Funds as well as coercive tactics by American Express management that threatened American Express brokers with demotion or termination if they failed to push the Shelf Space Funds.

8.      The advice for which American Express clients paid a fee (plus brokerage commissions for their transactions) was, therefore, not only biased by American Express's undisclosed interest in pushing Shelf Space Funds, it was also financially damaging to American Express clients because the returns on the Shelf Space Funds were diminished due to the improper payments paid from the assets of Shelf Space Fund investors that were used as kickbacks to reward American Express for pushing their Funds.

9.     Thus, plaintiffs and other members of the Class were harmed by defendants' fraudulent conduct because (a) they paid American Express a fee for unbiased expert advice and believed they were receiving such advice when, in fact, American Express financial advisors had an undisclosed material conflict of interest that made it impossible for them to render impartial and objective advice concerning the Shelf Space Funds and because (b) based on the advice American Express clients received from American Express financial advisors, they invested in such funds that underperformed due to the diminished returns on their Shelf Space Funds that was a result of the Shelf Space Funds improperly using investor assets to pay kickbacks to American Express to push the Funds.  Because of such deception and manipulation, American Express clients were prevented from making fully informed investment decisions, and their trust reposed in their American Express advisors was violated.

10.    As described by Sen. Peter Fitzgerald (R-Ill.) in a January 28, 2004 Los Angeles Times article about a Senate committee hearing on mutual fund abuses, the mutual fund industry is "'the world's largest skimming operation'" and comparable to "'a $7 trillion trough' exploited by fund managers, brokers and other insiders."

11.    Realizing that disclosure are of this scheme and the inherent conflicts of interest it created would undermine any investment recommendations made by American Express financial advisors, Defendants failed to disclose any of their improper conduct to plaintiffs and other members of the Class, thereby concealing information significant to any reasonable person deciding how to invest his or her money.

12.    The truth was finally revealed on February 9, 2004, in a Wall Street Journal article about American Express headlined, "Financial Plans: Selling for In-House Gains," which laid out the undisclosed plan and scheme set forth herein.

13.     Then, in May 2004, American Express disclosed that it had received notification from the staff of the NASD indicating that it had made a preliminary determination to recommend that the NASD bring an action against American Express for potential violations of the federal securities laws and the rules and regulations of the SEC and the NASD.  The NASD staff's allegations related to American Express's practices with respect to various revenue sharing and directed brokerage shelf-space arrangements pursuant to which American Express received payments from certain mutual funds as part of a *quid pro quo* arrangement with American Express to push their funds.  In particular, the NASD has alleged that American Express (i) failed to properly disclose such revenue sharing arrangements, (ii) failed to properly disclose such revenue sharing arrangements in its brokerage confirmations and (iii) improperly received directed brokerage.  The scheme uncovered by the NASD is essentially the same scheme alleged herein.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 12(a)(2) and 15 of the Securities Act (15 U.S.C. § 77l(a)(2) and § 77(o)); Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. 240.10b-5); the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.43); the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.68); the Minnesota False Advertising Act (Minn. Stat. § 325F.67); the Minnesota Unlawful Trade Practices Act (Minn. Stat. §325D.09); and, and the common law.

15.     This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act (15 U.S.C. § 77v); § 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa); 28 U.S.C. 1331; 28 U.S.C. § 1367(a); and 28 U.S.C. § 1391(b).

16.     Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. At all relevant times Defendant American Express Company was, and is, headquartered in this District.

17.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Lead Plaintiffs

18.     Lead Plaintiff Leonard D. Caldwell, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Shelf Space Funds through American Express during the Class Period.  Mr. Caldwell also purchased an American Express Financial Plan during the Class Period.

19.     Lead Plaintiff Carol M. Anderson, as set forth in her certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Shelf Space Funds through American Express during the Class Period.

20.     Lead Plaintiff Donald G. Dobbs, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Shelf Space Funds through American Express during the Class Period.

21.     Lead Plaintiff Kathie Kerr as set forth in her certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Shelf

Space Funds through American Express during the Class Period. Ms. Kerr also purchased an American Express Financial Plan during the Class Period.

22. Lead Plaintiff Susan M. Rangeley as set forth in her certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Shelf Space Funds through American Express during the Class Period.

23. Lead Plaintiff Patrick J. Wollmering as set forth in his certification previously filed with the Court and incorporated by reference herein, shares or units of certain of the Shelf Space Funds through American Express during the Class Period. Mr. Wollmering also purchased an American Express Financial Plan during the Class Period.

**Defendants**

**The Parent Companies and its Executive Officer**

24. Defendant American Express is incorporated in Delaware and its principal executive offices are located at World Financial Center, 200 Vesey Street, New York, New York. American Express is in the business of providing travel-related services, financial advisory services and international banking services worldwide. Financial advisory services and products include financial planning and advice, investment advisory services and various products, including insurance and annuities, investment certificates and mutual funds.

25. Defendant American Express Financial is incorporated in Delaware and its principal executive offices are located at 50606 AXP Financial Center, Minneapolis, Minnesota. American Express Financial, a wholly-owned subsidiary of American Express, is registered as an investment advisor under the Investment Advisers Act of 1940 and, at all relevant times, provided research, analysis and investment management services for the Shelf Space Funds that were under management of one or more of American Express's subsidiaries in exchange for a fee that was calculated as a percentage of assets under management.

26.     Defendant James M. Cracchiolo ("Cracchiolo") has served as President and Chief Executive Officer of American Express Financial and Chairman and Chief Executive Officer of American Express Advisors since March 2001.  Prior thereto, Defendant Cracchiolo had been President and Chief Executive Officer of American Express Financial Advisors since June 2000. Defendant Cracchiolo also serves as an Executive Officer of American Express as its Group President of Global Financial Services.

27.     Defendants American Express, American Express Financial and Cracchiolo are herein called the "Control Person Defendants."

**The Broker Dealer**

28.     Defendant American Express Advisors is a registered broker-dealer providing various investment services.  American Express Advisors is also the employer or franchisor of the broker-dealers who sold the Financial Plans and Shelf Space Funds to plaintiffs and the other Class Members.  American Express Advisors principal executive offices are located at 50606 AXP Financial Center, Minneapolis, Minnesota.  American Express Advisors is a wholly-owned subsidiary of American Express Financial and an indirect wholly-owned subsidiary of American Express.

29.     In 2003, American Express Advisors and American Express Financial accounted for approximately 24% of American Express's $26 billion in revenue and 22% of its net income.

**Nominal Defendants - The American Express Funds**

30.     The American Express Funds listed in Exhibit B are named as nominal defendants to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

**The John Doe Defendants**

31.     The true names and capacities of defendants sued herein as John Does 1 through 100 are other active participants with above-named defendants in the widespread unlawful conduct alleged herein whose identities have yet to be ascertained. Such defendants sponsored or otherwise participated in the unlawful and deceitful course of conduct alleged herein. Plaintiffs will seek to further amend this Complaint to state the true names and capacities of said defendants when they have been ascertained.

## SUBSTANTIVE ALLEGATIONS

**Defendants Improperly Used American Express's Financial Plans and Purported "Unbiased" Financial Advice As A Means To Induce American Express Clients To Purchase Shelf Space Funds**

32.     American Express Advisors is a registered broker dealer and investment advisor that maintains a nationwide sales force of approximately 12,000 financial advisors.

33.     American Express Advisors' "core business" is "financial planning and advice," according to American Express public filings. American Express public filings state that financial advisors "work with retail clients to develop strong relationships and long-term financial strategies" and American Express cites its client relationships as a competitive advantage over financial firms whose brokers focus solely on completing brokerage transactions, without providing financial planning and advice.

34.     The central element of American Express's "financial planning and advice" is the Financial Plan. As of the end of 2003, more than one million American Express clients had a Financial Plan.

35.     According to a number of former American Express financial advisors who worked for American Express during the Class Period, the Financial Plan was prepared after an initial consultation between the client and the American Express financial advisor, during which

the client provided extensive personal and financial information to American Express. According to these former American Express financial advisors, American Express financial advisors were required to present a canned scripted sales pitch, internally known as the Personal Money Management Script, which was designed specifically to persuade clients of the purported need to purchase an American Express Financial Plan. During the initial consultation, American Express financial advisors represented that each Financial Plan took between 10 and 30 hours to create and that each Financial Plan was personalized and customized to meet the financial needs of each American Express client based upon the expertise of the American Express financial advisor. American Express financial advisors on average charged their clients $500 for each Financial Plan.

### Defendants' Material Omissions Regarding the True Nature of its Advice

36.     In order to convince potential clients to invest their money with American Express, American Express went to great lengths to distinguish itself from other financial brokerage firms. In its public filings, press releases, public statements, marketing materials and on its website, American Express touted the training, ability and experience of American Express's financial advisors to provide American Express clients with unbiased, objective, customized financial planning and trustworthy advice. American Express also represented that most American Express clients were so satisfied with American Express's financial planning and advice that they had recommended American Express to others.

