**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AMERICAN EXPRESS FINANCIAL
ADVISORS INC. SECURITIES LITIGATION

04-CV-1773 (DAB)

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED COMPLAINT**

WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, New York  10022
Tel.:  (212) 230-8800
Fax:  (212) 230-8888

*Attorneys for Defendants*
American Express Company, American
Express Financial Corporation, American
Express Financial Advisors Inc., and
James M. Cracchiolo

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................iv

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS .........................................................................................5

ARGUMENT..............................................................................................................21

I.    THE COMPLAINT STATES NO CLAIM WITH RESPECT TO THE AXP
FUNDS ............................................................................................................21

    A.    The Potential Conflict of Interest Between Companies Using The Same
"American Express" Name and Logo Was Obvious and Was Disclosed .............22

    B.    Neither The AXP Funds Nor AMEX Financial Had Any Need To Use
"Revenue Sharing" Or "Directed Brokerage" To Buy "Shelf Space" at
AEFA..................................................................................................................24

II.    DEFENDANTS PROPERLY DISCLOSED THEIR REVENUE SHARING AND
DIRECTED BROKERAGE ARRANGEMENTS ..........................................26

    A.    Defendants Had No Duty to Disclose Revenue Sharing Arrangements
That Were Adequately Disclosed In The Funds' Prospectuses ............................28

    B.    Defendants' Revenue Sharing Arrangements Were Adequately Disclosed
In The Shelf Space Funds' Prospectuses .............................................................29

    C.    Even Assuming *Arguendo* That Fund Prospectuses Omitted Details About
Revenue Sharing, Such Omission Would Have Been Immaterial as a
Matter of Law ....................................................................................................31

    D.    Defendants Had No Duty to Disclose Directed Brokerage Arrangements............32

    E.    Even Assuming *Arguendo* That Fund Prospectuses Omitted Details About
Directed Brokerage, Such Omission Would Have Been Immaterial as a
Matter of Law ....................................................................................................35

    F.    Plaintiffs' Claims Brought Under Section 10(b) of the Exchange Act Must
Be Dismissed .....................................................................................................36

    G.    Plaintiffs' Claims Brought Under Section 12(a)(2) of the Securities Act
Must be Dismissed..............................................................................................38

III.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE LOSS CAUSATION .....38

|   |   |   |   |
|---|---|---|---|
|   | A. | The Exchange Act Claims Fail to Allege Loss for Causation | 38 |
|   | B. | The Securities Act Claims Fail to Allege Loss Causation | 41 |
| IV. | | PLAINTIFFS FAIL TO ADEQUATELY ALLEGE TRANSACTION CAUSATION | 43 |
| V. | | AEFA FINANCIAL PLANS WERE PERSONALIZED AND FREE OF UNDISCLOSED CONFLICTS OF INTEREST | 45 |
|   | A. | AEFA Financial Plans Are Personalized | 45 |
|   | B. | AEFA Properly Disclosed Potential Conflicts of Interest In Connection With Its Financial Planning and Advice | 46 |
| VI. | | PLAINTIFFS HAVE FAILED TO PLEAD WITH SUFFICIENT PARTICULARITY UNDER FED. R. CIV. P. 9(B) AND THE PSLRA | 48 |
|   | A. | Plaintiffs' Claims Under Exchange Act § 10(b) and Rule 10b-5 Must Be Dismissed for Lack of Particularity | 50 |
|   | B. | Plaintiffs' Claims Under § 12(a)(2) of the Securities Act Must be Dismissed for Lack of Particularity | 52 |
|   | C. | Plaintiffs State-Law Claims Are Also Subject To Rule 9(b) Pleading Requirements | 53 |
| VII. | | PLAINTIFFS HAVE FAILED TO ADEQUATELY PLEAD SCIENTER UNDER THE EXCHANGE ACT | 54 |
| VIII. | | PLAINTIFFS DO NOT HAVE STANDING TO ASSERT ANY CLAIMS WITH RESPECT TO FUNDS OF WHICH THEY ARE NOT SHAREHOLDERS | 55 |
| IX. | | CERTAIN OF PLAINTIFFS' CLAIMS ARE TIME-BARRED | 56 |
| X. | | PLAINTIFFS HAVE NOT SUFFICIENTLY PLEAD FACTS ESTABLISHING CONTROL PERSON LIABILITY | 58 |
|   | A. | Plaintiffs Have Failed to Allege A Primary Violation | 59 |
|   | B. | Plaintiffs Have Not Alleged Defendant's "Control" Over A Primary Violator | 59 |
|   | C. | Plaintiffs Have Not Alleged That The Control Person Defendants Were Culpable Participants in The Primary Violations Alleged | 61 |

XI.  DISMISSAL OF PLAINTIFFS' FEDERAL CLAIMS WARRANTS
     DISMISSAL OF THE STATE LAW CLAIMS.................................................................61

XII.  SLUSA REQUIRES DISMISSAL OF PLAINTIFFS' STATE LAW CLAIMS..............62

XIII.  EVEN ASSUMING *ARGUENDO* THAT SLUSA DOES NOT PREEMPT
       PLAINTIFFS' STATE LAW CLAIMS, THESE CLAIMS FAIL AS A MATTER
       OF LAW .................................................................................................................68

CONCLUSION..............................................................................................................................75

# TABLE OF AUTHORITIES

## CASES

*Acito v. Imcera Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ................................................................................32, 48

*Akerman v. Oryx Communications., Inc.*,
    810 F.2d 336 (2d Cir. 1987) ........................................................................................42

*Alternative Pioneering Sys., Inc. v. Direct Innovative Prod.*,
    822 F. Supp. 1437 (D. Minn. 1993).............................................................................69

*Araujo v. John Hancock Life Ins. Co.*,
    206 F. Supp. 2d 377 (E.D.N.Y. 2002) .........................................................................64

*Ato Ram, II, Ltd. v. SMC Multimedia Corp.*,
    No. 03 Civ 5569, 2004 WL 744792 (S.D.N.Y. Apr. 7, 2004)............................................57

*Barnum v. Millbrook Care Ltd. P'ship*,
    850 F. Supp. 1227 (S.D.N.Y.)
    *aff'd*, 43 F.3d 1458 (2d Cir. 1994) ......................................................................5, 70

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................................32

*Belhen v. Merrill Lynch*,
    311 F.3d 1087 (11th Cir. 2002) ..................................................................................66

*Benzon v. Morgan Stanley Distributors, Inc*,
    No. 3:03-0159, 2004 WL 62747 (M.D. Tenn. Jan. 8, 2004) ................................................30

