SEP 2 9 2005

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE AMERICAN EXPRESS FINANCIAL ADVISORS SECURITIES LITIGATION | ) Civil Action No.  1:04-CV-1773 <br> ) <br> ) JURY TRIAL DEMANDED <br> ) <br> ) <br> ) |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by and through their counsel, allege the following based upon the investigation of counsel, which included interviews with persons with knowledge of the conduct complained of herein, a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, and media reports about the American Express Company, American Express Financial Corporation ("American Express Financial") and American Express Financial Advisors, Inc. ("American Express Advisors" or "AEFA" n/k/a Ameriprise Financial, Inc. ("Ameriprise")) (collectively, "American Express" or "Defendants") and the facts forming the basis for the allegations herein.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a federal class action arising out of the failure of American Express to disclose an unlawful and deceitful course of conduct they engaged in that was designed to improperly financially advantage Defendants to the detriment of Plaintiffs and other members of the Class (defined herein).  American Express calls its broker-dealers "financial advisors," claiming they will provide "trusted advice" that focuses on an investor's "needs and goals" rather than "promoting specific products or investments."  Recently-learned facts, however, show that

the truth is far different and have revealed an insidious scheme at American Express to sell investors pre-determined Financial Plans and canned "financial advice" and then, pursuant to this advice, push investors into a select number of pre-determined mutual funds that were either proprietary to American Express (the "Proprietary Funds") or were sold by companies that were making undisclosed payments to American Express to promote their mutual funds (the "Shelf Space Funds").  Among other things, American Express had undisclosed kickback arrangements – referred to as buying "shelf space" at American Express – with a number of Shelf Space Fund families whereby American Express received illegal payments and other improper incentives from these Shelf Space Funds in exchange for American Express pushing its clients into the Shelf Space Funds.  In addition, American Express pressured and coerced their financial advisors to have their clients invest heavily in the Proprietary and Shelf Space Funds.

       2.     In other words, instead of offering fair, honest and unbiased recommendations to Plaintiffs and other investors, American Express "financial advisors" gave pre-determined recommendations, pushing clients into a pre-selected, limited number of mutual funds in order to reap millions of dollars in secret kickbacks from the Shelf Space Funds and millions more from sales of American Express Proprietary Funds.  Among other things, Defendants engaged in a course of materially deceptive conduct designed to conceal that American Express was using substantial mutual fund investor assets in a manner that would not generate any benefit for the Class.  Defendants accomplished this through a secret program of coercing their financial advisors to place their clients in Proprietary and Shelf Space Funds rather than competing funds, and concealing the existence of the nature and purpose of their revenue sharing/directive brokerage programs.

3.       As a result of their material omissions and other conduct regarding this scheme –
and the inherent conflicts of interest it created – Defendants are liable for violations of the
Securities Act of 1933 (the "Securities Act"); the Securities Exchange Act of 1934 (the
"Exchange Act"); the Investment Advisers Act of 1940 ("Investment Advisers Act"); the
Minnesota Deceptive Trade Practices Act; the Minnesota Consumer Fraud Act; the Minnesota
False Advertisement Act; the Minnesota Unlawful Trade Practices Act; and under the common
law to a class (the "Class") of all persons or entities, other than Defendants and persons barred
from asserting further claims against AEFA under the *Benacquisto et al. v. American Express
Financial Corp.* settlement agreement, who were American Express clients between March 10,
1999 and April 1, 2004 (the "Class Period"), inclusive, and who purchased Proprietary and/or
Shelf Space Funds during the Class Period through American Express and/or Financial Plans
with AEFA during the Class Period.  The Class is divided into two Subclasses.  The first
Subclass (the "Mutual Fund Subclass") consists of all persons who purchased Proprietary and/or
Shelf Funds during the Class Period through American Express.  The second Subclass (the
"Financial Plan Subclass") consists of all persons who purchased Financial Plans with AEFA
during the Class Period.

4.       During the Class Period, American Express used its nationwide network of
American Express financial advisors and the sale of bogus Financial Plans to improperly steer
Plaintiffs and other members of the Class into the Shelf Space and Proprietary Funds.  Plaintiffs
and other members of the Class paid hundreds of dollars for bogus and misleading Financial
Plans and/or financial advice only to be steered into pre-determined Shelf Space and Proprietary
Funds.  Then, to exacerbate Plaintiffs' injury, Plaintiffs received diminished returns on their
Fund investments as (a) the Proprietary funds typically underperformed comparable non-

American Express funds during the Class Period; (b) Shelf Space Funds improperly used investor assets to pay kickbacks to American Express as part of a *quid pro quo* arrangement to have American Express push even more investors into the Shelf Space Funds. This latter practice has since come under scrutiny of the National Association of Securities Dealers ("NASD"), with the NASD condemning the practice and recommending that proceedings be brought against American Express for potential violations of the federal securities laws and the rules and regulations of the SEC and NASD.

5.     Defendants' motivation, though concealed from investors throughout the Class Period, is now apparent. American Express was motivated to engage in this undisclosed plan and scheme because it (a) reaped millions of dollars in fees for its bogus Financial Plans and investment advice; (b) received undisclosed kickbacks from the Shelf Space Funds in exchange for American Express placing its clients into those Funds; and (c) collected fees for managing and advising Proprietary Funds which were calculated as a percentage of assets under management, and, therefore, tended to increase as the size of the Funds grew.

6.     As detailed below, American Express and its defendant subsidiaries, while claiming to provide unbiased, objective financial planning advice and objective recommendations in the best interest of their clients, made a standard business practice of giving their customers self-serving and biased investment advice for the sole purpose of pushing customers into Proprietary and Shelf Space Funds as part of a secret plan and scheme to improperly generate fees and other revenue.

7.     The Financial Plans sold by American Express financial advisors were neither objective nor tailored to the particular needs of the clients, but rather, were part of the undisclosed and illegal plan and scheme to use American Express's nationwide financial advisor

network to steer unwitting clients, who thought they were getting unbiased advice, into inferior

Proprietary and Shelf Space Funds, pre-determined by American Express's financial advisors.

8.     In truth and in fact, Defendants' undisclosed incentive arrangements operated as a

fraudulent scheme that exploited the misplaced trust of American Express clients.  American

Express advisors were under constant pressure, and had enormous financial incentive to steer

their clients to Proprietary and Shelf Space Funds.  This pressure existed both in the form of

improper revenue-sharing (*i.e.* direct payments from the mutual fund families to the brokerage

house) and directed brokerage payments (*i.e.* allotting trades – and the lucrative commissions

that are a result of the trades – in the securities that made up a mutual fund investment portfolio)

from the Shelf Space Funds as well as coercive tactics by American Express management that

threatened American Express financial advisors with demotion or termination if they failed to

push the Proprietary and Shelf Space Funds.