37.     With respect to the training, ability and expertise of American Express's financial advisors, American Express represented that its financial advisors provided "sound advice" and specific recommendations based on the advisors' "expertise," and that American Express advisors were "trusted and knowledgeable." American Express stated as follows:

**Trained and Qualified Advisors.** Our approach to financial planning is unlike many others, in that we focus on the "big picture" to help ensure no area of your financial life is left unchecked. With that in mind, our financial advisors are trained in all areas of planning, including investment, retirement, college, estate and income tax planning. In addition to their required licenses and registrations, many of our financial advisors expand their training and maintain industry certifications, such as the Certified Financial Planner designation.

*   *   *

Our financial advisors are knowledgeable and highly trained career professionals dedicated to helping you achieve your financial goals.

*   *   *

American Express financial advisors have a wide range of business and educational backgrounds. They undergo extensive financial planning and product training before becoming registered representatives and working with clients.

*   *   *

American Express financial advisors are required to have appropriate licenses and registrations to transact business, including an NASD registration, required state securities and insurance licenses, and where required, a state investment advisor agent registration. In addition, financial advisors are required to complete a comprehensive training program developed specifically for the American Express Financial Advisory Service.

*See* http://finance.americanexpress.com; American Express Financial Advisory Service

Brochure. All of these representations were misleading as they omitted material

information as explained below.

38.    With respect to American Express providing its clients with unbiased, objective,

customized financial planning and trustworthy advice, American Express represented as follows:

American Express strives to help clients achieve their financial objectives prudently and thoughtfully through a long term relationship based on trusted, knowledgeable advice.

*   *   *

Get one-to-one advice from an expert to help make your goals become a reality.

Our advisors combine customized planning, sound advice, and the right products to help you meet your unique goals

From college planning to retirement, American Express financial advisors help you achieve your dreams. And because everyone is different, we believe the best financial plan is one that is customized to your individual needs.

We are committed to **working with you over the long term and providing financial advice that's personalized to you,** your unique situation, and your individual goals – we see it as the key to helping you make the right financial decisions.

We introduced one of the first mutual funds, and today we offer a variety of competitive investment and retirement products – our own and from other leading companies.

*      *      *

We've built our reputation as a leading financial planning company with individualized, high-quality service. Today millions of clients trust us for sound financial advice.

*      *      *

American Express Financial Advisors' mission is to help clients achieve their financial objective – prudently and thoughtfully – through a long-term financial planning relationship with a trusted and knowledgeable advisor.

We are a values-driven company, and our values guide our business decisions. One of those values is, "Clients come first." We are deeply committed to client satisfaction and service.

We emphasize sound financial planning along with a variety of personal financial services and investment opportunities. We can help you identify and then prudently and thoughtfully meet your unique financial concerns and objectives.

*      *      *

American Express Financial Advisors Inc. (the Company) offers a comprehensive approach to help you uncover and meet your financial needs and objectives.

This service is tailored to address your specific needs and objectives, analyze your current financial situation and goals and present strategies and recommended actions to help you attain your goals.

*See* American Express 2003 10-K; http://finance.americanexpress.com; American

Express Financial Advisory Brochure. All of these representations were misleading as

they omitted material information as explained directly below.

**Defendants Failed To Disclose The Truth About**
**American Express And Its Financial Advisors**

39.    American Express's representations that it provided its clients with experienced, unbiased, objective and trustworthy advice were materially misleading as they failed to disclose the truth about American Express and its financial advisors.

40.    American Express financial advisors were not "knowledgeable and highly trained career professionals," were not "trained in all areas of planning," and did not "undergo extensive financial planning and product training before becoming registered representatives and working with clients." In fact, most of the financial advisors who were American Express employees had no knowledge, experience or training in financial planning, had not been "trained in all areas of planning," and had not undergone "extensive financial planning" training before working with American Express clients. Moreover, American Express capitalized on the inexperience of its workforce in order to have them push clients into the Financial Plans and Shelf Space Funds that were affiliated with American Express through a revenue sharing/directed brokerage kickback scheme.

41.    According to a number of former American Express financial advisors who worked for American Express during the Class Period, American Express financial advisors typically were recent college graduates with no experience or training in the financial industry. According to one of these former financial advisors, American Express liked to hire people right out of college that had no experience with the financial markets or financial planning. According to another one of these former financial advisors, American Express would only give these new employees a couple of weeks training and then pass them off as professional financial advisors. Indeed, American Express actually discouraged people with financial services experience from applying to work at American Express. According to one former American Express financial

advisor who worked for American Express during the Class Period, American Express targeted these young, inexperienced employees, rather than experienced financial professionals, because they were more susceptible to being trained by American Express management to engage in the illegal, improper and unethical activities that were an integral part of American Express's business.

42.     In other words, according to a number of former American Express financial advisors who worked for American Express during the Class Period, once the financial advisors were hired by American Express, they were not trained in financial planning, but rather in how to sell poorly-performing American Express affiliated products, *i.e.* the Shelf Space Funds.

43.     According to a former American Express financial advisor who worked for American Express during the Class Period, during the first few months of employment, virtually all of the training focused on how to sell American Express affiliated financial products, such as the Shelf Space Funds.   This training included memorizing various scripts that financial advisors were required to recite verbatim when meeting with clients.  Nor were the financial advisors trained in how to prepare the Financial Plans.  Instead, the financial advisors were instructed simply to obtain basic personal and financial information from their clients so that American Express managers could input that information into a computer software application which, in a few minutes, generated a Financial Plan that invariably recommended purchasing the "happy meal," *i.e.* American Express affiliated financial products.  According to a former American Express financial advisor who worked for American Express during the Class Period, standard templates were used such that the same products were recommended every time.

44.     According to a former American Express financial advisor who worked for American Express during the Class Period, all American Express financial advisors with less

than one year of experience, which made up a significant portion of the financial advisors since employee turn-over in the first year alone was between 80% and 90%, were required to attend daily and weekly meetings and classes with their managers. These meetings and classes were little more than vehicles for admonishing financial advisors about the importance of selling American Express affiliated financial products and instructing them in high pressure sales technique. According to a former American Express financial advisor who worked for American Express during the Class Period, management exhorted financial advisors to sell American Express affiliated mutual funds to everybody. During these meetings, financial advisors would be required to present the scripted sales presentation to managers, who played the role of reluctant clients. What was not provided at these meetings was substantive training in financial planning. As a result, while American Express financial advisors learned how to sell American Express affiliated financial products, they did not learn how to be financial planners.

45.     Most American Express financial advisors were so unsophisticated and inexperienced, the scripts they were required to memorize to be used during the sales process even instructed the financial advisors in proper posture and tone. For example, in the Personal Money Management Script that was to used during the initial consultation, at the point in the consultation when the financial advisor was to begin the process of soliciting sales leads from the current client, the financial advisor was instructed as follows: "Tone: Clear and Expectant. Physical: Seated upright over table with pen poised over pad."

46.     According to several former American Express financial advisors who worked for American Express during the Class Period, while American Express publicly touted the experience of its highly trained career professionals, American Express failed to disclose that virtually all of American Express financial advisors left American Express within two years,

with the retention rate of first year financial advisors being only between approximately 10% and 20%. Thus, for a new client of American Express, there was a significant likelihood that any particular client's financial advisor would be yet another new American Express employee, completely inexperienced and untrained.

47.    In fact, it was such a significant problem that American Express managers were compensated in large part based upon the retention rate for first year financial advisors. American Express never disclosed the magnitude of the ongoing retention problems at American Express or what ramification this had for American Express clients seeking "knowledgeable," "experienced," and "highly trained career professionals."

48.    The financial planning and advice that provided by American Express financial advisors was not "unbiased," "objective," "customized financial planning," or "trustworthy," as represented by American Express. Instead, it was highly biased in favor of American Express. There was no customized financial planning. Instead, there was a standard allocation formula at American Express that all American Express financial advisors were pressured to follow. Thus, regardless of the financial position or goals of any particular American Express client, the result always was the same, a portfolio of between 80% and 90% invested in American Express affiliated financial products, *e.g.* the Shelf Space Funds. A number of former financial advisors have confirmed that this standard portfolio of American Express affiliated financial products that was recommended to all American Express clients who purchased a "Financial Plan" was derogatorily referred to within American Express as the "happy meal."

49.    The following comments and observations were obtained from former American Express financial advisors and managers who worked in American Express offices throughout the United States. These former financial advisors confirm that the financial advice provided by

American Express was highly biased in favor of American Express and that the advice was

neither customized nor objective:

> Anyone who is considering becoming an advisor should stay away from AEFA!!
> They treat clients only as vehicles to more commission....I have heard advisors
> calling clients "suckers", "mother-f...ers" and to "f...." the client etc. Can you
> imagine anyone like that is going to provide unbiased advice??

> Although advisors claim they are able to sell many products offered by several
> different companies, 90%+ of clients are conned in to proprietary products that
> are often not competitive with their peers and have long surrender schedule.