*Boguslavsky v. Kaplan*,
    159 F.3d 717 (2d Cir.1998) .........................................................................................59

*Burke v. Jacoby*,
    981 F.2d 1372 (2d Cir. 1992) .....................................................................................44

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (S.D.N.Y. 2002) .........................................................................60

*In re Canandaigua Sec. Litig.*,
    944 F. Supp. 1202 (S.D.N.Y. 1996) ............................................................................54

*Castillo v. Dean Witter Discover & Co.*,
    No. 97 Civ 1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998)....................................*passim*

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) ............................................................................... 9

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  Nos. 03-7499, 03-7458, 2005 WL 44434 (2d Cir. Jan. 11, 2005) ............................ 63, 66, 67

*De Jesus v. Sears, Roebuck & Co.*,
  87 F.3d 65 (2d Cir.) ...................................................................................... 5, 70

*In re Digital Island Sec. Litig.*,
  23 F. Supp. 2d 546 (D. Del. 2002),
  *aff'd*, 2004 U.S. App. LEXIS 1848 (3d Cir. Feb. 6, 2004) .................................... 49

*Doe v. Shakur*,
  164 F.R.D. 359 (S.D.N.Y. 1996) ...................................................................... 8

*In re Doubleclick, Inc. Privacy Litig.*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................................................. 42

*Dudek v. Prudential Sec., Inc.*,
  295 F.3d 875 (8th Cir. 2002) .......................................................................... 64, 66

*Ellison v. American Image Motor Co.*,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999) ............................................................. 50, 54

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
  343 F.3d 189 (2d Cir. 2003) .......................................................................... 38, 39

*Fezzani* v. *Bear Stearns & Co.*,
  No. 99 Civ. 0793 (RCC), 2004 WL 744594 (S.D.N.Y. Apr. 6, 2004) ................................ 37

*Force v. ITT Hartford Life & Annuity Ins. Co.*,
  4 F. Supp. 2d 843 (D. Minn. 1998) ................................................................. 74

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) .......................................................................... 9, 49

*Geiger v. Solomon Paige Group, Ltd.*,
  933 F. Supp. 1180 (S.D.N.Y. 1996) ............................................................... 55

*In re Global Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ............................................................ 57

*Gordon & Breach Sci. Publishers S.A. v. American Inst. of Physics*,
  905 F. Supp. 169 (S.D.N.Y. 1995) ................................................................. 69

*Grace v. Rosenstock*,
   228 F.3d 40 (2d Cir. 2000) ............................................................................................62

*Greenhouse v. MCG Capital Corp.*,
   No. 03-2318, 2004 U.S. App. LEXIS 26543 (4th Cir. Dec. 21, 2004) ........................31, 32

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996) ........................................................................................43, 44

*Hoffman v. Di Falco*,
   424 F. Supp. 902 (S.D.N.Y. 1976) ..................................................................................22

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
   936 F.2d 759 (2d Cir. 1991) ......................................................................................5, 70

*In re Initial Pub. Offering Sec. Litig.*,
   214 F.R.D. 117 (S.D.N.Y. 2002) .....................................................................................56

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................59, 60, 61

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ......................................................................................49, 52

*Klein v. General Nutrition Cos.*,
   186 F.3d 338 (3d Cir. 1999) ..........................................................................................23

*L-3 Communications Corp. v. Clevenger*,
   03-CV-3932, 2004 WL 1941248 (E.D. Penn. Aug. 31, 2004) ..........................................57

*Lampf, Pleva, Lipkind, Prupis & Petigrown v. Gilbertson*,
   501 U.S. 350 (1991).......................................................................................................57

*Laub v. Faessel*,
   981 F. Supp. 870 (S.D.N.Y. 1997) ..............................................................................11, 36

*Lawrence v. Cohn*,
   325 F.3d 141 (2d Cir. 2003) ...........................................................................................22

*LensCrafters, Inc. v. Vision World, Inc.*,
   943 F. Supp. 1481 (D. Minn. 1996).......................................................................69, 70, 71

*Lentell v. Merrill Lynch & Co, Inc.*,
   No. 03-7948, 2005 U.S. App. LEXIS 1016 (2d Cir. Jan. 20, 2004)..................38, 39, 41, 51

*Lerner v. Fleet Bank,*
    318 F.3d 113 (2d Cir. 2003) ........................................................................62

*Lewis v. Casey,*
    518 U.S. 343 (1996)....................................................................................56

*In re Livent, Inc. Noteholders Sec. Litig.,*
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) .......................................................44

*Marbury Mgmt., Inc. v. Kohn,*
    629 F.2d 705 (2d Cir. 1980) .......................................................................67

*Marvin Lumber v. PPG Indus., Inc.,*
    No. 3-94-545, 1995 U.S. Dist. LEXIS 22256 (D. Minn. Mar. 17, 1995) ............53

*Medical Graphics Corp. v. SensorMedics Corp.,*
    872 F. Supp. 643 (D. Minn. 1994).............................................................69

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
    273 F. Supp. 2d 351 (S.D.N.Y. 2003) .......................................................51

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
    289 F. Supp. 2d 429 (S.D.N.Y. 2003) ...........................................41, 42, 43

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................23, 57

*NM IQ LLC v. McVeigh,*
    No. 03 Civ. 4371,  2004 U.S. Dist. LEXIS 24775 (S.D.N.Y. Dec. 9, 2004)........59

*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,*
    No. 02 Civ. 1230, 2002 U.S. Dist. LEXIS 16995 (S.D.N.Y. Sept. 9, 2002) ........53

*Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,*
    No. 02 Civ. 1230, 2003 WL 21088506 (S.D.N.Y. May 14, 2003).......................51

*Nordale Inc. v. Samsco Inc.,*
    830 F. Supp. 1263 (D. Minn. 1993),
    *aff'd*, 86 F.3d 1179 (Fed. Cir. 1996) ........................................................69

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) .......................................................................49

*O'Shea v. Littleton,*
    414 U.S. 488 (1974).....................................................................................22

*Olsen v. Pratt & Whitney Aircraft*,
   136 F.3d 273 (2d Cir. 1998) ....................................................................................48, 71

*OSRecovery, Inc.* v. *One Groupe Int'l, Inc.*,
   No. 02 Civ. 8993, 2004 WL 238035 (S.D.N.Y. Feb. 9, 2004) ............................................54

*Pani v. Empire Blue Cross Blue Shield*,
   152 F.3d 67 (2d Cir. 1998) ....................................................................................41