9.     The advice for which American Express clients paid a fee (plus brokerage

commissions for their transactions) was, therefore, not only biased by American Express's

undisclosed interest in pushing Proprietary and Shelf Space Funds, it was also financially

damaging to American Express clients because the returns on the Proprietary and Shelf Space

Funds were diminished due to the improper payments paid from the assets of Proprietary and

Shelf Space Fund investors that were used as kickbacks to reward American Express for pushing

these Funds.  That advice was also damaging because the Proprietary Funds underperformed

comparable funds that were not affiliated with American Express.

10.     Thus, Plaintiffs and other members of the Class were harmed by Defendants'

fraudulent conduct because they paid American Express a fee for what was described as

unbiased expert advice tailored to the individual needs of each Class Member and believed they

were receiving such advice when, in fact, American Express financial advisors were not experts

or unbiased, and provided predetermined standardized recommendations aimed at maximizing

investment in the Proprietary and Shelf Space Funds. Therefore the Class Members who bought

shares in these Funds did not receive the services for which they paid. Defendants had an

undisclosed, material conflict of interest that made it impossible for them to render impartial

advice. For instance, the Class Members were injured because, based on the advice they

received from American Express financial advisors, they invested in Proprietary Funds that

underperformed their peers, and Shelf Space Funds that suffered diminished returns from the

improper use of investor assets to pay kickbacks to American Express to push these Funds.

11.      As described by former Sen. Peter Fitzgerald (R-Ill.) in a January 28, 2004 *Los

Angeles Times* article about a Senate committee hearing on mutual fund abuses, the mutual fund

industry is "the world's largest skimming operation" and comparable to "'a $7 trillion trough'

exploited by fund managers, brokers and other insiders."

12.      Realizing that disclosure of this scheme and the inherent conflicts of interest it

created would undermine any investment recommendations made by American Express financial

advisors, Defendants failed to disclose any of their improper conduct to Plaintiffs and other

members of the Class, thereby concealing information significant to any reasonable person

deciding how to invest his or her money.

13.      The truth was finally revealed on February 9, 2004, in a *Wall Street Journal*

article about American Express headlined, "Financial Plans: Selling for In-House Gains," which

laid out the undisclosed plan and scheme set forth herein.

14.      Then, in May 2004, American Express disclosed that it had received notification

from the staff of the NASD indicating that it had made a preliminary determination to

recommend that the NASD bring an action against American Express for potential violations of

the federal securities laws and the rules and regulations of the SEC and the NASD.  The NASD

staff's allegations related to American Express's practices with respect to various revenue

sharing and directed brokerage shelf space arrangements pursuant to which American Express

received payments from certain mutual funds as part of a *quid pro quo* arrangement with

American Express to push their funds.  In particular, the NASD has alleged that American

Express (i) failed to properly disclose such revenue sharing arrangements, (ii) failed to properly

disclose such revenue sharing arrangements in its brokerage confirmations, and (iii) improperly

received directed brokerage.  The scheme uncovered by the NASD is essentially the same

scheme alleged herein.

15.     More recently, after a year-long investigation of American Express branch offices

located within New Hampshire, the New Hampshire Bureau of Securities Regulation uncovered

that during the Class Period, American Express engaged in improper directed brokerage

arrangements with "several mutual fund companies," that there were "numerous" revenue-

sharing arrangements with mutual fund companies, and that American Express's sales force was

"heavily incentivized" to sell Shelf Space Funds over other mutual funds available for sale.  *See*

www.sos.nh.gov/securities/EnforceOrderINV04-122.pdf.  The New Hampshire Securities

Regulation Bureau identified "significant conflicts of interest" and concluded that the failure to

disclose these arrangements "operated as a fraud or deceit upon the customers of [American

Express] in the rendering of investment recommendations and advice."  *Id.* at 3. Moreover, the

New Hampshire Bureau of Securities charged that American Express "breached its [fiduciary]

duty by failing to properly disclose to its clients in writing before advice was given [about] the

existence of *material conflicts of interest which could reasonably be expected to impair the rendering of unbiased and objective investment advice." Id.* at 1 (emphasis added).

16.     Significantly, the Bureau found that although American Express made some disclosures regarding its conflicts of interest, the disclosures were "inadequate, obscure, and misleading." *Id.* at 5. The Bureau also found that the inadequate disclosures "failed to reveal the extensive and insidious nature of the conflicts of interest driving the sale of proprietary and specifically selected mutual fund products over non-proprietary products." *Id.*

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 12(a)(2) and 15 of the Securities Act (15 U.S.C. § 77l(a)(2) and § 77(o)); Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. 240.10b-5); the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.43); the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.68); the Minnesota False Advertising Act (Minn. Stat. § 325F.67); the Minnesota Unlawful Trade Practices Act (Minn. Stat. §325D.09); Sections 206 and 215 of the Investment Advisers Act (15 U.S.C. §§ 80b-6 and 80b-15); and common law.

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v); Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa); 28 U.S.C. 1331; 28 U.S.C. 1367(a); 28 U.S.C. § 1391(b); 15 U.S.C. § 80b-14; and supplemental jurisdiction.

19. .    Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members

reside within this District.  At all relevant times Defendant American Express Company was, and is, headquartered in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Lead Plaintiffs**

21.     Lead Plaintiff Leonard D. Caldwell, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Proprietary and/or Shelf Space Funds through American Express during the Class Period. Mr. Caldwell also purchased an American Express Financial Plan during the Class Period.

22.     Lead Plaintiff Carol M. Anderson, as set forth in her certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Proprietary and/or Shelf Space Funds through American Express during the Class Period.

23.     Lead Plaintiff Donald G. Dobbs, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Proprietary and/or Shelf Space Funds through American Express during the Class Period.

24.     Lead Plaintiff Kathie Kerr, as set forth in her certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Proprietary and/or Shelf Space Funds through American Express during the Class Period.  Ms. Kerr also purchased an American Express Financial Plan during the Class Period.

25.     Lead Plaintiff Susan M. Rangeley, as set forth in her certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Proprietary and/or Shelf Space Funds through American Express during the Class Period.

26.     Lead Plaintiff Patrick J. Wollmering, as set forth in his certification previously filed with the Court and incorporated by reference herein, purchased shares or units of certain of the Proprietary and/or Shelf Space Funds through American Express during the Class Period. Mr. Wollmering also purchased an American Express Financial Plan during the Class Period.

**Defendants**

**The Parent Companies and its Executive Officer**

27.     Defendant American Express is incorporated in Delaware and its principal executive offices are located at World Financial Center, 200 Vesey Street, New York, New York.  American Express is in the business of providing travel-related services, financial advisory services and international banking services worldwide.  Financial advisory services and products include financial planning and advice, investment advisory services and various products, including insurance and annuities, investment certificates and mutual funds.