> I barely made it through my first year because I refused to sell vuls and annuitys
> when not appropriate.  I can't tell you how many times I got lectured on the
> importance of making money. A common refrain at AEFA from my managers
> was "you can't help your clients if you don't earn enough to stay in business, so it
> is okay to put people in things they don't need."

> Amex wants you to sell their products and makes sure you sell certain products to
> almost everyone.  You have to sell: VULs (variable universal life), variable
> annuities (they call it RAVA there), disability, long term care, and mutual funds
> (their fund family made up 95+ percent of funds sold at my old office).  In years 3
> and beyond can be more selective on what you sell, but years 1-2 it's all what the
> FVP says.

> The ticket charges are not the same.  The ticket charges are much more for non-
> prop than they are for prop.  That's why many P2 advisors still sell prop even
> though they don't have managers pressuring them, because it costs them more to
> sell non-prop. P1 doesn't pay ticket charges just P2.  No matter what level you are
> AMEX always has you by the throat.  This is Amex's sneaky way with pushing
> prop.  The rules say you can't reward advisors for selling prop but it doesn't say
> you can't punish them for selling non-prop.

> "The new PMM [Personal Money Management] script before I left said
> independent and unbiased advice. HAH!!!"

> Also the fact that they charge someone a fee for their supposed "unbiased" advice
> and then turn around and push their crappy products instead of truly
> recommending good products is wrong.  The fact that they misrepresent
> themselves and their service by charging high fees for work that is done by
> inexperienced advisors who have no idea what they are doing.  The AMEX motto
> for hiring advisors is "hire the masses, give them the classes, and then fire their
> asses"

The object of the P1 program is to tie up as much money for as long as possible, by making it as difficult/costly as possible for the clients to withdraw their money for any reason.

The reason that Amex sells more shelf funds in comparison to others is because in the office I was in, it is the only way to earn yourself an office. You are a cubicle drone until you earn enough prop gdc to put you in an office, currently about 63k on a rolling 12 month period.

50.    The compensation system and reporting structure at American Express was set up to push the sale of American Express affiliated financial products over everything else. The compensation of the financial advisors depended in large part on the sale of American Express affiliated financial products. Several former American Express managers have confirmed that the compensation and bonuses of every American Express manager, vice president and group vice president was dependent on the amount of American Express affiliated financial products sold, particularly as compared to the amount of non- affiliated American Express products that were sold. American Express managers were expected to have the financial advisors under them selling between 80% and 90% of American Express affiliated financial products. Managers were judged on their ability to influence and control the financial advisors under them, which was reflected primarily in the amount of American Express affiliated financial products sold by those financial advisors.

51.    There was enormous pressure at all levels of American Express to meet or exceed the 80% to 90% American Express sales quota. There were weekly reports distributed by American Express senior management which detailed the amount and type of American Express affiliated financial products sold by each  manager each week. Thus, every American Express manager, vice president and group vice president was aware every week how his or her office, group or region had performed compared to every other American Express office, group or region.

52.     According to a former American Express manager who oversaw American Express financial advisors during the Class Period, as well as several former American Express who worked at American Express during the Class Period, with respect to the American Express financial advisors, the pressure to sell American Express affiliated financial products came in many forms. First, the need to sell American Express affiliated products was reinforced at daily, weekly and monthly meetings with American Express management. Second, financial advisors were told that they would make more money, receive an office and advance into American Express's management by selling American Express affiliated products. Typically, the new financial advisors who sold the most Financial Plans and American Express affiliated products were promoted to managerial positions. Third, financial advisors needed the approval of their managers for all asset allocations. According to a number of former financial advisors, if a financial advisor proposed an allocation of assets that was less than 80% or 90% of American Express affiliated financial products, the manager would not approve the allocation, or would approve the allocation, but stop providing sales leads and marketing dollars to the financial advisor. Finally, a financial advisor who persisted in allocating less than 80% of client assets to American Express affiliated financial products would be castigated by management and eventually fired, as this directly and negatively impacted the compensation, bonuses and job advancement of that financial advisor's manager and the vice president of that American Express office. This is because a manager compensation was directly tied the amount of American Express affiliated products sold by that manager's brokers.

**Defendants' Material Omissions Caused Plaintiffs And
The Class To Purchase Shelf Space Funds**

53.     The Financial Plan was a primary means by which an American Express financial advisor would recommend American Express affiliated financial products to the client in order to reach the client's stated financial goals.  American Express senior management required the financial advisors to aggressively market the Financial Plans to all prospective clients. According to several former financial advisors, new American Express financial advisors were not permitted to invest a client's money without first selling that client a Financial Plan. Moreover, advisors were required to meet minimum, annual quotas for the sale Financial Plans as well. There were several reasons for this.  First, the sale of Financial Plans provided American Express with hundreds of millions of dollars of revenue each year.  Second, having paid on average $500 for the Financial Plan, clients were far less likely to reject the recommendations of the American Express financial advisors and invest their money elsewhere.  Third, and most important, the Financial Plans were the primary vehicle by which American Express clients were induced to invest in Shelf Space Funds and/or other American Express affiliated financial products.

54.     American Express's financial results demonstrate the importance of the Financial Plans as a primary means by which American Express induced clients to invest in the Shelf Space Funds.  During the Class Period, American Express generated hundreds of millions of dollars in revenue from the sale of Financial Plans and other financial advice.  Moreover, American Express reaped even more improper gains from investors from the improper kickbacks it received from the Shelf Space Funds that came from investors assets.  Finally, American Express benefited from the millions in fees it was able to collect from the particular Shelf Space Funds that were under the management of American Express's mutual fund investment advisers.

55.   As a result of this incentive scheme, American Express's primary loyalty was not to its clients and achievement of the clients' financial goals. Rather, defendants viewed paying American Express clients primarily as a vehicle for generating investment management fees and "revenue sharing" payments so that American Express could achieve American Express's financial goals and increase the profitability of the ultimate corporate parent.

56.   Disclosure of the true motivations of American Express's financial advisors would greatly reduce their influence over American Express clients, and eliminate American Express financial advisors and the Financial Plan as a fee-generating mechanism for American Express. Consequently, American Express's ulterior motives and conflict of interest were not disclosed in any of the defendants' public filings or promotional material, or in the initial consultation between American Express financial advisors and their clients.

57.   Nowhere do defendants reveal that their recommendations are based not on their understanding of their client's personal financial needs, but rather, on their incentives to sell American Express affiliated products such as the Shelf Space Funds.

58.   American Express's revenue-sharing/directed brokerage arrangements also presented a clear undisclosed conflict of interest, pitting the financial interest of the American Express financial advisors against that of their clients. Disclosure of this conflict is clearly material if clients are expected to make informed investment decisions. However, knowing that a recommendation to purchase one of the Shelf Space Funds would be given lesser weight if clients knew that American Express was paid to give them, American Express was strongly motivated to, and did, conceal the truth regarding American Express's revenue-sharing/directed brokerage arrangements. Defendants failed to disclose their compensation system and revenue-

sharing/directed brokerage arrangements on their website, in sales brochures distributed to their

clients or in any other form or manner.

### The Truth About American Express And Its Financial Advisors Begins To Emerge

59.     On February 9, 2004, *The Wall Street Journal* published an article about

American Express under the headline, "Financial Plans: Selling for In-House Gains," which

began to reveal the undisclosed plan and scheme set forth herein.  The article stated in pertinent

part as follows:

> Investors who sign up for financial plans believe they are getting independent
> advice tailored to their own needs.  But in one of several "open secrets" that have
> been hazards for investors in this era, these plans often are little more than sales
> tools that stand a better chance of making money for advisers and their firm than
> their clients.
>
> *Critics say advisers rarely disclose that they get big bucks for directing investors
> to insurance products and mutual funds that provide the highest payouts, rather
> than offering investments that may pay the adviser less but are better-suited to
> the client's needs. Any information about potential conflicts is often vague at
> best and tucked into documents provided to investors when they are already well
> into the planning process.*
>
> A good financial plan can be useful to chart an investor's future, of course. But
> "for a number of advisers it is a marketing hook," says Matthew McGinness, an
> associate director with Cerulli Associates, a market-research firm.
>
> Many financial firms that provide such plans also offer proprietary, or in-house,
> financial products. *The potential for conflicts at American Express is intense
> because of its large stable of in-house mutual funds and insurance products.
> Proprietary products account for roughly 65% of adviser sales at AmEx, a
> regulatory filing says.*
>
> *Many AmEx funds have been poor performers. Over the past three and five
> years, AmEx funds have, on average, ranked in the bottom third of all fund
> families, according to fund-tracker Morningstar, Inc. And AmEx receives
> special revenue-sharing payments from 11 outside fund families -- including
> AIM, Putnam, Strong and Van Kampen.*
>
> An American Express spokesman says the company has been overhauling its fund
> operation in the past two years in an effort to boost returns. "We are absolutely
> committed to improving our performance," he says. Though fund performance

has improved, AmEx funds still ranked in the bottom half of all fund families in the past 12 months, according to Morningstar.