*In re Philip Servs. Corp. Secs. Litig.*,
   No. 98 Civ. 0835, 2004 U.S. Dist. LEXIS 9261 (S.D.N.Y. May 24, 2004).........................61

*Press v. Quick & Reilly, Inc.*,
   218 F.3d 121 (2d Cir. 2000) ....................................................................................*passim*

*Rombach v. Chang*, 3
   55 F.3d 164 (2d Cir. 2004) ....................................................................................*passim*

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ....................................................................................58

*SEC v. Zandford*,
   535 U.S. 813 (2002)....................................................................................64

*In re Salomon Analyst AT&T Litig.*,
   No. 02 Civ. 6801, 2004 U.S. Dist. LEXIS 24186 (S.D.N.Y. Dec. 3, 2004).........................51

*In re Salomon Analyst Level 3 Litig.*, Nos. 02 Civ. 6919, 02 Civ. 8114,
   2004 U.S. Dist. LEXIS 24187 (S.D.N.Y. Dec. 3, 2004) ....................................................56

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ....................................................................................9

*Seibert v. Sperry Rand Corp.*,
   586 F.2d 949 (2d Cir. 1978) ....................................................................................23

*Shanahan v. Vallat*,
   No. 03 Civ. 3496, 2004 U.S. Dist. LEXIS 25523 (S.D.N.Y. Dec. 19, 2004)................59, 61

*Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*,
   No. 96 Civ. 3231, 1998 WL 167330 (S.D.N.Y. Apr. 8, 1998)......................................50, 54

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) ....................................................................................60

*Sulton v. Wright*,
    265 F. Supp. 2d 292 (S.D.N.Y. 2003) ................................................................5, 27, 40, 70

*In re Towers Fin. Corp. Noteholders Litig.*,
    No. 93 Civ. 0810 (WK) (AJP), 1995 WL 571888 (S.D.N.Y. Sept. 20, 1995) ....................37

*Transamerica v. Mortgage Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979)................................................................................................................68

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp 2d 678 (S.D.N.Y. 2000) ....................................................................................53

*United Mine Workers of America v. Gibbs*,
    383 U.S. 715 (1966)..............................................................................................................62

*United States v. Russo*,
    74 F.3d 1383 (2d Cir. 1996) ................................................................................................64

*Vogel v. Sands Bros. & Co.*,
    126 F. Supp. 2d 730 (S.D.N.Y. 2001) ................................................................................52

*White v. Melton*,
    757 F. Supp. 267 (S.D.N.Y. 1991) ......................................................................................12

*In re Wonderfair Stores, Inc. of Arizona*,
    511 F.2d 1206 (9th Cir. 1975)..............................................................................................45

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003) ................................................................................57

*In re WorldCom, Inc. Sec. Litig.*,
    No. 03 Civ. 0890, 2004 WL 1097786 (S.D.N.Y. May 18, 2004)..................................58, 60

*In re World Com, Inc. Secs. Litig.*,
    Nos. Civ. A. 02-3288, 03 Civ. 9490, 2004 WL 1435356 (S.D.N.Y. June 28, 2004)...........57

## STATUTES

15 U.S.C. § 77l.............................................................................................................................6, 38

15 U.S.C. § 77m................................................................................................................................56

15 U.S.C. § 77o.............................................................................................................................6, 58

15 U.S.C. § 77p............................................................................................................................5, 62, 63

15 U.S.C. § 77r .................................................................................................... 63

15 U.S.C. § 78j ............................................................................................... 6, 28

15 U.S.C. § 78t ................................................................................................. 62

15 U.S.C. § 78u-4 ........................................................................ 1, 38, 48, 49, 61

15 U.S.C. § 78bb ...................................................................................... 5, 62, 63

15 U.S.C. §§ 80b-1 *et seq* ................................................................................. 68

28 U.S.C. § 1332 ............................................................................................... 62

28 U.S.C. § 1367 ............................................................................................... 62

28 U.S.C. § 1658 ............................................................................................... 56

Minn. State. §§ 325D.09 *et seq* .......................................................................... 8

Minn. Stat. §§ 325D.13 *et seq.* ......................................................................... 68

Minn. Stat. §§ 325D.43 *et seq.* ........................................................................... 7

Minn. Stat. §§ 325D.44 *et seq* .......................................................................... 68

Minn. Stat. §§ 325F.67 *et seq* .............................................................. 7, 68, 74

Minn. Stat. §§ 325F.68 *et seq* ............................................................................. 7

Minn. Stat. §§ 325F.69 *et seq* ........................................................................... 68

## RULES AND REGULATIONS

17 C.F.R. § 240.10b-5 ...................................................................................... 6, 37

17 C.F.R. § 240.10b-10 .................................................................................... 6, 28

17 C.F.R. § 270.12b-1 .................................................................................... 13, 31

17 C.F.R. § 275.204-1 ......................................................................................... 9

Fed. R. Civ. P. 9(b) ..................................................................................... 4, 48, 71

Fed. R. Civ. P. 12 ........................................................................................... 4, 22

## MISCELLANEOUS

Paul F. Roye, Dir. of SEC Div. of Inv. Mgmt., *SEC Testimony Concerning the Mutual Funds Integrity and Fee Transparency Act of 2003*, H.R. 2420, before the House Subcommittee on Capital Markets, Ins. & Govt. Sponsored Enterprises, Committee on Fin. Services (June 18, 2003) ....................................................................12, 13, 27, 28

*Prohibition on the Use of Brokerage Commissions to Finance Distribution*, 60 Fed. Reg. 54,728 (2004) ...........................................................................13, 14, 24, 25

SEC Rel. No. IC-26356 ......................................................................................................25, 27, 33

SEC Rel. No. 33-8358, *Proposed Rule:  Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities* (Jan. 29, 2004)..........................................................................11, 13, 14, 31, 55

## TABLE OF CONTENTS

# TABLE OF AUTHORITIES

Defendants American Express Company ("AMEX"), American Express Financial Corporation ("AMEX Financial"), American Express Financial Advisors Inc. ("AEFA"), and James J. Cracchiolo ("Cracchiolo") (collectively, the "defendants"), by their undersigned attorneys, respectfully submit this memorandum of law in support of their motion to dismiss the consolidated amended complaint (the "complaint" or "Compl."), pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, and Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b) for failure to plead fraud with sufficient particularity.