28.     Defendant American Express Financial is incorporated in Delaware and its principal executive offices are located at 50606 AXP Financial Center, Minneapolis, Minnesota. American Express Financial, a wholly-owned subsidiary of American Express, is registered as an investment advisor under the Investment Advisers Act of 1940 and, at all relevant times, provided research, analysis and investment management services for the Proprietary Funds that were under management of one or more of American Express's subsidiaries in exchange for a fee that was calculated as a percentage of assets under management.

29.     Defendant James M. Cracchiolo ("Cracchiolo") has served as President and Chief Executive Officer of American Express Financial and Chairman and Chief Executive Officer of

American Express Advisors since March 2001.  Prior thereto, Defendant Cracchiolo had been

President and Chief Executive Officer of American Express Financial Advisors since June 2000.

Defendant Cracchiolo also serves as an Executive Officer of American Express as its Group

President of Global Financial Services.

30.     Defendants American Express, American Express Financial and Cracchiolo are

herein called the "Control Person Defendants."

**The Broker Dealer**

31.     Defendant American Express Advisors (n/k/a Ameriprise) is a registered broker-

dealer providing various investment services.  American Express Advisors is also the employer

or franchisor of the broker-dealers who sold the Financial Plans and Proprietary and/or Shelf

Space Funds to Plaintiffs and the other Class Members.  American Express Advisors principal

executive offices are located at 50606 AXP Financial Center, Minneapolis, Minnesota.

American Express Advisors is a wholly-owned subsidiary of American Express Financial and an

indirect wholly-owned subsidiary of American Express.

32.     In 2003, American Express Advisors and American Express Financial accounted

for approximately 24% of American Express's $26 billion in revenue and 22% of its net income.

**Nominal Defendants - The American Express Funds**

33.     The American Express Funds listed in Exhibit B are named as nominal defendants

to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of

the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of

adequate remedies.

## SUBSTANTIVE ALLEGATIONS

**Defendants Improperly Used American Express's Financial
Plans and Purported "Unbiased" Financial Advice As A Means To
Induce American Express Clients To Purchase Proprietary and Shelf Space Funds**

34.     American Express Advisors is a registered broker dealer and investment advisor

that maintains a nationwide sales force of approximately 12,000 financial advisors.

35.     American Express Advisors' "core business" is "financial planning and advice,"

according to American Express public filings.  American Express public filings state that

financial advisors "work with retail clients to develop strong relationships and long-term

financial strategies" and American Express cites its client relationships as a competitive

advantage over financial firms whose brokers focus solely on completing brokerage transactions,

without providing financial planning and advice.

36.     The central element of American Express's "financial planning and advice" is the

Financial Plan.  As of the end of 2003, more than one million American Express clients had a

Financial Plan.

37.     According to a number of former American Express financial advisors who

worked for American Express during the Class Period, the Financial Plan was prepared after an

initial consultation between the client and the American Express financial advisor, during which

the client provided extensive personal and financial information to American Express.

According to these former American Express financial advisors, American Express financial

advisors were required to present a canned scripted sales pitch, internally known as the Personal

Money Management Script, which was designed specifically to persuade clients of the purported

need to purchase an American Express Financial Plan.  During the initial consultation, American

Express financial advisors represented that each Financial Plan took between 10 and 30 hours to

create and that each Financial Plan was personalized and customized to meet the financial needs

of each American Express client based upon the expertise of the American Express financial advisor. American Express financial advisors on average charged their clients $500 for each Financial Plan.

### Defendants' Material Omissions Regarding the True Nature of its Advice

38.     In order to convince potential clients to invest their money with American Express, American Express went to great lengths to distinguish itself from other financial brokerage firms. In its public filings, press releases, public statements, marketing materials and on its website, American Express touted the training, ability and experience of American Express's financial advisors to provide American Express clients with unbiased, objective, customized financial planning and trustworthy advice. American Express also represented that most American Express clients were so satisfied with American Express's financial planning and advice that they had recommended American Express to others.

39.     With respect to the training, ability and expertise of American Express's financial advisors, American Express represented that its financial advisors provided "sound advice" and specific recommendations based on the advisors' "expertise," and that American Express advisors were "trusted and knowledgeable." American Express stated as follows:

> **Trained and Qualified Advisors.** Our approach to financial planning is unlike many others, in that we focus on the "big picture" to help ensure no area of your financial life is left unchecked. With that in mind, our financial advisors are trained in all areas of planning, including investment, retirement, college, estate and income tax planning. In addition to their required licenses and registrations, many of our financial advisors expand their training and maintain industry certifications, such as the Certified Financial Planner designation.
>
> *            *            *
>
> Our financial advisors are knowledgeable and highly trained career professionals dedicated to helping you achieve your financial goals.
>
> *            *            *

American Express financial advisors have a wide range of business and educational backgrounds.  They undergo extensive financial planning and product training before becoming registered representatives and working with clients.

*     *     *

American Express financial advisors are required to have appropriate licenses and registrations to transact business, including an NASD registration, required state securities and insurance licenses, and where required, a state investment advisor agent registration.  In addition, financial advisors are required to complete a comprehensive training program developed specifically for the American Express Financial Advisory Service.

*See* http://finance.americanexpress.com; American Express Financial Advisory Service Brochure.  All of these representations were misleading as they omitted material information as explained below.

40.     Defendants went out of their way to stress that the client's relationship with Defendants and the financial advisors was a relationship of trust, and that the clients would receive unbiased, objective, customized financial planning and trustworthy advice.  Typical statements throughout the Class Period include:

American Express strives to help clients achieve their financial objectives prudently and thoughtfully through **a long term relationship based on trusted, knowledgeable advice**.

*     *     *

Get one-to-one advice from an expert to help make your goals become a reality.

Our advisors combine customized planning, sound advice, and the right products to help you meet your unique goals

From college planning to retirement, American Express financial advisors help you achieve your dreams.  And because everyone is different, we believe the best financial plan is one that is customized to your individual needs.

We are committed to **working with you over the long term and providing financial advice that's personalized to you,** your unique situation, and your individual goals – we see it as the key to helping you make the right financial decisions.

We introduced one of the first mutual funds, and today we offer a variety of competitive investment and retirement products – our own and from other leading companies.

      *      *      *

We've built our reputation as a leading financial planning company with individualized, high-quality service. **Today millions of clients trust us for sound financial advice**.

      *      *      *

American Express Financial Advisors' mission is to help clients achieve their financial objective – prudently and thoughtfully – **through a long-term financial planning relationship with a trusted and knowledgeable advisor**.