*American Express Financial Advisors carries a lower profile than the firm's credit-card business, yet it accounted for roughly 24% of American Express's $26 billion in revenue and 22% of its net income last year. Fees from financial plans and other advice services accounted for just $121 million of the unit's $6.2 billion in revenue last year, according to regulatory filings. But the importance of planning to AmEx and the firm's more than 12,000 advisers is far greater: Three-quarters of total sales were generated by financial plans and advice services.*

Financial advisers use the planning process to draw clients in, but they depend on product sales for their livelihood, current and former advisers say. "The financial plan is their big claim to fame. But if that's all you did, you'd starve to death," says Judy Reed, an adviser who left American Express in early 2002 after more than a decade with the company. *Other former AmEx advisers say that when they presented a financial plan, they dubbed it "The Close," because of its usefulness in selling high-fee products, including proprietary funds and insurance that paid more to the salesmen -- and to the firm.*

An AmEx spokesman says "financial planning is at the core of what we do" and is "the best way to serve the needs of our clients," adding that the firm's approach to financial planning is "comprehensive." While many clients buy financial plans from AmEx and then use the firm to follow its recommendations, others pay for plans and implement the suggestions elsewhere or simply buy products from the firm, the spokesman says. "It's not one size fits all."

*In some cases, the pressure to sell in-house products is overt. Peggy Bigelow, a financial adviser who left American Express in 2001 after a year with the firm, says she was repeatedly criticized for recommending that her clients invest in outside mutual funds. Other former advisers say the training they received focused largely on sales techniques and the company's proprietary insurance products.*

*   *   *

[I]nvestors say they were directed to the firm's in-house mutual funds and other proprietary investments. Pierre Gangloff, a software engineer in Boston, says he was looking for tax and investment advice when he paid $600 for a financial consultation in 2002. Mr. Gangloff says his adviser persuaded him to invest a total of more than $17,000 in a dozen different AmEx mutual funds. Mr. Gangloff also invested $500 a month in an IDS variable universal life policy and moved $8,000 from a money-market account to a less-liquid AmEx Market Strategy Certificate -- a certificate of deposit tied to the Standard & Poor's 500. "I had the impression I would be . . . hiring some professional . . . who would work for me to

figure out the best alternatives," he says. "But they were really pushing the American Express brand." [emphasis added.]

60. Then on February 12, 2004, the SEC sanctioned and fined American Express for failing to disclose and give its mutual fund clients appropriate breakpoint discounts in 30% of all eligible mutual fund transactions during 2002 and 2003, costing mutual funds clients millions of dollars in unnecessary charges.

61. On March 30, 2004, Connecticut bank regulators announced that as a result of 29their investigation into possible violations of Connecticut securities laws by American Express, it was fining American Express, having determined that certain policies implemented by American Express management may have created conflicts of interest between American Express financial advisors and their clients that were not disclosed to the clients.

62. In May 2004, American Express disclosed that it had received notification from the staff of the NASD indicating that NASD had made a preliminary determination to recommend that an action be brought against American Express for potential violations of federal securities laws and the rules and regulations of the SEC and the NASD. The NASD staff's allegations related to American Express's practices with respect to various revenue sharing/directed brokerage arrangements pursuant to which American Express received payments from certain Shelf Space Funds as *quid pro quo* for American Express pushing the Shelf Space Funds. In particular, the NASD has alleged that American Express (i) failed to properly disclose such revenue sharing arrangements with the Shelf Space Funds, (ii) failed to properly disclose in its brokerage confirmations such revenue sharing arrangements with the Shelf Space Funds and (iii) received directed brokerage from the Shelf Space Funds.

## The Shelf Space Prospectuses Were Materially False And Misleading

63.     Plaintiffs and other members of the Class were entitled to, and did, receive the prospectuses pursuant to which the Shelf Space Funds shares were offered (the "Shelf Space Fund Prospectuses").

64.     Mutual fund prospectuses are required to disclose all material facts regarding the mutual funds being sold in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund. The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

65.     Each of the Shelf Space Fund Prospectuses issued during the Class Period failed to properly disclose to investors material information about the Shelf Space Funds and the fees and costs associated with them. For example, the April 1, 2003 Prospectus for the Massachusetts Financial Services ("MFS") Investors Growth Stock Fund – one of the Shelf Space Fund families identified in Exhibit A - is identical in substance to all the other Shelf Space Fund Prospectuses issued during the Class Period in that states under the heading PORTFOLIO TRANSACTIONS AND BROKERAGE COMMISSIONS:

> In connection with the selection of broker dealers and the placing of Fund portfolio transactions, the Adviser seeks to achieve for the Fund the best overall price and execution available from responsible brokerage firms, taking account of all factors it deems relevant, including by way of illustration: price; the size of the transaction; the nature of the market for the security; the amount of the commission; the timing and impact of the transaction taking into account market prices and trends; the reputation, experience and financial stability of the broker or dealer involved; and the quality of services rendered by the broker or dealer in other transactions.
>
> In the case of securities traded in the over-the-counter market, the Adviser normally seeks to deal directly with the primary market makers, unless in its opinion, best execution may be available elsewhere. In the case of securities purchased from underwriters, the cost of such securities generally includes a fixed underwriting commission or concession. From time to time, soliciting dealer fees

are available to the Adviser on tender or exchange offers. Such soliciting or dealer fees are in effect recaptured by the MFS Funds. At present, no other recapture arrangements are in effect.

As permitted by Section 28(e) of the Securities Exchange Act of 1934, as amended, the Adviser may cause the Fund to pay a broker or dealer which provides brokerage and research services to the Adviser an amount of commission for effecting a securities transaction for the Fund in excess of the amount other brokers or dealers would have charged for the transaction if the Adviser determines in good faith that the greater commission is reasonable in relation to the value of the brokerage and research services provided by the executing broker or dealer viewed in terms or either a particular transaction or the Adviser's overall responsibilities to the Fund and its other clients. "Commissions," as interpreted by the SEC, include fees paid to brokers for trades conducted on an agency basis, and certain mark-ups, mark-downs, commission equivalents and other fees received by dealers in riskless principal transactions placed in the over-the-counter market.

Although commissions paid on every transaction will, in the judgment of the Adviser, be reasonable in relation to the value of the brokerage and research services provided, commissions exceeding those which another broker might charge may be paid to broker-dealers who were selected to execute transactions on behalf of the Fund and the Adviser's other clients in part for providing such brokerage and research services.

The term "brokerage and research services" includes advice as to the value of securities, the advisability of investing in, purchasing or selling securities, and the availability of securities or purchasers or sellers of securities; furnishing analyses and reports concerning issues, industries, securities, economic factors and trends, portfolio strategy and the performance of accounts; and effecting securities transactions and performing functions incidental thereto (such as clearance and settlement).

Broker-dealers may be willing to furnish statistical, research and other factual information or service ("Research") to the Adviser for no consideration other than brokerage or underwriting commissions.  Securities may be bought or sold from time to time through such broker-dealers on behalf of the Fund and the Adviser's other clients.

The Adviser's investment management personnel seek to evaluate the quality of Research provided by brokers. Results of this effort are made available to the Adviser's Equity Trading Department which sometimes uses this information as a consideration in the selection of brokers to execute portfolio transactions. However, the Adviser is unable to quantify the amount of commissions which were paid as a result of such Research because a substantial number of transactions are effected through brokers which provide Research but which were selected principally because of their execution capabilities.

The advisory fee paid by the Fund to the Adviser is not reduced as a consequence of the Adviser's receipt of Research. To the extent the Fund's portfolio transactions are used to obtain Research, the brokerage commissions paid by the Fund might exceed those that might otherwise be paid, by an amount which cannot be currently determined. The Research received is useful and of value to the Adviser in serving both the Fund and other clients of the Adviser. While the Research is not expected to reduce the expenses of the Adviser, the Adviser would, through the use of the Research, avoid the additional expenses which would be incurred if it should attempt to develop comparable information through its own staff.

In effecting portfolio transactions on behalf of the Fund and the Adviser's other clients, the Adviser from time to time may instruct the broker-dealer that executes a transaction to allocate, or "step out," a portion of such transaction to another broker-dealer. The broker-dealer to which the Adviser has "stepped out" would then settle and complete the designated portion of the transaction, and the executing broker-dealer would settle and complete the remaining portion of the transaction that has not been "stepped out." Each broker-dealer would receive a commission or brokerage fee with respect to that portion of the transaction that it settles and completes.

Consistent with the Advisory Agreement and applicable rules and regulations, the Adviser may consider sales of shares of the Fund and of other funds or accounts of the Adviser as a factor in the selection of broker-dealers to execute the Fund's portfolio transactions.