## PRELIMINARY STATEMENT

The complaint grandly charges that AEFA, by selling its financial plans to the general public, is part of an "insidious scheme" to "steer" unsuspecting citizens to purchase certain mutual funds recommended in the AEFA financial plans. *See* Compl. ¶¶ 1-3.  AEFA recommends these mutual funds, it is alleged, not because of their intrinsic merit, but because these funds supposedly paid "undisclosed kickbacks" to AEFA in the "millions of dollars." *Id.* These "kickbacks," the complaint avers, are the "undisclosed" reason why AEFA recommends particular mutual funds to its clients.  For their damages, the plaintiffs seek restitution of the "undisclosed kickbacks" and the fees paid to AEFA for the financial plans. *See* Compl. ¶¶ 3, 4, 8.  Plaintiffs seek to act as class action representatives for two nationwide classes, one consisting of all AEFA clients who purchased the preferred mutual funds (called "Shelf Space Funds" in the complaint) during the relevant period (the "Funds Class") and the other comprised of those AEFA clients who also purchased financial plans during the relevant period (the "Financial Plan Sub-Class").  Compl. ¶ 2.

1

This grand charge founders upon examination of the plaintiffs who brought these claims, upon review of the ample disclosures that plaintiffs received before purchasing any Shelf Space Funds, and upon an examination of the lack of any damages suffered by the plaintiffs or the putative classes that they seek to represent. Thus, the complaint should be dismissed in its entirety.

The claims asserted by five of the six named plaintiffs, all of whom only bought American Express brand mutual funds ("AXP Funds"), fail because these plaintiffs cannot say they were misled by any of the defendants. *See* Section I, *infra* at 21-26.   Because the plaintiffs only purchased AXP Funds (commonly referred to as propriety funds) from AEFA, they cannot claim to have been misled by AEFA's supposedly undisclosed affiliation with the AXP Funds. Indeed, the disclosures in the prospectuses and financial plans clearly reveal to AEFA clients that the advisor to the AXP Funds, defendant AMEX Financial, makes payments to AEFA to distribute the proprietary AXP Funds and that AEFA receives commissions from AXP Funds for acting as the main distributor of the fund shares.  It is nothing short of fatuous to claim that the public is not informed about potential conflicts of interest of AEFA advisors in recommending AXP Funds.  Far from being "undisclosed" or an illegal "kickback," these payments are laid out for AEFA clients and are recognized as lawful.

For the three plaintiffs who bought financial plans, AEFA plainly discloses its potential conflicts of interest in the plans or brochure distributed to them.  These plans plainly disclose that AEFA generally recommends American Express products and that AEFA advisors may have an incentive to recommend one product over another.  For this reason, AEFA's financial plans cannot properly be said to furtively "steer" the investing public into anything. *See* Section V, *infra* at 45-47.

Even if the Court were to focus on the one plaintiff who made purchases of non-proprietary funds and who is not alleged to have bought a financial plan, the prospectuses and statements of additional information ("SAIs") for the other so-called Shelf Space Funds clearly disclosed the nature of distribution-related payments to AEFA, as the broker-dealer. For example, a representative disclosure states that "[the investment adviser] may, at its own expense, pay concessions in addition to the payments disclosed in the prospectus to dealers that satisfy certain criteria . . . relating to increasing net sales of [the fund's shares] and certain other factors." Putnam Fund for Growth and Income, SAI (Feb. 26, 2001), Exh. B. The disclosure is so common and so ample in the prospectuses and SAIs that defendants have collected a comprehensive cross-section of relevant disclosures – including all of the disclosures for the funds purchased by the six named plaintiffs – and assembled several charts that are attached hereto for the Court's convenience, as follows:

- *Chart of Representative Prospectus Disclosures*, Exh. B (with excerpts from each of the relevant fund families, i.e., AIM, AXP, and Putnam);

- *Prospectus and Statement of Additional Information Disclosures*, Exhs. G-L (each with excerpts of the relevant disclosures for a given named plaintiff); and

- *Chart of Representative [Financial Advisory Service ("FAS")] Brochure Disclosures*, Exh. A (with excerpts of the relevant disclosures from 2001-05, including those provided to plaintiffs in connection with their purchase of financial plans).

These ubiquitous disclosures totally belie the complaint's sensational allegation of "undisclosed kickbacks" and require dismissal of both the federal and state-law claims. *See* Sections II.B, *infra* at 29-31; II.D, *infra* at 32-34; and XIII, *infra* at 68-74.

Even assuming that defendants failed to disclose every last detail – something the law does not require – the omission of the remaining details would have been immaterial as a matter of law. Where, as here, the total fees charged to a given fund are disclosed to investors in the

fund prospectus, there is no further duty to disclose the precise allocation of fees between the various entities such as the fund's investment adviser and the broker-dealer. The law uniformly recognizes that such details are immaterial to an investor's decision as a matter of law because they do not pertain to the *total fee* charged to the retail investor. *See* Section II.C, *infra* at 33-34; II.E, *infra* at 36-37.

Plaintiffs likewise cannot establish that they suffered loss as a result of the "kickbacks." *See* Section III, *infra* at 41-43. Quite apart from the fact that these "kickbacks" were plainly disclosed, these payments do not deplete the assets of the so-called Shelf Space Funds. The complaint attacks two types of payments, both of which it dubs "kickbacks." The first of these, revenue sharing, is paid by the *advisor* to the funds out of its own assets (and not out of the assets of the Shelf Space Funds). The second of these, directed brokerage, is a necessary expense paid by the funds to have broker-dealers, such as AEFA, effect securities transactions for the funds. As some broker must effect these securities transactions, the fund advisor's "direction" of the fund brokerage business to AEFA (as opposed to some other broker-dealer) results in no loss to the Shelf Space Funds.

The complaint suffers from other fatal defects as a result of the disclosure of the "kickbacks" and the lack of any use of fund assets to pay them to AEFA. The disclosure and lack of loss precludes plaintiffs from alleging reliance, *see* Section IV, *infra* at 43-44, and from alleging *scienter* with respect to the claims under the … Securities and Exchange Act of 1934, 15 U.S.C. 78j, *et seq.* ("Exchange Act"), *see* Section VII, *infra* at 54-55.