We are a values-driven company, and our values guide our business decisions. One of those values is, "Clients come first." We are deeply committed to client satisfaction and service.

We emphasize sound financial planning along with a variety of personal financial services and investment opportunities. We can help you identify and then prudently and thoughtfully meet your unique financial concerns and objectives.

      *      *      *

American Express Financial Advisors Inc. (the Company) offers a comprehensive approach to help you uncover and meet your financial needs and objectives.

This service is tailored to address your specific needs and objectives, analyze your current financial situation and goals and present strategies and recommended actions to help you attain your goals.

*See* American Express 2003 10-K [emphasis added]; http://finance.americanexpress.com;

American Express Financial Advisory Brochure. All of these representations were misleading

as they omitted material information as explained directly below.

### Defendants Failed To Disclose The Truth About American Express And Its Financial Advisors

     41.    American Express's representations that it provided its clients with experienced,

unbiased, objective and trustworthy advice were materially misleading as they failed to disclose

the truth about American Express and its financial advisors.

- 15 -

42.     American Express financial advisors were not "knowledgeable and highly trained career professionals," were not "trained in all areas of planning," and did not "undergo extensive financial planning and product training before becoming registered representatives and working with clients." In fact, most of the financial advisors who were American Express employees had no knowledge, experience or training in financial planning, had not been "trained in all areas of planning," and had not undergone "extensive financial planning" training before working with American Express clients. Moreover, American Express capitalized on the inexperience of its workforce in order to have them push clients into the Financial Plans and Proprietary and Shelf Space Funds that were affiliated with American Express or participated in a revenue sharing/directed brokerage kickback scheme.

43.     According to a number of former American Express financial advisors who worked for American Express during the Class Period, American Express financial advisors typically were recent college graduates with no experience or training in the financial industry. According to one of these former financial advisors, American Express liked to hire people right out of college that had no experience with the financial markets or financial planning. According to another one of these former financial advisors, American Express would only give these new employees a couple of weeks training and then pass them off as professional financial advisors. Indeed, American Express actually discouraged people with financial services experience from applying to work at American Express. According to one former American Express financial advisor who worked for American Express during the Class Period, American Express targeted these young, inexperienced employees, rather than experienced financial professionals, because they were more susceptible to being trained by American Express management to engage in the

illegal, improper and unethical activities that were an integral part of American Express's business.

44.     In other words, according to a number of former American Express financial advisors who worked for American Express during the Class Period, once the financial advisors were hired by American Express, they were not trained in financial planning, but rather in how to sell poorly-performing American Express affiliated products, *e.g.*, Proprietary and Shelf Space Funds.

45.     According to a former American Express financial advisor who worked for American Express during the Class Period, during the first few months of employment, virtually all of the training focused on how to sell American Express affiliated financial products, such as the Proprietary and Shelf Space Funds.  This training included memorizing various scripts that financial advisors were required to recite verbatim when meeting with clients.  Additionally, the financial advisors were not trained how to prepare the Financial Plans.  Instead, the financial advisors were instructed simply to obtain basic personal and financial information from their clients so that American Express managers could input that information into a computer software application which, in a few minutes, generated a Financial Plan that invariably recommended purchasing the "happy meal," *i.e.* American Express affiliated financial products (Proprietary and Shelf Space Funds).  According to a former American Express financial advisor who worked for American Express during the Class Period, standard templates were used such that the same products were recommended every time.

46.     According to a former American Express financial advisor who worked for American Express during the Class Period, all American Express financial advisors with less than one year of experience, which made up a significant portion of the financial advisors since

employee turn-over in the first year alone was between 80% and 90%, were required to attend

daily and weekly meetings and classes with their managers.  These meetings and classes were

little more than vehicles for admonishing financial advisors about the importance of selling

American Express affiliated financial products and instructing them in high pressure sales

technique.  According to a former American Express financial advisor who worked for American

Express during the Class Period, management exhorted financial advisors to sell American

Express affiliated mutual funds to everybody.  During these meetings, financial advisors would

be required to present the scripted sales presentation to managers, who played the role of

reluctant clients.  What was not provided at these meetings was substantive training in financial

planning.  As a result, while American Express financial advisors learned how to sell American

Express affiliated financial products, they did not learn how to be financial planners.

47.     Most American Express financial advisors were so unsophisticated and

inexperienced, the scripts they were required to memorize to be used during the sales process

even instructed the financial advisors in proper posture and tone.  For example, in the Personal

Money Management Script that was to used during the initial consultation, at the point in the

consultation when the financial advisor was to begin the process of soliciting sales leads from the

current client, the financial advisor was instructed as follows:  "Tone: Clear and Expectant.

Physical:  Seated upright over table with pen poised over pad."

48.     According to several former American Express financial advisors who worked for

American Express during the Class Period, while American Express publicly touted the

experience of its highly trained career professionals, American Express failed to disclose that

virtually all of American Express financial advisors left American Express within two years,

with the retention rate of first year financial advisors being only between approximately 10% and

20%. Thus, for a new client of American Express, there was a significant likelihood that any particular client's financial advisor would be yet another new American Express employee, completely inexperienced and untrained.

49.     In fact, it was such a significant problem that American Express managers were compensated in large part based upon the retention rate for first year financial advisors. American Express never disclosed the magnitude of the ongoing retention problems at American Express or what ramification this had for American Express clients seeking "knowledgeable," "experienced," and "highly trained career professionals."

50.     The financial planning and advice provided by American Express financial advisors was not "unbiased," "objective," "customized financial planning," or "trustworthy," as represented by American Express. Instead, it was highly biased in favor of American Express. There was no customized financial planning. Instead, there was a standard allocation formula at American Express that all American Express financial advisors were pressured to follow. Thus, regardless of the financial position or goals of any particular American Express client, the result always was the same, a portfolio of between 80% and 90% invested in American Express affiliated financial products, *e.g.* the Proprietary and Shelf Space Funds. A number of former financial advisors have confirmed that this standard portfolio of American Express affiliated financial products that was recommended to all American Express clients who purchased a "Financial Plan" was derogatorily referred to within American Express as the "happy meal."

51.     The following comments and observations were obtained from former American Express financial advisors and managers who worked in American Express offices throughout the United States. These former financial advisors confirm that the financial advice provided by

American Express was highly biased in favor of American Express and that the advice was

neither customized nor objective:

> Anyone who is considering becoming an advisor should stay away from AEFA!! They treat clients only as vehicles to more commission....I have heard advisors calling clients "suckers", "mother-f...ers" and to "f...." the client etc. Can you imagine anyone like that is going to provide unbiased advice??

> Although advisors claim they are able to sell many products offered by several different companies, 90%+ of clients are conned in to proprietary products that are often not competitive with their peers and have long surrender schedule.