66.     This MFS Shelf Space Fund Prospectus is false and misleading, as are all of the

Shelf Space Fund Prospectuses, in that it fails to disclose that it directed brokerage commissions

to American Express (or to any other broker-dealers) to satisfy pre-determined, negotiated

arrangements for specific amounts of brokerage commissions with American Express. *See also,*

*e.g.* American Express Managed Allocation Fund dated November 28, 2003; Van Kampen

Growth and Income Fund dated March 28, 2003 at B-34-36; Putnam Discovery Growth Fund

dated April 30, 2003 at 29-40; American Century Growth Fund dated September 29, 2003 at 41;

AIM Real Estate Fund dated July 21, 2003 at 33-34; Fidelity Securities Fund dated January 29,

2003; Evergreeen Tax Strategy Equity Fund dated March 1, 2003 at 36; Oppenheimer Multiple

Strategies Fund dated November 21, 2003; Strong Small Cap Growth Fund dated September 29,

2003 at 40; <u>Columbia Growth Fund</u>, dated January 1, 2004 at 75; and  <u>Wells Fargo Growth Fund</u> dated October 31, 2003 at 62-63.

67.    In the SEC's action against MFS filed March 31, 2004 for violation of the federal securities laws, the SEC has determined that such statements as those made in the Shelf Space Fund Prospectuses are ***inadequate and in violation of the federal securities laws***.  As stated by the SEC in its action against MFS, such statements "did not adequately disclose to [ ] shareholders that [MFS] allocated fund brokerage commissions to satisfy strategic alliances." The SEC further explained in its action against MFS that such statements in Prospectuses did not effectively communicate and "***did not adequately disclose that MFS had entered into bilateral arrangements with those broker-dealers to allocate specific negotiated amounts to fund brokerage commissions for specified marketing and distribution services.***"
*http://www.sec.gov/litigation/admin/ia-2224.htm*. [emphasis added].  Here, as the statements in the Shelf Space Prospectuses are identical in substance to the inadequate disclosures made by MFS, the Shelf Space Prospectuses similarly violated the disclosure requirements mandated by the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

68.    As alleged herein, Defendants acted with scienter in that all Defendants conspired to participate in concealing that American Express received cash and other incentives from mutual fund companies to push the Shelf Space Funds to line their own pockets, which created a conflict in advising client investors.

69.    Defendants further acted with scienter because they knew or were reckless in not knowing that entering into the directed brokerage, revenue sharing and the other improper practices detailed above that provided incentives to push the Shelf Space Funds was illegal, created conflicts of interest and violated SEC and NASD Rules.

70.     Section 17(a)(2) of the Securities Act prohibits one from obtaining money or property in the offer or sale of any securities "by means of any untrue statement of a material fact . . . necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). Defendants knew or were reckless in not knowing that their failure to disclose their receipt of directed brokerage; their receipt of revenue sharing payments; and their use of intimidation tactics to push the Shelf Space Funds over non-Shelf Space Funds - and the inherent, insurmountable conflicts of interest created by these practices - violated the disclosure provisions of the securities laws, and they therefore acted with scienter.

71.     Defendants are also charged with knowledge of NASD Rule 2830(k), which provides, in relevant part, the following:

> No member shall, directly or indirectly, favor or disfavor the sale or distribution of shares of any particular investment company or group of investment companies on the basis of brokerage commissions received or expected by such member from any source, including such investment company, or any covered account.

Defendants knew or were reckless in not knowing that their acceptance of directed brokerage commissions from the Shelf Space Funds in return for steering American Express clients into the Shelf Space Funds violated Rule 2830(k) and they therefore acted with scienter.

72.     Defendants also acted with scienter in that they knew or were reckless in not knowing that the public statements issued or disseminated in the name of American Express omitted material information; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements as primary violators of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their knowledge or reckless disregard for the

true facts regarding American Express's directed brokerage, revenue sharing, intimidation tactics and their control over, and/or receipt and/or modification of American Express's materially misleading omissions and/or their associations with American Express which made them privy to confidential proprietary information concerning American Express directed brokerage, revenue sharing and the other improper practices detailed above, culpably participated in the fraudulent scheme alleged herein.

73.     Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein.  In exchange for allowing the unlawful practices alleged herein, American Express received at least hundreds of millions of dollars from the sale of bogus Financial Plans and the improper inducements received from the Shelf Space Funds, or the managers or affiliates of the Shelf Space Funds, for recommending the Shelf Space Funds to their unsuspecting clients.

74.     Moreover, Defendants were highly motivated to conceal from Plaintiffs and other Class members, Defendants' receipt of directed brokerage; receipt of revenue sharing payments; and their use of intimidation tactics to push the Shelf Space Funds over non-Shelf Space Funds - and the inherent, insurmountable conflicts of interest created by these practices - because Defendants knew that if American Express clients knew that American Express was being paid and/or coerced to make recommendations to invest in the Shelf Space Funds, such recommendations would be completely undermined.

## CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities who purchased shares or like interests of any of the Shelf Space Funds between March 10, 1999 and February 9, 2004, inclusive, or purchased an American Express Financial Plan between March 10, 1999 and

February 9, 2004, inclusive, and who were damaged thereby (the "Class"). Included within the Class is a subclass of all persons or entities who paid for a Financial Plan during the Class Period ("Financial Plan Subclass"). Excluded from the class are Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

76.    The members of the class are so numerous that joinder of all members is impracticable. While the exact number of the class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed class. Record owners and other members of the class may be identified from records maintained by the proprietary funds and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

77.    Plaintiffs' claims are typical of the claims of the members of the class as all members of the class are similarly affected by defendants' wrongful conduct in violation of federal securities laws that is complained of herein.

78.    Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class. Among the questions of law and fact common to the class are:

- Whether the federal securities laws were violated by Defendants' acts as alleged herein;

- Whether Defendants failed to disclose to the investing public during the Class Period material facts about the business, sales practices and sources of compensation of American Express employees;

- Whether Defendants failed to disclose to the investing public during the Class Period material facts about the business, operations, and financial statements of the Shelf Space Funds;

- Whether Defendants failed to disclose the true nature and intent behind their Financial Plans and financial advice; and

- To what extent the members of the class have sustained damages and the proper measure of such damages.

79.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT CLAIMS

## COUNT I

## ON BEHALF OF THE CLASS AGAINST DEFENDANT AMERICAN EXPRESS ADVISORS FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT

80.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

81.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class against Defendant American Express Advisors for its failure to disclose sales practices that created an insurmountable conflict-of-interest.

82.    American Express was the seller, or the successor in interest to the seller, within the meaning of the Securities Act, for one or more of the respective fund shares sold to members of the Class because it either: (a) transferred title of shares of the Shelf Space Funds to members of the Class; (b) transferred title of shares of the Shelf Space Funds to the American Shelf Space distributors that in turn sold shares of the Shelf Space Funds as agents for the Shelf Space Funds; and/or (c) solicited the purchase of shares of the Shelf Space Funds by members of the Class.

83.    During its sale of Shelf Space Funds to Plaintiffs and other members of the Class, Defendant American Express Advisors failed to disclose that (a) it coerced its financial advisors to push the Shelf Space Funds through threats of demotion and termination and (b) received improper incentives from the Shelf Space Funds, *e.g.* revenue sharing and directed brokerage, in exchange for pushing American Express clients into the Shelf Space Funds. The practice of coercion as well as improper incentives from the Shelf Space Funds created an insurmountable conflict-of-interest which was never disclosed to investors.

84.     American Express Advisors also caused to be issued to Plaintiffs and other members of the Class the Shelf Space Fund Prospectuses that failed to disclose that fees and commissions from the Shelf Space Funds would be used to pay brokers for directing investors into the Shelf Space Funds and the existence of the American Express financial advisor's conflicts of interest described herein.

85.     As set forth herein, when they became effective, the Shelf Space Funds' Prospectuses were misleading as they omitted the following material facts:

(a)     that the Shelf Space Funds' investment advisers authorized the payment from Shelf Space investors assets through directed brokerage and revenue sharing payments to American Express in exchange for American Express pushing its clients into the Shelf Space Funds; and

(b)     that by paying American Express to push their Funds, the Shelf Space Funds created for American Express Advisors a conflict of interest material to investors.

86.     Members of the Class have sustained damages due to American Express's violations.

87.     At the time they purchased the Shelf Space Funds shares traceable to the defective Prospectuses, members of the Class were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge.

88.     This claim was brought within the applicable statute of limitations.

## COUNT II

### ON BEHALF OF THE CLASS AGAINST THE CONTROL PERSON DEFENDANTS FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT

89.     Members of the Class repeat and re-allege each and every allegation contained above, except that for purposes of this claim, Class expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

90.     This claim is brought pursuant to Section 15 of the Securities Act against the Control Person Defendants as control persons of defendant American Express Advisors. It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misleading information complained about herein is the collective action of the Control Person Defendants.