Perhaps in anticipation of defendants presenting the disclosure to AEFA clients of the payments to AEFA and of potential conflicts of interest, the complaint retreats into generalities. Nowhere does it explain how these particular plaintiffs were supposedly defrauded. Nor, for that

4

matter, does it identify what role any of the defendants, other than AEFA, played in the supposed fraud.  The complaint's persistent refusal to specify any particular facts about either how the named plaintiffs were defrauded or how the defendants, other than AEFA, were part of this "insidious scheme" renders it defective for lack of particularity.  *See* Sektion VI, *infra* at 48-54.[1]

## STATEMENT OF FACTS [2]

The complaint purports to assert claims on behalf of two nationwide classes:  (1) "all persons or entities . . . who were American Express clients between March 10, 1999 and February 9, 2004 (the 'Class Period'), inclusive, and who purchased [Shelf] Space Funds during that period" (the "Funds Class"); and (2) "all persons . . . who also purchased an American Express Financial Plan, Financial Management Proposal or Financial Advisory Proposal (collectively 'Financial Plan') during the Class Period" (the "Financial Plan Sub-Class").  Compl. ¶ 2.

---

[1]    The complaint also suffers from other infirmities.  Plaintiffs lack standing to bring various claims, *see* Point VIII, *infra* at 55; certain of plaintiffs' claims are time-barred under the statutes of repose for the Securities Act and the Exchange Act, *see* Point IX, *infra* at 56-58, the claims asserting "control person" liability should be dismissed where, as here, there is no underlying liability for the alleged primary actors, *see* Section X, *infra* at 58-61, and Plaintiffs' state law claims are also preempted by federal law under the Securities Litigation Uniform Standards Act, 15 U.S.C. §§ 77p, 78bb(f) ("SLUSA"), *see* Section XII, *infra* at 62-68.

[2]    For purposes of this motion, defendants must accept well-pleaded allegations as true, but conclusory allegations and legal conclusions disguised as fact *are not entitled to any presumption of truth*.  *See*, *e.g.*, *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.).  Even allegations of fact "*need not [be] accept[ed] as true . . . [if] contradicted by . . . documents*" that are referred to by the plaintiff or "integral to the complaint."  *Sulton v. Wright*, 265 F. Supp. 2d 292, 295-96 (S.D.N.Y. 2003) (emphasis added) (citations omitted); *see also I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991); ("when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.") (quotations and citations omitted) (*Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y.) *aff'd*, 43 F.3d 1458 (2d Cir. 1994).

On behalf of the Funds Class, plaintiffs claim to have purchased mutual fund shares in the so-called Shelf Space Funds without knowing that these funds made revenue sharing payments or directed brokerage to defendants in exchange for so-called shelf space with AEFA, the broker-dealer. *See* Compl. ¶ 13.  Defendants' supposed lack of disclosure of revenue sharing and directed brokerage arrangements, dubbed "kickbacks" in the complaint, "prevented [plaintiffs] from making fully informed investment decisions."  Compl. ¶ 9.  As a result, plaintiffs allegedly suffered damages when their Shelf Space Funds "underperformed due to the diminished returns . . . that [were] a result of . . . using investor assets to pay kickbacks to American Express to push the Funds."  Compl. ¶ 9.  Now, supposedly alerted to the fraud, plaintiffs seek restitution of "unlawfully . . . obtained fees and charges," compensatory damages, and punitive damages.  *See* Compl. at 53-54 (Prayer for Relief).  Plaintiffs, on behalf of the Funds Class, assert claims under the following federal securities laws and regulations:

(1) the Securities Act of 1933 (the "Securities Act")
- § 12(a)(2) (failure to disclose conflicts of interest in a prospectus or other communication) (codified at 15 U.S.C. § 77*l*(a)(2)) (Count I);
- § 15 (liability of control person defendants for violations of § 12(a)(2)) (codified at 15 U.S.C. 77o) (Count II);

(2) the Securities Exchange Act of 1934 (the "Exchange Act")
- § 10(b) (manipulative or deceptive device in connection with the purchase or sale of a security) (codified at 15 U.S.C. 78j(b));
  - Rule 10b-5(b) (untrue statement or omission of a material fact in connection with the purchase or sale of a security) (promulgated under § 10(b)) (codified at 17 C.F.R. § 240.10b-5) (Count III);
  - Rule 10b-5(a) and (c) (fraudulent scheme or business practice in connection with the purchase or sale of a security) (promulgated under § 10(b)) (codified at 17 C.F.R. § 240.10b-5(a) and (c)) (Count IV);
  - Rule 10b-10 (failure to disclose in transaction confirmations) (promulgated under § 10(b)) (codified at 17 C.F.R. § 240.10b-10) (Count V);

6

- § 20(a) (liability of control person defendants for violations of § 10(b) and rules promulgated thereunder) (codified at 15 U.S.C. 78t(a)) (Count VI).

*See*, *e.g.*, Compl. ¶ 14 (Jurisdiction and Venue), ¶ 81 (Count I under § 12(a)(2) of the Securities Act), ¶ 90 (Count II under § 15 of the Securities Act), ¶ 104 (Count III under § 10(b) of the Exchange Act and Rule 10b-5(b), ¶ 109 (Count IV under § 10(b) of the Exchange Act and Rule 10b-5(a) and (c)), ¶ 119 (Count V under §10(b) of the Exchange Act and Rule 10b-10), and ¶ 125 (Count VI under § 20(a) of the Exchange Act).

Of the six named plaintiffs, three bought Financial Plans from defendant AEFA during the Class Period. *See* Compl. ¶¶ 18-23. These three plaintiffs, suing on behalf of the Financial Plan Sub-Class, claim to have been harmed because they paid "a fee for unbiased expert advice and believed they were receiving such advice when, in fact, [AEFA] financial advisors had an undisclosed conflict of interest, that made it impossible for them to render impartial and objective advice concerning the Shelf Space Funds . . . ." Compl. ¶ 9. For these alleged wrongs, plaintiffs seek rescission of their financial advisory contracts and recovery of all related fees, as well as compensatory and punitive damages. *See* Compl. at 53-54 (Prayer for Relief). Plaintiffs, on behalf of the Financial Plan Sub-Class, assert the claims under the following state statutes or common law:

(1) Minnesota state statutes
- Minnesota Uniform Deceptive Trade Practices Act (codified at Minn. Stat. §§ 325D.43 *et seq.*) (misrepresentations and omissions regarding the true characteristics or quality of goods and services) (Count VII);
- Minnesota Consumer Fraud Act (codified at Minn. Stat. §§ 325F.68 *et seq.*) (misrepresentations, misleading statements, and/or deceptive practices in connection with the sale of merchandise) (Count VIII);
- Minnesota False Advertisement Act (codified at Minn. Stat. § 325F.67) (advertisements containing untrue, deceptive and/or misleading assertions) (Count IX);

- Minnesota Unlawful Trade Practices Act (codified at Minn. State §§ 325D.09 *et seq.*) (misrepresentations of true quality of goods and services in connection with sale of such goods and services)  (Count IX [sic]); and

(2) Breach of fiduciary duty (under common law) (Count X).