> I barely made it through my first year because I refused to sell vuls and annuitys when not appropriate. I can't tell you how many times I got lectured on the importance of making money. A common refrain at AEFA from my managers was "you can't help your clients if you don't earn enough to stay in business, so it is okay to put people in things they don't need."

> Amex wants you to sell their products and makes sure you sell certain products to almost everyone. You have to sell: VULs (variable universal life), variable annuities (they call it RAVA there), disability, long term care, and mutual funds (their fund family made up 95+ percent of funds sold at my old office). In years 3 and beyond can be more selective on what you sell, but years 1-2 it's all what the FVP says.

> The ticket charges are not the same. The ticket charges are much more for non-prop than they are for prop. That's why many P2 advisors still sell prop even though they don't have managers pressuring them, because it costs them more to sell non-prop. P1 doesn't pay ticket charges just P2. No matter what level you are AMEX always has you by the throat. This is Amex's sneaky way with pushing prop. The rules say you can't reward advisors for selling prop but it doesn't say you can't punish them for selling non-prop.

> "The new PMM [Personal Money Management] script before I left said independent and unbiased advice. HAH!!!"

> Also the fact that they charge someone a fee for their supposed "unbiased" advice and then turn around and push their crappy products instead of truly recommending good products is wrong. The fact that they misrepresent themselves and their service by charging high fees for work that is done by inexperienced advisors who have no idea what they are doing. The AMEX motto for hiring advisors is "hire the masses, give them the classes, and then fire their asses"

> The object of the P1 program is to tie up as much money for as long as possible, by making it as difficult/costly as possible for the clients to withdraw their money for any reason.

> The reason that Amex sells more shelf funds in comparison to others is because in the office I was in, it is the only way to earn yourself an office.  You are a cubicle drone until you earn enough prop gdc to put you in an office, currently about 63k on a rolling 12 month period.

52.     The compensation system and reporting structure at American Express was set up to push the sale of American Express affiliated financial products over everything else.  The compensation of the financial advisors depended in large part on the sale of American Express affiliated financial products.  Several former American Express managers have confirmed that the compensation and bonuses of every American Express manager, vice president and group vice president was dependent on the amount of American Express affiliated financial products sold, particularly as compared to the amount of non- affiliated American Express products that were sold.  American Express managers were expected to have the financial advisors under them selling between 80% and 90% of American Express affiliated financial products.  Managers were judged on their ability to influence and control the financial advisors under them, which was reflected primarily in the amount of American Express affiliated financial products sold by those financial advisors.

53.     There was enormous pressure at all levels of American Express to meet or exceed the 80% to 90% American Express sales quota.  There were weekly reports distributed by American Express senior management which detailed the amount and type of American Express affiliated financial products sold by each manager each week.  Thus, every American Express manager, vice president and group vice president was aware every week how his or her office, group or region had performed compared to every other American Express office, group or region.

54.     According to a former American Express manager who oversaw American Express financial advisors during the Class Period, as well as several former American Express Advisors who worked at American Express during the Class Period, with respect to the American Express financial advisors, the pressure to sell American Express affiliated financial products came in many forms.  First, the need to sell American Express affiliated products was reinforced at daily, weekly and monthly meetings with American Express management.  Second, financial advisors were told that they would make more money, receive an office and advance into American Express's management by selling American Express affiliated products.  Typically, the new financial advisors who sold the most Financial Plans and American Express affiliated products were promoted to managerial positions.  Third, financial advisors needed the approval of their managers for all asset allocations.  According to a number of former financial advisors, if a financial advisor proposed an allocation of assets that was less than 80% or 90% of American Express affiliated financial products, the manager would not approve the allocation, or would approve the allocation, but stop providing sales leads and marketing dollars to the financial advisor.  Finally, a financial advisor who persisted in allocating less than 80% of client assets to American Express affiliated financial products would be castigated by management and eventually fired, as this directly and negatively impacted the compensation, bonuses and job advancement of that financial advisor's manager and the vice president of that American Express office.  This is because a manager compensation was directly tied the amount of American Express affiliated products sold by that manager's brokers.

55.     Despite the representations by Defendants that their financial advisors would provide objective advice tailored to the particular needs the clients, the advisors routinely recommended investing in an array of Proprietary Funds shares, most of which were

substantially under-performing comparable non-American Express funds.  This fact was readily

known to Defendants and the financial advisors, because the relative performance of each

Proprietary Fund, compared with its competitors, was published regularly in the Morningstar

reports.

      56.     For the 5-year class period, on a weighted-average basis, the Proprietary Funds

underperformed the average peer group return on investment by an aggregate of more than $3

billion.  Any financial advisor reviewing the cumulative relative performance of the Proprietary

Funds as compared with their peer groups at any time during the Class Period would have seen

that, at least beginning in 1998, on a weighted-average basis, the Proprietary Funds were

substantially underperforming their peers.  Such facts were not revealed to the Class Members by

Defendants or their financial advisors at the time the financial advisors placed the Class

Members in those underperforming funds.

      57.     Defendants' brochures advertising their "American Express Financial Advisory

Service" were deceptive in obscuring the fact that the financial advisors would place their

customers almost exclusively into Proprietary and Shelf Space Funds.  For example, the

brochure covering the time frame May 1, 2000 – April 30, 2001 states, on page 22:

> The specific investment, financial and insurance products
> recommended by your financial advisor in connection with the
> American Express Financial Advisory Service you purchase
> generally are limited to products and services made available by
> American Express Financial Advisors or other subsidiaries of our
> parent company, American Express Financial Corporation.

However, the brochure further represents that the products "made available" by American

Express Financial Advisors and its affiliates include products of potentially numerous other

companies that American Express distributes as an agent for those other companies, stating at

page 33:

> American Express Financial Advisors acts as principal for
> purchases of American Express Funds.  American Express
> Financial Advisors acts as agent for all other investment
> companies whose investment products its distributes….

58.     Similar language and obfuscation exists in the American Express Financial

Advisory service brochures covering the periods May 1, 2001 – April 30, 2002 (*see* pages 19,

27), April 1, 2002 – March 31, 2003 (*see* pages 18, 26), April 2003 – March 31, 2004 (*see* pages

15, 26), and April 1, 2004 – March 31, 2005 (*see* pages 16, 30).

59.     Furthermore, as alleged in more detail below, Defendants and the financial

advisors did not disclose to their prospective customers that they were getting kickbacks from the

Shelf Space Funds in return for recommending to their customers that they purchase shares of

those Funds.

### Defendants' Material Omissions Caused Plaintiffs And
### The Class To Purchase Proprietary and Shelf Space Funds

60.     The Financial Plan was a primary means by which an American Express financial

advisor would recommend American Express affiliated financial products to the client in order to

reach the client's stated financial goals.  American Express senior management required the

financial advisors to aggressively market the Financial Plans to all prospective clients.