91.     Defendant American Express Advisors is liable under Section 12(a)(2) of the Securities Act as set forth herein.

92.     Each of the Control Person Defendants was a "control person" of defendant American Express Advisors within the meaning of Section 15 of the Securities Act, by virtue of its position of operational control and/or ownership. At the time that members of the Class purchased shares of one or more of the Shelf Space Funds from defendant American Express Advisors - by virtue of their positions of control and authority over defendant American Express Advisors – the Control Person Defendants directly and indirectly, had the power and authority, and exercised the same, to cause defendant American Express Advisors to engage in the wrongful conduct complained of herein.

93.     Pursuant to Section 15 of the Securities Act, by reason of the foregoing, the Control Person Defendants are liable to members of the Class to the same extent as defendant American Express Advisors is for its primary violations of Section 12(a)(2) of the Securities Act.

94.     By virtue of the foregoing, members of the Class are entitled to damages against
the Control Person Defendants.

## VIOLATIONS OF THE EXCHANGE ACT

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE MARKET DOCTRINE

95.     At all relevant times, the market for Shelf Space Funds was efficient for the
following reasons, among others:

(a)     The Shelf Space Funds met the requirements for listing, and were listed
and actively bought and sold through a highly efficient and automated market;

(b)     As regulated entities, periodic public reports concerning the Shelf Space
Funds were regularly filed with the SEC;

(c)     Persons associated with the Shelf Space Funds regularly communicated
with public investors via established market communication mechanisms, including through
regular disseminations of press releases on the national circuits of major newswire services and
through other wide-ranging public disclosures, such as communications with the financial press
and other similar reporting services; and

(d)     The Shelf Space Funds were followed by several securities analysts
employed by major brokerage firms who wrote reports which were distributed to the sales force
and certain customers of their respective brokerage firms.  Each of these reports was publicly
available and entered the public marketplace.

96.     As a result of the foregoing, the market for the Shelf Space Funds promptly
digested current information regarding the Shelf Space Funds from all publicly available sources
and reflected such information in the respective value attributed to the Shelf Space Funds.
Investors who purchased or otherwise acquired shares or interests in the Shelf Space Funds relied

on the integrity of the market for such securities as well as the integrity and honesty of American Express. Under these circumstances, all purchasers of the Shelf Space Funds during the Class Period suffered similar injury through their purchase or acquisition of Shelf Space Funds.

## COUNT III

**ON BEHALF OF THE CLASS**
**AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF**
**THE EXCHANGE ACT AND RULE 10B-5(b) PROMULGATED THEREUNDER**

97.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

98.     During the Class Period, Defendants employed manipulative and deceptive devices and contrivances in that it omitted to state material facts, *i.e.* disclose the improper incentives regarding the Shelf Space Funds that created an insurmountable conflict of interest and that such incentives were intended to and did deceive members of the Class, and caused members of the Class to purchase Shelf Space Funds and suffer damages. Part and parcel of the manipulative and deceptive devices and contrivances used by Defendants were the Financial Plans and/or other financial advice used by Defendants to steer Plaintiffs and other members of the Class into the Shelf Space Funds.

99.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information about the improper inducements alleged herein. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

100.    Defendants omitted to state material facts in order to profit from millions of dollars of incentive payments described above made to them by the Shelf Space Funds from the

assets of unwitting investors. Defendants thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Class.

101.    Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to them. American Express's material omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

102.    As a result of the failure to disclose material facts, as set forth above, market values and market trends of the Shelf Space Funds were distorted during the Class Period such that they did not reflect the risks and costs of the continuing course of conduct alleged herein. In ignorance of the facts that the advice they were receiving was tainted by undisclosed conflicts of interest, and relying directly or indirectly on the false and misleading statements made by defendants and the purported honesty of Defendants' business practices, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, members of the Class paid advisory fees, commissions, fees for the Financial Plans and/or other financial advice provided by American Express financial advisors, and Shelf Space mutual fund fees that members of the Class would have refused to paid had they known of the practices alleged herein. As a result of Defendants material omissions, members of the Class acquired the shares or interests in the Shelf Space Funds during the Class Period and were damaged thereby.

103.    At the time of said omissions, members of the Class were ignorant of the truth. Had members of the Class known the truth concerning American Express's operations, which

were not disclosed by Defendants, members of the Class would not have purchased or otherwise acquired their shares of the Shelf Space Funds, would not have paid the commissions or fees paid as a result of their acquisition of the Shelf Space Funds, would not have paid for the Financial Plans and other financial "advice" provided by American Express financial advisors, and would not have paid the fees and costs associated with ownership of the Shelf Space Funds, or if they had acquired such shares or other interests during the Class Period.

104.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

105.    As a direct and proximate result of Defendants' wrongful conduct, members of the Class suffered damages in connection with their purchases and acquisitions of the Shelf Space Funds during the Class Period.

106.    This claim was brought within the applicable statute of limitations.

## COUNT IV

### ON BEHALF OF THE CLASS AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5(a) AND (c) PROMULGATED THEREUNDER

107.    Members of the Class repeat and reallege each and every allegation contained above as if fully set forth herein except for claims brought pursuant to the Securities Act.

108.    During the Class Period, each of the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including members of the Class, as alleged herein and caused members of the Purchasers Class to purchase shares of the Shelf Space Funds and to otherwise suffer damages. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

109.    Defendants (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of the Shelf Space Funds, including members of the Class, in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully distorted the pricing and market trends of the American Express Funds in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c). Part and parcel of the devices, schemes and artifices used by Defendants were the Financial Plans and/or other financial advice used by Defendants to steer Plaintiffs and other members of the Class into the Shelf Space Funds. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

110.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about American Express and the Shelf Space Funds' operations, as specified herein.

111.    Defendants employed devices and artifices to defraud and engaged in a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from excessive fees and commissions as a result of the undisclosed sales practices to peddle the Shelf Space Funds alleged above and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon members of the Class.

112.    The members of the Class reasonably relied upon the integrity of the market in which the Shelf Space Funds traded.

113.    Members of the Class were ignorant of Defendants' fraudulent scheme. Had members of the Class known of Defendants' unlawful scheme, they would not have purchased or otherwise acquired their shares of the Shelf Space Funds, would not have paid any commissions

or fees paid as a result of their acquisition of the Shelf Space Funds, would not have paid the fees

for the Financial Plans and/or other financial advice provided by American Express financial

advisors, and would not have paid the fees and costs associated with ownership of the Shelf

Space Funds, or if they had acquired such shares or other interests during the Class Period, they

would not have done so due to the purportedly fair and impartial advice for which they had paid.

114.    By virtue of the foregoing, Defendants each violated Section 10(b) of the

Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

115.    As a direct and proximate result of Defendants' wrongful conduct, members of

the Class suffered damages in connection with their purchases and acquisitions of American

Express Funds during the Class Period.

116.    This claim was brought within the applicable statute of limitations.

**COUNT V**

**AGAINST DEFENDANT AMERICAN EXPRESS ADVISORS**
**FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND RULE 10b-10 PROMULGATED THEREUNDER**

117.    Plaintiffs repeat and re-allege each and every allegation contained above as if

fully set forth herein except for claims brought pursuant to the Securities Act.

118.    During the Class Period, American Express Advisors, a registered broker-dealer,

effected transactions in the Shelf Space Funds for or with the accounts of Class members, and/or

induced Class members to purchase the Shelf Space Funds.

119.    At or before completion of Class members' purchases of the Shelf Space Funds,

American Express Advisors failed to disclose the source and amount of remuneration American

Express Advisors received from the Shelf Space Funds in connection with Class members'

purchases of the Shelf Space Funds, as required by Rule 10b-10, promulgated under Exchange

Act Section 10(b) as well as failed to disclose the nature and extent of the coercive programs used at American Express to push the Shelf Space Funds.

120.    The Shelf Space Funds' payment of such remuneration created insurmountable and undisclosed conflicts of interest. Class members were thus ignorant of the source and amount of remuneration American Express Advisors received from the Shelf Space Funds and of the resulting conflicts of interest. Had Class members known of the source and amount of such remuneration and the resulting conflicts of interest, they would not have purchased or otherwise acquired shares of the Shelf Space Funds, would not have paid any commissions or fees paid as a result of their acquisitions of the Shelf Space Funds, and would not have paid the fees or costs associated with ownership of the Shelf Space Funds, or if they had, they would not have purchased or otherwise acquired them at the artificial prices they paid for such securities.

121.    Class members have sustained damages due to American Express Advisors' violation of Rule 10b-10.

122.    At the time they purchased the Shelf Space Funds shares traceable to the defective disclosures, Class members were without knowledge of the facts concerning the material omissions alleged herein and could not reasonably have possessed such knowledge.

123.    This claim was brought within the applicable statute of limitations.

## COUNT VI

### AGAINST THE CONTROL PERSON DEFENDANTS
### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

124.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except for Claims brought pursuant to the Securities Act.

125.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against each of the Control Person Defendants, as a control person of American Express Financial Advisor.