*See, e.g.*, Compl. ¶ 14 (Jurisdiction and Venue), ¶ 131 (Count VII for deceptive trade practices), ¶ 137 (Count VIII for consumer fraud), ¶ 145 (Count IX for false advertising), ¶ 150 (Count IX [sic] for unlawful trade practices), and ¶ 157 (Count X for breach of fiduciary duty).

**The Named Plaintiffs**

The six named plaintiffs who purport to represent the Fund Class – Leonard D. Caldwell ("Caldwell"), Carol M. Anderson ("Anderson"),[3/] Donald G. Dobbs ("Dobbs"), Kathie Kerr ("Kerr"), Susan M. Rangeley ("Rangeley"), and Patrick J. Wollmering ("Wollmering") – allegedly purchased Shelf Space Funds through defendant AEFA, as broker-dealer, during the putative class period.  *See* Compl. ¶¶ 18-23 (citing plaintiffs' certifications "previously filed with the Court").

The three plaintiffs who purport to represent the Financial Plan Sub-Class are Caldwell, Kerr, and Wollmering, each of whom allegedly purchased financial plans from an AEFA financial advisor during the putative Class Period.  *Id.*

Other than providing plaintiffs' names and their certifications identifying detailing their purchases of mutual funds or Financial Plans, the complaint contains no factually-specific

---

[3/]      AEFA has no record of a present or former client by the name of "Carol M. Anderson." Plaintiffs' counsel has declined, in the face of repeated requests from defendants' counsel, to provide any additional identifying information regarding Carol M. Anderson and her alleged business dealings with AEFA.  Accordingly, defendants respectfully request that the Court dismiss Anderson's claims unless plaintiffs' counsel can demonstrate in their response to this motion that Anderson was, in fact, an AEFA client. *See Doe v. Shakur*, 164 F.R.D. 359, 360 (S.D.N.Y. 1996) (it is essential under Rule 10(a) that plaintiffs be identified sufficiently to "apprise parties of who their opponents are and to protect the public's legitimate interest in knowing the facts at issue in court proceedings").

allegations regarding any plaintiff.  *See* Compl. ¶¶ 1-17, 24-156 (pp. 1-7, 8-52) (referring to

plaintiffs generally, but not any particular plaintiff(s)).  Plaintiffs do not allege when, where,

precisely how, and by whom (*i.e.*, which AEFA financial advisor) any of these plaintiffs were

allegedly defrauded.

**The Defendants**

Defendant AMEX is a diversified, international financial services company.  It is the

parent company of AMEX Financial, which, in turn, is the parent company of AEFA.  *See*

Compl. ¶¶ 25, 28; *see also* Financial Advisory Service ("FAS") brochure at 23 (effective May 1,

2000 to April 30, 2001) ("2000-01 FAS brochure"),[4/] attached hereto as Exh. A.[5/]  AMEX is not

a broker-dealer, s*ee* FAS brochure at back cover (effective April 1, 2004 to March 30, 2005)

("2004-05 FAS brochure"), attached hereto as Exh. A, and is not alleged to have had any direct

dealings with any of the plaintiffs.

_____

[4/]     The FAS brochure contains all disclosures and information from Part II of Form ADV, as
required by the U.S. Securities and Exchange Commission ("SEC") pursuant to the regulations
under the Investment Advisers Act of 1940 ("IAA").  *See* 17 C.F.R. § 275.204-1(a); 15 U.S.C. §
80b-1, *et seq.*, *see also* 2000-01 FAS brochure at 1, Exh. A.  AEFA provides financial advisory
service clients, including individuals who purchase Financial Plans, with a copy of the FAS
brochure prior to or at the time of purchase.  *See* 17 C.R.F. § 275.204-1(a); *see also* 2000-01
FAS Agreement at 2, Exh. A ("By signing below, you acknowledge 1) having received the
American Express Financial Advisory Service brochure (Form 94001), 2) that you understand
and agree to all the terms contained in this Agreement and the brochure that apply to the
financial service you selected.").

[5/]     On a motion to dismiss, the Court may take judicial notice of and consider:  (1) any
documents referenced or relied on in the complaint, *see*, *e.g.*, *San Leandro Emergency Med.
Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996); (2) any
documents filed publicly or with the SEC, *see*, *e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949
F.2d 42, 48 (2d Cir. 1991); and (3) the price of publicly traded securities, *see*, *e.g.*, *Ganino v.
Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  Here, the 2000-01 FAS brochure (which
includes the FAS Agreement) is referenced in the complaint, *see*, *e.g.*, Compl. ¶¶ 56, 58, and is
filed with the SEC as Part II of Form ADV, *see* 17 C.F.R. § 275.204-1(a); *see also* 2000-01 FAS
brochure at 2, Exh. A, and therefore is properly before the Court.

Defendant AMEX Financial, a wholly-owned subsidiary of AMEX, provides research, analysis and investment management services to the American Express Funds ("AXP Funds"), Compl. ¶ 25, and other affiliates, *see* 2000-01 FAS brochure at 16-17, Exh. A.  AMEX Financial is registered with the U.S. Securities and Exchange Commission ("SEC") as an investment adviser and broker-dealer.  *See* Compl. ¶ 25; *see also* 2000-01 FAS brochure at 16-17, Exh. A. AMEX Financial is the parent company of AEFA and various other wholly-owned subsidiaries. *See* Compl. ¶ 28; *see also* 2000-01 FAS brochure at 16, Exh. A.   AMEX Financial acts as the investment advisor to various AXP Funds, which are alleged to be part of the so-called Shelf Space Funds making improper "kickbacks" to AEFA in exchange for AEFA "steering" plaintiffs into the so-called Shelf Space Funds.  *See* Compl. ¶¶ 1, 3-4.

Defendant AEFA, a wholly-owned subsidiary of AMEX Financial, offers brokerage services, financial planning and financial advisory services to individuals.  *See* Compl. ¶ 28; *see also* 2000-01 FAS brochure at 23, Exh. A.  It is registered as an investment advisor and broker-dealer with the SEC and in every state where such registrations are required.  *See* Compl. ¶ 28; *see also* 2000-01 FAS brochure at 15, Exh. A.  AEFA offers to the public a wide variety of financial planning and advisory services, including financial plans, as well as a diverse array of investment products, including mutual funds.  *See* 2000-01 FAS brochure at 15, Exh. A.  It promotes, sells and distributes such services and products through a network of more than 10,000 financial advisors operating in all 50 states out of more than 620 area offices and 32 market groups.  *See, e.g.*, 2005-05 FAS brochure at 36, attached hereto, Exh. A; *see also* 2001-02 FAS brochure at 30, attached hereto, Exh. A.