According to several former financial advisors, new American Express financial advisors were

not permitted to invest a client's money without first selling that client a Financial Plan.

Moreover, advisors were required to meet minimum, annual quotas for the sale Financial Plans

as well.  There were several reasons for this.  First, the sale of Financial Plans provided

American Express with hundreds of millions of dollars of revenue each year.  Second, having

paid on average $500 for the Financial Plan, clients were far less likely to reject the

recommendations of the American Express financial advisors and invest their money elsewhere.

Third, and most important, the Financial Plans were the primary vehicle by which American Express clients were induced to invest in Proprietary and Shelf Space Funds.

61.    American Express's financial results demonstrate the importance of the Financial Plans as a primary means by which American Express induced clients to invest in these products. During the Class Period, American Express generated hundreds of millions of dollars in revenue from the sale of Financial Plans and other financial advice. Moreover, American Express reaped even more improper gains from investors from the improper kickbacks it received from the Shelf Space Funds that came from investors assets. Finally, American Express benefited from the millions in fees it was able to collect from the Proprietary and Shelf Space Funds.

62.    As a result of this incentive scheme, American Express's primary loyalty was not to its clients and achievement of the clients' financial goals. Rather, Defendants viewed paying American Express clients primarily as a vehicle for generating investment management fees and "revenue sharing" payments so that American Express could achieve American Express's financial goals and increase the profitability of the ultimate corporate parent.

63.    Disclosure of the true motivations of American Express's financial advisors would greatly reduce their influence over American Express clients, and eliminate American Express financial advisors and the Financial Plan as a fee-generating mechanism for American Express. Consequently, American Express's ulterior motives and conflict of interest were not disclosed in any of the Defendants' public filings or promotional material, or in the initial consultation between American Express financial advisors and their clients.

64.    Nowhere do Defendants reveal that their recommendations are based not on their understanding of their client's personal financial needs, but rather, on their incentives to sell American Express affiliated products such as the Proprietary and Shelf Space Funds.

65.     American Express's revenue-sharing/directed brokerage arrangements also presented a clear undisclosed conflict of interest, pitting the financial interest of the American Express financial advisors against that of their clients.  Disclosure of this conflict is clearly material if clients are expected to make informed investment decisions.  However, knowing that a recommendation to purchase one of the Shelf Space Funds would be given lesser weight if clients knew that American Express was paid to give them, American Express was strongly motivated to, and did, conceal the truth regarding American Express's revenue-sharing/directed brokerage arrangements.  Defendants failed to disclose their compensation system and revenue-sharing/directed brokerage arrangements on their website, in sales brochures distributed to their clients or in any other form or manner.

**The Truth About American Express And Its Financial Advisors Begins To Emerge**

66.     On February 9, 2004, *The Wall Street Journal* published an article about American Express under the headline, "Financial Plans: Selling for In-House Gains," which began to reveal the undisclosed plan and scheme set forth herein.  The article stated in pertinent part as follows:

> Investors who sign up for financial plans believe they are getting independent advice tailored to their own needs.  But in one of several "open secrets" that have been hazards for investors in this era, these plans often are little more than sales tools that stand a better chance of making money for advisers and their firm than their clients.
>
> *Critics say advisers rarely disclose that they get big bucks for directing investors to insurance products and mutual funds that provide the highest payouts, rather than offering investments that may pay the adviser less but are better-suited to the client's needs. Any information about potential conflicts is often vague at best and tucked into documents provided to investors when they are already well into the planning process.*
>
> A good financial plan can be useful to chart an investor's future, of course. But "for a number of advisers it is a marketing hook," says Matthew McGinness, an associate director with Cerulli Associates, a market-research firm.

Many financial firms that provide such plans also offer proprietary, or in-house, financial products. ***The potential for conflicts at American Express is intense because of its large stable of in-house mutual funds and insurance products. Proprietary products account for roughly 65% of adviser sales at AmEx, a regulatory filing says.***

***Many AmEx funds have been poor performers. Over the past three and five years, AmEx funds have, on average, ranked in the bottom third of all fund families, according to fund-tracker Morningstar, Inc. And AmEx receives special revenue-sharing payments from 11 outside fund families -- including AIM, Putnam, Strong and Van Kampen.***

An American Express spokesman says the company has been overhauling its fund operation in the past two years in an effort to boost returns. "We are absolutely committed to improving our performance," he says. Though fund performance has improved, AmEx funds still ranked in the bottom half of all fund families in the past 12 months, according to Morningstar.

***American Express Financial Advisors carries a lower profile than the firm's credit-card business, yet it accounted for roughly 24% of American Express's $26 billion in revenue and 22% of its net income last year. Fees from financial plans and other advice services accounted for just $121 million of the unit's $6.2 billion in revenue last year, according to regulatory filings. But the importance of planning to AmEx and the firm's more than 12,000 advisers is far greater: Three-quarters of total sales were generated by financial plans and advice services.***

Financial advisers use the planning process to draw clients in, but they depend on product sales for their livelihood, current and former advisers say. "The financial plan is their big claim to fame. But if that's all you did, you'd starve to death," says Judy Reed, an adviser who left American Express in early 2002 after more than a decade with the company. ***Other former AmEx advisers say that when they presented a financial plan, they dubbed it "The Close," because of its usefulness in selling high-fee products, including proprietary funds and insurance that paid more to the salesmen -- and to the firm.***

An AmEx spokesman says "financial planning is at the core of what we do" and is "the best way to serve the needs of our clients," adding that the firm's approach to financial planning is "comprehensive." While many clients buy financial plans from AmEx and then use the firm to follow its recommendations, others pay for plans and implement the suggestions elsewhere or simply buy products from the firm, the spokesman says. "It's not one size fits all."

***In some cases, the pressure to sell in-house products is overt. Peggy Bigelow, a financial adviser who left American Express in 2001 after a year with the firm, says she was repeatedly criticized for recommending that her clients invest in outside mutual funds. Other former advisers say the training they received***

*focused largely on sales techniques and the company's proprietary insurance products.*

*     *     *

[I]nvestors say they were directed to the firm's in-house mutual funds and other proprietary investments. Pierre Gangloff, a software engineer in Boston, says he was looking for tax and investment advice when he paid $600 for a financial consultation in 2002. Mr. Gangloff says his adviser persuaded him to invest a total of more than $17,000 in a dozen different AmEx mutual funds. Mr. Gangloff also invested $500 a month in an IDS variable universal life policy and moved $8,000 from a money-market account to a less-liquid AmEx Market Strategy Certificate -- a certificate of deposit tied to the Standard & Poor's 500. "I had the impression I would be . . . hiring some professional . . . who would work for me to figure out the best alternatives," he says. "But they were really pushing the American Express brand." [Emphasis added.]