126. It is appropriate to treat these Defendants as a group for pleading purposes and to presume that the materially incomplete information conveyed in American Express Advisors' public representations are the collective actions of the Control Person Defendants.

127. Each of the Control Person Defendants acted as a controlling person of American Express Advisors within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein. By virtue of their operational and management control of American Express Advisors' business and systematic involvement in the fraudulent scheme alleged herein, the Control Person Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of American Express Advisors, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Control Person Defendants had the ability to prevent the issuance of statements alleged to have failed to disclose the material information described herein.

128. In particular, each of the Control Person Defendants had direct and supervisory involvement in the operations of American Express Advisors and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

129. As set forth above, the Control Person Defendants and American Express Advisors each violated Section 10(b) and Rules 10b-5 and 10b-10 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Control Person Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Shelf Space Funds' securities during the Class Period.

130.    This claim was brought within the applicable statute of limitations.

## COUNT VII

**FOR VIOLATIONS OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT MINN. STAT. §§ 325D.43 ET SEQ., ON BEHALF OF THE FINANCIAL PLAN SUBCLASS AGAINST ALL DEFENDANTS**

131.    Members of the Financial Plan Subclass hereby reallege and incorporate by reference all paragraphs previously alleged herein.  Members of the Financial Plan Subclass assert this cause of action against each and every Defendant on behalf of themselves and the Financial Plan Subclass for violations of Minnesota's Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43 et seq.

132.    Defendants have violated the Uniform Deceptive Trade Practices Act by engaging in and continuing to engage in acts and practices, including misrepresentation, deception, and concealment, which create a likelihood of confusion and/or misunderstanding.

133.    As set forth herein, Defendants' acts, practices, representations, statements, omissions, and courses of conduct with respect to the sale of financial plans violate Minnesota's Deceptive Trade Practices Act in that, among other things:

(a)    Defendants represented, and continue to represent, that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, in violation of Minn. Stat. § 325D.44(1)(5);

(b)    Defendants represented, and continue to represent, that goods or services are of a particular standard, quality, or grade, in violation of Minn. Stat. § 325D.44(1)(7);

(c)    Defendants advertise, and continue to advertise, goods or services with intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44(1)(9);

    (d)    Defendants have engaged, and continue to engage, in conduct which creates a likelihood of confusion or of misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

    134.    As set forth herein, Defendants' acts, practices, representations, statements, omissions, and courses of conduct with respect to the advertising, marketing, and sale of financial plans violate Minnesota's Deceptive Trade Practices Act in that, among other things:

    (a)    Defendants misrepresented, and continue to misrepresent, that they provide personalized, objective financial advice and recommendations;

    (b)    Defendants misrepresented, and continue to misrepresent, that their financial advice and recommendations are intended exclusively to promote clients' best interests;

    (c)    Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal, conflicts of interest, including that their financial advice and recommendations are designed to generate fees and sales commissions and increase assets under Defendants' management;

    (d)    Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal that their financial advice and recommendations are intended to induce clients to purchase Defendants' financial products;

    (e)    Defendants' advertisements and marketing practices fail to disclose, inadequately disclose, and/or conceal material information;

    (f)    Defendants' advertising and marketing practices were and are likely to mislead, deceive, and/or damage consumers.

    135.    As a direct and proximate result of Defendants' misrepresentations, misleading statements, and/or deceptive practices, in violation of Minnesota's Deceptive Trade Practices

Act, Plaintiffs and the Financial Plan Subclass have been injured and suffered harm in that, among other things, Plaintiffs and the Financial Plan Subclass have purchased Defendants' financial plans when they otherwise would not have and/or Plaintiffs and the Financial Plan Subclass have paid more for the Financial Plans than they otherwise would have.

136.    Pursuant to Minn. Stat. § 325D.45, Plaintiffs and the Financial Plan Subclass are entitled to an order permanently enjoining Defendants from engaging in the unlawful practices described herein, as well as recovery of attorneys' fees and costs of the litigation.

**COUNT VIII**

**FOR VIOLATIONS OF THE MINNESOTA CONSUMER FRAUD ACT
MINN. STAT. §§ 325F.68 ET SEQ., ON BEHALF OF THE
FINANCIAL PLAN SUBCLASS AGAINST ALL DEFENDANTS**

137.    Members of the Financial Plan Subclass hereby reallege and incorporate by reference all paragraphs previously alleged herein.  Pursuant to Minnesota's Private Attorney General Act, Minn. Stat. § 8.31, Members of the Financial Plan Subclass assert this cause of action against each and every Defendant on behalf of themselves and the Financial Plan Subclass for violations of Minnesota's Consumer Fraud Act, Minn. Stat. §§ 325F.68 et seq.

138.    The financial plans advertised, marketed, and sold by Defendants are "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

139.    Each and every Defendant is a "person" within the meaning of Minn. Stat. § 325F.68(3).

140.    Defendants advertised, marketed, and offered for "sale" their financial plans within the meaning of Minn. Stat. § 325F.68(4).

141.    Defendants have violated Minn. Stat. § 325F.69(1) by using and employing misrepresentation, misleading statements, and/or deceptive practices in connection with the sale of their financial plans.

142.    As set forth herein, Defendants' acts, practices, representations, statements, omissions, and courses of conduct with respect to the sale of financial plans violate Minnesota's Consumer Fraud Act in that, among other things:

(a)    Defendants misrepresented, and continue to misrepresent, that they provide personalized, objective financial advice and recommendations;

(b)    Defendants misrepresented, and continue to misrepresent, that their financial advice and recommendations are intended exclusively to promote clients' best interests;

(c)    Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal, conflicts of interest, including that their financial advice and recommendations are designed to generate fees and sales commissions and increase assets under Defendants' management;

(d)    Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal that their financial advice and recommendations are intended to induce clients to purchase Defendants' financial products;

(e)    Defendants' advertisements and marketing practices fail to disclose, inadequately disclose, and/or conceal material information;

(f)    Defendants' advertising and marketing practices were and are likely to mislead, deceive, and/or damage consumers.

143.    As a direct and proximate result of Defendants' misrepresentations, misleading statements, and/or deceptive practices, in violation of Minnesota's Consumer Fraud Act, Plaintiffs and the Financial Plan Subclass have been injured and suffered harm in that, among other things, Plaintiffs and the Financial Plan Subclass have purchased Defendants' financial

plans when they otherwise would not have and/or Plaintiffs and the Financial Plan Subclass have paid more for the financial plans than they otherwise would have.

144.    Pursuant to Minn. Stat. § 8.31, Plaintiffs and the Financial Plan Subclass are entitled to damages, costs and disbursements, including costs of investigation and reasonable attorneys' fees, and equitable relief.

**COUNT IX**

**FOR VIOLATIONS OF THE MINNESOTA FALSE ADVERTISEMENT ACT MINN. STAT. § 325F.67, ON BEHALF OF THE FINANCIAL PLAN SUBCLASS AGAINST ALL DEFENDANTS**

145.    Members of the Financial Plan Subclass hereby reallege and incorporate by reference all paragraphs previously alleged herein.  Pursuant to Minnesota's Private Attorney General Act, Minn. Stat. § 8.31, Members of the Financial Plan Subclass assert this cause of action against each and every Defendant on behalf of themselves and the Financial Plan Subclass for violations of Minnesota's False Advertisement Act, Minn. Stat. § 325F.67.

146.    Defendants have violated Minn. Stat. § 325F.67 by making, publishing, disseminating, circulating, and/or placing before the public, including in Minnesota, advertisements regarding their financial plans, which contain material assertions, representations, and/or statements of fact, which are untrue, deceptive, and/or misleading.

147.    As set forth herein, Defendants' acts, practices, representations, statements, omissions, and courses of conduct with respect to the sale of financial plans violate Minnesota's False Advertising Act in that, among other things:

(a)    Defendants misrepresented, and continue to misrepresent, that they provide personalized, objective financial advice and recommendations;

(b)    Defendants misrepresented, and continue to misrepresent, that their financial advice and recommendations are intended exclusively to promote clients' best interests;

(c)     Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal, conflicts of interest, including that their financial advice and recommendations are designed to generate fees and sales commissions and increase assets under Defendants' management;

(d)     Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal that their financial advice and recommendations are intended to induce clients to purchase Defendants' financial products;

(e)     Defendants' advertisements and marketing practices fail to disclose, inadequately disclose, and/or conceal material information;

(f)     Defendants' advertising and marketing practices were and are likely to mislead, deceive, and/or damage consumers.

148.    As a direct and proximate result of Defendants' misrepresentations, misleading statements, and/or deceptive practices, in violation of Minnesota's False Advertising Act, Plaintiffs and the Financial Plan Subclass have been injured and suffered harm in that, among other things, Plaintiffs and the Financial Plan Subclass have purchased Defendants' financial plans when they otherwise would not have and/or Plaintiffs and the Financial Plan Subclass have paid more for the financial plans than they otherwise would have.