James M. Cracchiolo is the Chairman and Chief Executive Officer of AEFA.  *See* Compl. ¶ 26; *see also* 2004-05 FAS brochure at 22, Exh. A.

Other than labeling AMEX, AMEX Financial, and Cracchiolo as "control persons", Compl. ¶ 27, the complaint contains no particularized allegations regarding their respective roles in the alleged scheme relating to the so-called Shelf Space Funds.[6/]

## The American Express Mutual Fund Business

AEFA, acting in its broker-dealer capacity, sells mutual fund shares of affiliates known as AXP Funds, *see* 2000-01 FAS brochure at 15, Exh. A, also referred to as defendants' "proprietary funds". AXP Funds are distributed almost exclusively through AEFA financial advisors. *See, e.g.*, 2000-01 FAS brochure at 16 (stating that "[AEFA] is the principal underwriter (distributor) of the publicly offered [AXP Funds]"), Exh. A; *see also, e.g.*, AXP Blue Chip Advantage fund prospectus, Part 5(f) (effective March 31, 1998) ("The Fund has an exclusive distribution agreement with [AEFA], a wholly-owned subsidiary of [AMEX Financial].", excerpt attached hereto at Exh. L; AXP Equity Value fund prospectus, Part 5(f) (effective May 29, 1998) (same), excerpt attached hereto at Exh. L; *accord* AXP Diversified Equity Income fund prospectus, Part 5(f) (effective Nov. 29, 2002) ("[AEFA] is the Fund's principal underwriter (the Distributor)."), excerpt hereto at Exh. L.

The mutual fund marketplace, however, has changed dramatically in recent years. *See, e.g.*, SEC Release ("Rel.") No. 33-8358, *Proposed Rule: Confirmation Requirements and Point of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other Securities,*

---

[6/]    Plaintiffs do allege that AMEX states "in its public filings, press releases, public statements, marketing materials and on its website," Compl. ¶ 36, that financial advisors provide clients with "unbiased, objective, customized Financial Planning and trustworthy advice" and that clients were "satisfied with American Express's Financial Planning and advice. . . ," *id.* However, even assuming that these statements were inaccurate, they are not the basis for cognizable claims because allegations of fraudulent statements that are unrelated to the intrinsic value of the securities at issue cannot form the basis of a claim for securities fraud. *See, e.g., Laub v. Faessel*, 981 F. Supp. 870,  872 (S.D.N.Y. 1997).

at 10 (June 29, 2004).  The number and variety of mutual funds have grown exponentially and so too have the number of mutual fund investors.  *See id.*; *see also* Paul F. Roye, Dir. of SEC Div. of Inv. Mgmt., *SEC Testimony Concerning the Mutual Funds Integrity and Fee Transparency Act of 2003*, H.R. 2420, before the House Subcommittee on Capital Markets, Ins. & Govt. Sponsored Enterprises, Committee on Fin. Services, at 6 (June 18, 2003).  To meet investor expectations, AEFA has made the transition from its historical role as the primary distributor of its proprietary funds, like the AXP Funds, to a provider of a full range of mutual fund products.  2004-05 FAS brochure at 31, Exh. A.  Today, AEFA offers its customers more than 700 funds from so-called Shelf Space Funds in the "Select Group Program," as well as many more funds that do not participate in the Select Group Program.  *Id.*

By opening its system to provide more investor choice, AEFA has incurred costs in developing and maintaining compliance, training, and transaction processing systems necessary to support this greater range of choice without sacrificing the knowledge and expertise necessary to give high-quality investment advice.  *See id.*  In the face of these added distribution costs, AEFA – like other broker-dealers – receives payments from the non-proprietary funds or their investment advisers.  *See id.* at 31 ("In exchange for certain benefits, such as broader access to American Express financial advisors, fund families in the Select Group Program are required to pay American Express Financial Advisors for participation in the program by sharing with American Express Financial Advisors a portion of the revenue generated from the sales of fund shares."); *see also* Putnam Int'l Growth and Income Fund, SAI (Feb. 26, 2001), Exh. J.[2] ("In

---

[2]      The SEC permits "registrants to incorporate the SAI into the prospectus by reference." *White* v. *Melton*, 757 F. Supp. 267, 269 (S.D.N.Y. 1991).  "[I]f a mutual fund incorporates the Statement of Additional Information by reference, the Statement would be a part of the prospectus as a matter of law." *Id.*

addition, Putnam Retail Management may, at its expense, pay concessions to dealers that satisfy certain criteria established from time to time by Putnam Retail Management relating to increasing net sales of shares of the Putnam funds over prior periods, and certain other factors.").

The complaint challenges two types of payments from the AXP Funds (the proprietary funds) and the funds dubbed as Shelf Space Funds (the participating non-proprietary funds) to AEFA:  revenue sharing and directed brokerage.  *See* Compl. ¶ 7.  The first of these, revenue sharing, is virtually universally employed in the financial services industry to compensate distributors for distribution costs and access by fund companies.  *See*, *e.g.*, *Prohibition on the Use of Brokerage Commissions to Finance Distribution*, 60 Fed. Reg. 54,728 (2004) (to be codified at 17 C.F.R. 270.12b-1); *see also* Roye, *SEC Testimony* at 6.  With the proliferation of funds and the increased competition for access to investors, it is now commonplace for the fund manager or adviser to help cover distribution costs of broker-dealers as a means of improving a fund's distribution channels and access to investors.  *See* SEC Rel. No. 33-8358, at 6-7.  Because a fund manager's fees are usually based on the total amount of fund assets under management, it may be in the manager's interest to attempt to increase investment in the fund by paying a broker-dealer, *out of the fund manager's own assets*, to promote, sell, and distribute shares in the fund; such arrangements are known as "revenue sharing."  SEC Rel. No. 33-8358, at 7, and n.17 ("Broker-dealers also may be paid in other ways for distributing fund shares, such as through revenue sharing payments from a *fund's investment advisor*.") (citations omitted and emphasis added); *see also* 60 Fed. Reg. 54,728 (2004) (noting that brokers may "require [the additional] compensation from the adviser").