67.   Then, on February 12, 2004, the SEC sanctioned and fined American Express for failing to disclose and give its mutual fund clients appropriate breakpoint discounts in 30% of all eligible mutual fund transactions during 2002 and 2003, costing mutual funds clients millions of dollars in unnecessary charges.

68.   On March 30, 2004, Connecticut bank regulators announced that as a result of their investigation into possible violations of Connecticut securities laws by American Express, it was fining American Express, having determined that certain policies implemented by American Express management may have created conflicts of interest between American Express financial advisors and their clients that were not disclosed to the clients. The Connecticut regulations disclosed that American Express was fining its Financial Advisors $1,000 if they moved a client out of a Proprietary Fund and into a wrap account, even though the sales charges for the client would be reduced by such a move.

69.   In May 2004, American Express disclosed that it had received notification from the staff of the NASD indicating that NASD had made a preliminary determination to recommend that an action be brought against American Express for potential violations of

federal securities laws and the rules and regulations of the SEC and the NASD.  The NASD

staff's allegations related to American Express's practices with respect to various revenue

sharing/directed brokerage arrangements pursuant to which American Express received

payments from certain Shelf Space Funds as *quid pro quo* for American Express pushing the

Shelf Space Funds.  In particular, the NASD has alleged that American Express (i) failed to

properly disclose such revenue sharing arrangements with the Shelf Space Funds, (ii) failed to

properly disclose in its brokerage confirmations such revenue sharing arrangements with the

Shelf Space Funds, and (iii) received directed brokerage from the Shelf Space Funds.

70.     On or about June 27, 2005, the Attorney General for the State of New Jersey

obtained a consent order in the matter of *American Express Financial Advisors Inc.*, CRD #6363.

The Bureau of Securities made findings stemming from an AEFA internal investigation that had

been initiated as a result of customer complaints relating to the forging of client signatures.

These findings included, *inter alia,* that, with respect to AEFA's supervision of Franchisee

Advisors in the State of New Jersey, there were weaknesses in the following areas: enforcement

of procedures, supervision of financial advisory services contracts, and the selection process by

which registered principals historically had been assigned and paid directly by financial advisors

for supervision.  In addition to agreeing to make changes in its business practices and

supervisory procedures, AEFA was assessed a civil monetary penalty in the amount of

$5,000,000 and made restitution in the amount of $450,000.

### The Proprietary and Shelf Space Fund Prospectuses
### Were Materially False And Misleading

71.     Plaintiffs and the other members of the Mutual Fund Subclass were entitled to

receive the prospectuses pursuant to which the Proprietary and Shelf Space Funds shares were

offered (the "Fund Prospectuses").

72.     Mutual fund prospectuses are required to disclose all material facts regarding the mutual funds being sold in order to provide investors with information that will assist them in making an informed decision about whether to invest in a mutual fund.  The law requires that such disclosures be in straightforward and easy to understand language such that it is readily comprehensible to the average investor.

73.     Each of the Fund Prospectuses issued during the Class Period failed to properly disclose to investors material information about the Proprietary and Shelf Space Funds and the fees and costs associated with them.  For example, according to the January 29, 2002 Prospectus for the AXP Intermediate Tax Exempt Fund, which is identical in substance to other proprietary prospectuses issued during the Class Period, under the heading TRANSACTIONS THROUGH AMERICAN EXPRESS BROKERAGE OR THIRD PARTIES states:

> Some organizations may receive compensation from the
> Distributor or its affiliates for shareholder recordkeeping and
> similar services.

74.     The AXP prospectus were deceptive regarding the marketing of their funds by AEFA.  The prospectus states that Shareholders' fund assets were being used to pay for servicing their funds, when in reality, they were being used to pay to push investors into AXP funds.

75.     Furthermore, none of the Shelf Funds adequately disclosed material information about the costs and conflicts of interests associated with the fund.  For example, the April 1, 2003 Prospectus for the Massachusetts Financial Services ("MFS") Investors Growth Stock Fund – one of the Shelf Space Fund families identified in Exhibit A - is identical in substance to all the other Shelf Space Fund Prospectuses issued during the Class Period in that states under the heading PORTFOLIO TRANSACTIONS AND BROKERAGE COMMISSIONS:

> In connection with the selection of broker dealers and the placing of Fund
> portfolio transactions, the Adviser seeks to achieve for the Fund the best overall
> price and execution available from responsible brokerage firms, taking account of

all factors it deems relevant, including by way of illustration: price; the size of the transaction; the nature of the market for the security; the amount of the commission; the timing and impact of the transaction taking into account market prices and trends; the reputation, experience and financial stability of the broker or dealer involved; and the quality of services rendered by the broker or dealer in other transactions.

In the case of securities traded in the over-the-counter market, the Adviser normally seeks to deal directly with the primary market makers, unless in its opinion, best execution may be available elsewhere. In the case of securities purchased from underwriters, the cost of such securities generally includes a fixed underwriting commission or concession. From time to time, soliciting dealer fees are available to the Adviser on tender or exchange offers. Such soliciting or dealer fees are in effect recaptured by the MFS Funds. At present, no other recapture arrangements are in effect.

As permitted by Section 28(e) of the Securities Exchange Act of 1934, as amended, the Adviser may cause the Fund to pay a broker or dealer which provides brokerage and research services to the Adviser an amount of commission for effecting a securities transaction for the Fund in excess of the amount other brokers or dealers would have charged for the transaction if the Adviser determines in good faith that the greater commission is reasonable in relation to the value of the brokerage and research services provided by the executing broker or dealer viewed in terms or either a particular transaction or the Adviser's overall responsibilities to the Fund and its other clients. "Commissions," as interpreted by the SEC, include fees paid to brokers for trades conducted on an agency basis, and certain mark-ups, mark-downs, commission equivalents and other fees received by dealers in riskless principal transactions placed in the over-the-counter market.

Although commissions paid on every transaction will, in the judgment of the Adviser, be reasonable in relation to the value of the brokerage and research services provided, commissions exceeding those which another broker might charge may be paid to broker-dealers who were selected to execute transactions on behalf of the Fund and the Adviser's other clients in part for providing such brokerage and research services.

The term "brokerage and research services" includes advice as to the value of securities, the advisability of investing in, purchasing or selling securities, and the availability of securities or purchasers or sellers of securities; furnishing analyses and reports concerning issues, industries, securities, economic factors and trends, portfolio strategy and the performance of accounts; and effecting securities transactions and performing functions incidental thereto (such as clearance and settlement).