149.    Pursuant to Minn. Stat. § 8.31, Plaintiffs and the Financial Plan Subclass are entitled to damages, costs and disbursements, including costs of investigation and reasonable attorneys' fees, and equitable relief.

## COUNT IX

### FOR VIOLATIONS OF THE MINNESOTA UNLAWFUL TRADE PRACTICES ACT MINN. STAT. §§ 325D.09 ET SEQ., ON BEHALF OF THE FINANCIAL PLAN SUBCLASS AGAINST ALL DEFENDANTS

150.    Members of the Financial Plan Subclass hereby reallege and incorporate by reference all paragraphs previously alleged herein.  Members of the Financial Plan Subclass assert this cause of action against each and every Defendant on behalf of themselves and the Financial Plan Subclass for violations of Minnesota's Unlawful Trade Practices Act, Minn. Stat. §§ 325D.09 et seq.

151.    Each and every Defendant is a "person" within the meaning of Minn. Stat. § 325D.10(a).

152.    Defendants advertised and offered for "sale" their financial plans within the meaning of Minn. Stat. § 325D.10(c).

153.    Defendants have violated, and continue to violate, Minn. Stat. § 325D.13 by knowingly misrepresenting the true quality of their financial plans in connection with the sale of the financial plans.

154.    As set forth herein, Defendants' acts, practices, representations, statements, omissions, and courses of conduct with respect to the sale of financial plans violate Minnesota's Unlawful Trade Practices Act in that, among other things:

(a)    Defendants misrepresented, and continue to misrepresent, that they provide personalized, objective financial advice and recommendations;

(b)    Defendants misrepresented, and continue to misrepresent, that their financial advice and recommendations are intended exclusively to promote clients' best interests;

(c)    Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal, conflicts of interest, including that their financial advice

and recommendations are designed to generate fees and sales commissions and increase assets under Defendants' management;

(d)     Defendants inadequately disclosed and/or concealed, and continue to inadequately disclose and/or conceal that their financial advice and recommendations are intended to induce clients to purchase Defendants' financial products;

(e)     Defendants' advertisements and marketing practices fail to disclose, inadequately disclose, and/or conceal material information;

(f)     Defendants' advertising and marketing practices were and are likely to mislead, deceive, and/or damage consumers.

155.   As a direct and proximate result of Defendants' misrepresentations, misleading statements, and/or deceptive practices, in violation of Minnesota's Unlawful Trade Practices Act, Plaintiffs and the Financial Plan Subclass have been injured and suffered harm in that, among other things, Plaintiffs and the Financial Plan Subclass have purchased Defendants' financial plans when they otherwise would not have and/or Plaintiffs and the Financial Plan Subclass have paid more for the financial plans than they otherwise would have.

156.   Pursuant to Minn. Stat. § 325D.15, Plaintiffs and the Financial Plan Subclass are entitled to injunctive relief and actual damages.

## COUNT X

### FOR BREACH OF FIDUCIARY DUTY ON BEHALF OF THE FINANCIAL PLAN SUBCLASS AGAINST ALL DEFENDANTS

157.   Members of the Financial Plan Subclass hereby reallege and incorporate by reference all paragraphs previously alleged herein.  Members of the Financial Plan Subclass assert this cause of action against each and every Defendant on behalf of themselves and the Financial Plan Subclass for breach of fiduciary duty.

158.    As financial advisers, the Defendants were fiduciaries to the members of the Financial Plan Subclass and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care, and candor.

159.    As set forth above, the Defendants breached their fiduciary duties to members of the Financial Plan Subclass.

160.    Members of the Financial Plan Subclass have been injured as a direct, proximate, and foreseeable result of such breach on the part of the Defendants and have suffered substantial damages.

161.    Because the Defendants acted with reckless and willful disregard for the rights of members of the Financial Plan Subclass, the Defendants are liable for punitive damages in an amount to be determined by the jury.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and appointing plaintiffs as lead plaintiff and their counsel as lead counsel for the Class and certifying them as Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding punitive damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Awarding plaintiffs and the other members of the Class rescission of their contracts with American Express, including recovery of all fees which would otherwise apply, and recovery of all fees paid to American Express;

E.     Ordering restitution of all unlawfully or discriminatorily obtained fees and charges;

F.     Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure that plaintiffs and the Class have an effective remedy;

G.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 29, 2004

> **MILBERG WEISS BERSHAD
> & SCHULMAN LLP**
>
> By: _____
> Jerome Congress (JC-2060)
> Janine Pollack (JP-0178)
> Michael Reese (MR-3183)
> One Pennsylvania Plaza
> New York, New York 10119-0165
> (212) 594-5300

**GIRARD GIBBS &**
  **De BARTOLOMEO LLP**
Daniel C. Girard
Jonathan K. Levine (JL-8390)
Aaron M. Sheanin
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (415) 981-4800

**STULL, STULL & BRODY**
 Jules Brody
Aaron L. Brody
6 East 45th Street
New York , New York  10017
Telephone: (212) 687-7230

*Plaintiffs' Co-Lead Counsel*

**LAW OFFICES OF CHARLES J.**
**PIVEN,   P.A.**
Charles J. Piven
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland  21202
Telephone:  (410) 986-0036

*Additional Counsel for Plaintiffs*

Exhibit A

## Exhibit A

## AMERICAN EXPRESS SHELF SPACE FUND FAMILIES

American Express
Putnam Investments
Oppenheimer Funds
Strong Funds
Columbia Funds
AIM Investments
MFS Investment Management
Van Kampen Investments
Evergreen Investments
American Century
Fidelity Investments
Wells Fargo Funds
INVESCO Funds (merged distributors
with AIM Investments)

Exhibit B

## Exhibit B

## AMERICAN EXPRESS FUNDS

AXP New Dimensions Fund
AXP Growth Dimensions Fund
AXP Growth Fund
AXP Partners Growth Fund
AXP Equity Select Fund
AXP Focused Growth Fund
AXP Partners Aggressive Growth Fund
AXP Strategy Aggressive Fund
AXP Partners Small Cap Growth Fund
AXP Managed Allocation Fund
AXP Stock Fund Prospectus
AXP Blue Chip Advantage Fund
AXP Quantitative Large Cap Equity Fund
AXP Large Cap Equity Fund
AXP Research Opportunities Fund
AXP Small Cap Advantage Fund
AXP Partners Small Cap Core Fund
AXP Discovery Fund
AXP Mutual Fund
AXP Diversified Equity Income Fund
AXP Partners Value
AXP Partners Fundamental Value Fund
AXP Equity Value Fund Prospectus
AXP Partners Select Value Fund
AXP Large Cap Value Fund
AXP Mid Cap Value Fund
AXP Partners Small Cap Value Fund
AXP Progressive Fund
AXP Global Balanced Fund
AXP Partners International Select Value Fund
AXP Global Equity Fund
AXP Partners International Core Fund
AXP International Fund
AXP European Equity Fund
AXP Partners International Small Cap Fund
AXP Partners International Aggressive Growth
AXP Emerging Markets Fund
AXP Tax-Free Money Fund
AXP Cash Management Fund
AXP Short Duration U.S. Government Fund
AXP U.S. Government Mortgage Fund
AXP Insured Tax-Exempt Fund
AXP Intermediate Tax-Exempt Fund
AXP Limited Duration Bond Fund

AXP California Tax-Exempt Fund
AXP Massachusetts Tax-Exempt Fund
AXP Michigan Tax-Exempt Fund
AXP Minnesota Tax-Exempt Fund
AXP New York Tax-Exempt Fund
AXP Ohio Tax-Exempt Fund
AXP Selective Fund
AXP Core Bond Fund
AXP Tax-Exempt Bond Fund
AXP Diversified Bond Fund
AXP Global Bond Fund
AXP Income Opportunities Fund
AXP High Yield Tax-Exempt Fund
AXP High Yield Bond Fund
AXP Global Technology Fund
AXP Precious Metals Fund
AXP Utilities Fund Prospectus
AXP Small Company Index Fund
AXP Mid Cap Index Fund
AXP S&P 500 Index Fund

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMERICAN EXPRESS FINANCIAL ADVISORS SECURITIES LITIGATION | ) ) ) ) Civil Action No. 1:04-CV-1773 ) ) |

## CERTIFICATE OF SERVICE

I, Jennifer J. Wagner, hereby certify that on this 29th day of September, 2004 I caused to be served a true and correct copy of the Consolidated and Amended Class Action Complaint by Federal Express upon the following:

**WILMER CUTLER PICKERING**
**HALE & DORR LLP**
Peter K. Vigeland
David W. Bowker
399 Park Avenue
New York, New York 10022
Tel:  (212) 230-8807

**GIRARD GIBBS & De BARTOLOMEO LLP**
Jonathan K. Levine
601 California Street, Suite 1400
San Francisco, California 94108
Tel:  (415) 981-4800

**STULL STULL & BRODY**
Jules Brody
6 East 45th Street
New York, New York 10017
Tel:  (212) 687-7230

Jennifer Wagner