Alternatively, some fund managers have chosen to allocate or "direct" the brokerage business of the mutual funds they manage to certain broker-dealers because of "[p]ressure to

distribute fund shares." 60 Fed. Reg. 54,728 (2004).   In "directing brokerage" to a certain

broker-dealer, the managers of the funds may take into account a number of factors, including

the broker-dealers' distribution costs and prior sales of the funds' shares.  *See* SEC Rel. No. 33-

8358.

## AEFA's Revenue Sharing and Directed Brokerage Programs

In 2001, AEFA created the Preferred Provider program,[8/] whereby it provided

participating non-proprietary funds an increased level of access to AEFA advisors and "various

services" in exchange for additional revenue.  *See* 2001-02 FAS brochure at 32, Exh. A.  The

non-proprietary funds in the Preferred Provider program explained revenue sharing in general

terms in their own prospectuses and SAI.[9/]  These funds clearly disclosed that the fund *adviser*

or *manager* may pay, out of its own assets – as opposed to the funds' assets – additional revenue

to dealers as compensation for their net sales and/or distribution assistance.[10/]  *See*, *e.g.*, Putnam

---

[8/]     A list of fund families in the Preferred Provider program is attached at Exhibit C.

[9]     A chart of representative prospectuses and SAI for the funds that plaintiffs allegedly purchased is attached hereto as Exhibit B.  For purposes of this motion and to avoid burdening the Court, defendants submit herewith representative disclosure documents in each of the four relevant fund families – AXP, AIM, IDS, and Putnam. These disclosures cover the fund families purchased by the six named plaintiffs and the revenue sharing and directed brokerage disclosures are similar in all material respects (unless noted) the same within each fund family.  Should the Court wish to have all the prospectuses and SAI for the relevant funds, defendants will readily provide them.

[10/]     Prior to 2001, the relevant fund families' prospectuses contained general disclosures regarding revenue sharing and directed brokerage.  *See*, *e.g.*, The Putnam Fund for Growth and Income, SAI (Feb. 29, 2000), Exh. B ("Putnam Mutual Funds *may*, at its expense, pay concessions . . . to dealers which satisfy certain criteria established from time to time by Putnam Mutual Funds relating to increasing net sales of shares of the Putnam funds over prior periods, and certain other factors. . . . Putnam Management *may* consider sales of shares of the fund (and, if permitted by law, of the other Putnam funds) as a factor in the selection of broker-dealers to execute portfolio transactions for the fund.") (emphasis added).

Fund for Growth and Income, SAI (Feb. 24, 2000), Exh. B ("Putnam Mutual Funds may, at its expense, pay concessions . . . to dealers . . . relating to increasing net sales of shares of the Putnam funds over prior periods, and certain other factors."),[11] *see also* Plaintiff Specific Charts of Representative Disclosures, Exhs. G-L (quoting disclosures provided to each named plaintiff).[12]

The non-proprietary funds in the Preferred Provider program also disclosed the possibility of using "directed brokerage" as an alternative means of compensating broker-dealers. *See* Plaintiff Specific Charts of Representative Disclosures, Exhs. G-L (quoting disclosures provided to each named plaintiff). For example, the AIM Investments Funds disclosed that "AIM may determine target levels of commission business with various brokers . . . based upon

---

Plaintiffs themselves even allege that every Shelf Space Fund disclosed at least the following information during the putative Class Period:

> . . . . [T]he [Fund] Adviser may cause the Fund to *pay a broker or dealer* which provides brokerage and research services to the [Fund] Adviser . . . .

> . . . . [C]ommissions exceeding those which another broker might charge may be paid to broker-dealers *who were selected to execute transactions . . . in part for providing such brokerage and research services.*

> The term "brokerage and research services" includes *advice as to the value of securities, the advisability of investing in, purchasing or selling securities* . . . .

> . . . . Consistent with the Advisory Agreement and applicable rules and regulations, *the [Fund] Adviser may consider sales of shares of the Fund . . . as a factor in the selection of broker-dealers* to execute the Fund's portfolio transactions.

Compl. ¶ 65 (allegedly quoting MFS Investors Growth Stock Fund prospectus (April 1, 2003) (emphasis added).

[11]   *Accord* AXP Growth Fund, Prospectus (Jan. 19, 2001), Excerpts attached at Exhibit B ("[AMEX Financial] or an affiliate may make payments from its own resources, which include management fees paid by the Fund, to compensate broker-dealers or other persons for providing distribution assistance.").

[12]   These charts summarize the prospectus and SAI disclosures in effect at the time of each named plaintiffs purchases of mutual fund shares as listed in their Certifications.

15

the following factors, among others . . . (1) the execution services provided by the broker; (2) the research services provided by the broker; and (3) the broker's interest in mutual funds in general and in the Funds and other mutual funds advised by AIM or AIM Capital Management, Inc. . . ." *See* AIM Constellation Fund, SAI (March 1, 2001), attached hereto as Exhibit A.  The Preferred Provider program continued until early 2003, at which time AEFA undertook a significant restructuring of its revenue sharing program.  *See* 2004-05 FAS brochure at 31, Exh. A.

In June 2003, AEFA discontinued the Preferred Provider program and introduced the Select Group program, and with it, even greater access to AEFA advisors for certain non-proprietary funds.[13]  *See* 2004-05 FAS brochure at 31, Exh. A.  The Select Group program has two levels of funds.  *See id.*  The first tier is known as the Select Group, and funds that participate at this level are placed on similar footing with the AXP Funds (the proprietary funds) in terms of advisor access, education and training, and marketing materials provided to AEFA's clients.  *See id.*  AEFA describes that program in detail to its clients, as follows:

> *Select Group Program. . . . Fund families are selected to participate based on several criteria including brand recognition, product breadth, investment performance, strategic relationships with [AEFA] and its affiliates and training and wholesaling support. In exchange for certain benefits, such as broader access to American Express financial advisors, fund families in the Select Group Program are required to pay [AEFA] for participation in the program by sharing with [AEFA] a portion of the revenue generated from the sales of fund shares. . . .* The fund families in the Select Group Program have the ability to provide [AEFA] financial advisors with educational and training materials, as well as sales and product support. . . . [T]ransaction costs borne by [AEFA] financial advisors can be less for doing business with Select Group fund families than with non-Select Group families. *These factors may lead an [AEFA] financial advisor to recommend a suitable fund from the Select Group over another suitable fund.*

---

[13]   A list of the fund families participating in the Select Group is attached as Exhibit D.