Broker-dealers may be willing to furnish statistical, research and other factual information or service ("Research") to the Adviser for no consideration other than brokerage or underwriting commissions.  Securities may be bought or sold from

time to time through such broker-dealers on behalf of the Fund and the Adviser's other clients.

The Adviser's investment management personnel seek to evaluate the quality of Research provided by brokers. Results of this effort are made available to the Adviser's Equity Trading Department which sometimes uses this information as a consideration in the selection of brokers to execute portfolio transactions. However, the Adviser is unable to quantify the amount of commissions which were paid as a result of such Research because a substantial number of transactions are effected through brokers which provide Research but which were selected principally because of their execution capabilities.

The advisory fee paid by the Fund to the Adviser is not reduced as a consequence of the Adviser's receipt of Research. To the extent the Fund's portfolio transactions are used to obtain Research, the brokerage commissions paid by the Fund might exceed those that might otherwise be paid, by an amount which cannot be currently determined. The Research received is useful and of value to the Adviser in serving both the Fund and other clients of the Adviser. While the Research is not expected to reduce the expenses of the Adviser, the Adviser would, through the use of the Research, avoid the additional expenses which would be incurred if it should attempt to develop comparable information through its own staff.

In effecting portfolio transactions on behalf of the Fund and the Adviser's other clients, the Adviser from time to time may instruct the broker-dealer that executes a transaction to allocate, or "step out," a portion of such transaction to another broker-dealer. The broker-dealer to which the Adviser has "stepped out" would then settle and complete the designated portion of the transaction, and the executing broker-dealer would settle and complete the remaining portion of the transaction that has not been "stepped out." Each broker-dealer would receive a commission or brokerage fee with respect to that portion of the transaction that it settles and completes.

Consistent with the Advisory Agreement and applicable rules and regulations, the Adviser may consider sales of shares of the Fund and of other funds or accounts of the Adviser as a factor in the selection of broker-dealers to execute the Fund's portfolio transactions.

76.    This MFS Fund Prospectus is false and misleading, as are all of the Fund

Prospectuses, in that it fails to disclose that it directed brokerage commissions to American

Express (or to any other broker-dealers) to satisfy pre-determined, negotiated arrangements for

specific amounts of brokerage commissions with American Express. *See also* American Express

Managed Allocation Fund dated November 28, 2003; Van Kampen Growth and Income Fund

dated March 28, 2003, at B-34-36; <u>Putnam Discovery Growth Fund</u> dated April 30, 2003, at 29-40; <u>American Century Growth Fund</u> dated September 29, 2003, at 41; <u>AIM Real Estate Fund</u> dated July 21, 2003, at 33-34; <u>Fidelity Securities Fund</u> dated January 29, 2003; <u>Evergreen Tax Strategy Equity Fund</u> dated March 1, 2003, at 36; <u>Oppenheimer Multiple Strategies Fund</u> dated November 21, 2003; <u>Strong Small Cap Growth Fund</u> dated September 29, 2003, at 40; <u>Columbia Growth Fund</u> dated January 1, 2004, at 75; and  <u>Wells Fargo Growth Fund</u> dated October 31, 2003, at 62-63.

77.    In the SEC's action against MFS filed March 31, 2004 for violation of the federal securities laws, the SEC determined that such statements as those made in the Shelf Space Fund Prospectuses are ***inadequate and in violation of the federal securities laws***.  As stated by the SEC in its action against MFS, such statements "did not adequately disclose to [ ] shareholders that [MFS] allocated fund brokerage commissions to satisfy strategic alliances."  The SEC further explained in its action against MFS that such statements in Prospectuses did not effectively communicate and "***did not adequately disclose that MFS had entered into bilateral arrangements with those broker-dealers to allocate specific negotiated amounts to fund brokerage commissions for specified marketing and distribution services.***" *http://www.sec.gov/litigation/admin/ia-2224.htm*. [Emphasis added].  Here, as the statements in the Fund Prospectuses are identical in substance to the inadequate disclosures made by MFS, the Fund Prospectuses similarly violated the disclosure requirements mandated by the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

78.    As alleged herein, Defendants acted with scienter in that all Defendants conspired to participate in concealing that American Express received cash and other incentives from

mutual fund companies to push the Shelf Space Funds to line their own pockets, which created a conflict in advising client investors.

79.     Defendants further acted with scienter because they knew or were reckless in not knowing that entering into the directed brokerage, revenue sharing and the other improper practices detailed above that provided incentives to push the Shelf Space Funds was illegal, created conflicts of interest and violated SEC and NASD Rules.

80.     Defendants knew or were reckless in not knowing that their failure to disclose their receipt of directed brokerage and revenue sharing payments, their use of intimidation tactics to push Proprietary and Shelf Space Funds over other funds, and the inherent, insurmountable conflicts of interest created by these practices were materially deceptive to the Mutual Fund Subclass Members, and they therefore acted with scienter.

81.     Defendants are also charged with knowledge of NASD Rule 2830(k), which provides, in relevant part, the following:

> No member shall, directly or indirectly, favor or disfavor the sale or distribution of shares of any particular investment company or group of investment companies on the basis of brokerage commissions received or expected by such member from any source, including such investment company, or any covered account.

Defendants knew or recklessly disregarded that their acceptance of directed brokerage commissions from the Shelf Space Funds, in return for steering American Express clients into the Shelf Space Funds, violated Rule 2830(k), and they therefore acted with scienter.

82.     Defendants also acted with scienter in that their senior management actively prepared, and insisted on compliance with, the standardized selling scripts, brochures, and Fund Prospectuses that were materially deceptive as alleged above.  Because senior management of Defendants was actively involved in creating and implementing the marketing programs alleged

above, and as a regular part of their activity compared the return on investment of the Proprietary Funds with competing funds, they were knowledgeable that the impact of the programs they had created would be to place clients with whom they had a fiduciary relationship in historically underperforming funds. They knew or were reckless in not knowing that the public statements issued or disseminated in the name of American Express omitted material information; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their knowledge or reckless disregard for the true facts regarding American Express's directed brokerage, revenue sharing, intimidation tactics and their control over, and/or receipt and/or modification of American Express's materially misleading omissions and/or their associations with American Express which made them privy to confidential proprietary information concerning American Express directed brokerage, revenue sharing and the other improper practices detailed above, culpably participated in the fraudulent scheme alleged herein.

83.    Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for allowing the unlawful practices alleged herein, American Express received at least hundreds of millions of dollars from the sale of bogus Financial Plans and the improper inducements received from the Shelf Space Funds, or the managers or affiliates of the Shelf Space Funds, for recommending the Shelf Space Funds to their unsuspecting clients.

84.    Moreover, Defendants were highly motivated to conceal from Plaintiffs and other Class members, Defendants' receipt of directed brokerage; receipt of revenue sharing payments;